**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(BALTIMORE DIVISION)**

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| **NOVATION COMPANIES, INC.**, *et al.*[1], | * | Case Nos. 16-19745, 19747-19749-DER |
| | * | (Joint Administration Requested) |
| Debtors. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DECLARATION OF RODNEY SCHWATKEN IN SUPPORT**
**OF THE FIRST DAY MOTIONS**

I, Rodney Schwatken, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of Novation Companies, Inc., a Maryland Corporation, f/k/a NovaStar Financial, Inc. ("Novation") and an officer of NovaStar Mortgage Funding Corporation, a Delaware Corporation. ("NMFC"), NovaStar Mortgage LLC f/k/a NovaStar Mortgage, Inc. ("NMI") and 2114 Central, LLC f/k/a Advent Financial Services LLC ("Central") (Novation, NMFC, NMI, and Central each a "Debtor" and collectively, the "Debtors" or the "Company"). In these capacities, I am familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases are: (i) Novation Companies, Inc. f/k/a NovaStar Financial, Inc., (ii) NovaStar Mortgage LLC f/k/a NovaStar Mortgage, Inc., (iii) NovaStar Mortgage Funding Corporation and (iv) 2114 Central, LLC f/n/a Advent Financial Services, LLC.

3.      I submit this declaration (this "First Day Declaration") to provide an overview of the Debtors' chapter 11 cases.  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Background

4.      Novation is a corporation organized under the laws of the State of Maryland with headquarters in Kansas City, Missouri.  Novation is the direct or indirect holding company to the other Debtors herein.

5.      Prior to 2008, the Debtors originated, purchased, securitized, sold, invested in and serviced residential nonconforming mortgage loans and mortgage securities. At the height of its business, Debtor NMI originated more than $11 billion annually in mortgage loans. After the Debtors ceased their lending operations and completed a sale of its servicing portfolio amidst the housing collapse in 2007, the Company has been engaged in the business of acquiring various businesses (explained below).  NMI also retains current investments generating cash flow.

6.      NMI was engaged in the business of mortgage lending and finance.  NMFC facilitated the securitization and sale of loans that were originated by NMI.  Central was engaged in the business of tax refund processing and issuing prepaid debit cards to individuals for their

tax refund deposits.  Central, and its predecessor Advent Financial, provided services to income tax preparers that allowed the preparer to settle income tax refunds in various forms for the tax provider (*i.e.*, debit cards, checks, etc.), with fees netted and paid to the preparer.  Today, Central continues to receive requests from individual taxpayers and tax preparers for information regarding tax filings for tax periods prior to Advent's closing.  In addition, Central receives demands from the Internal Revenue Service for information related to those tax periods.  Central has hired a third party company, Marketsphere, to manage unclaimed funds process and adhere to state escheat regulations.

7.      In October 2012, Novation acquired a majority interest in IVR Central LLC, later renamed Corvisa LLC.  Corvisa developed a cloud-based telecommunications platform.  This business was sold to Shoretel, Inc. in January 2016.  Novation is owed up to $1 million from a holdback from the Shoretel transaction, which amount comes due in January 2017 per the terms of the underlying transaction agreements.

**The Debtors Current Business and Operations**

8.      From April 2015 through approximately the end of 2015 the Company underwent a change in leadership with a majority of the Board being replaced and I was appointed CEO. The current board is composed of 5 members, three of whom joined the Board in 2015 or 2016 to implement a turnaround strategy to acquire an operating business or make other investments for the benefit of the Debtors creditors and other stakeholders.  The Debtors have had a history of buying and selling operating businesses and such acquisitions are permitted under our unsecured Indentures.

9.      The Debtors have five full time employees and one part time employee. As of March 31, 2016, the Company had approximately $29 million in unencumbered cash and

marketable securities.  As of the Petition Date, the Debtors have in excess of $32 million in cash, marketable securities and other current assets.  Included in these marketable securities are mortgage securities that were retained interests of the company's loan securitizations.  These securities continue to be a source of earnings and cash flow.  The Debtors project revenues from these mortgage securities in excess of $400,000 per month for the upcoming four months.

10.    In addition, the Debtors own over-collateralization bonds (the "OC Bonds") with a face amount of more than $50 million.  The current overcollateralization associated with these bonds is approximately $27 million.  In the event the Debtors realize this value, the Debtors will seek to use the value received under the OC Bonds to repay creditors.

11.    Finally, the Debtors have significant net operating losses ("NOL's).  The Debtors intend on preserving and maximizing its NOL's and any other tax attributes for the benefit of creditors and equity holders.  At the end of 2015, the Company had approximately $370 million in NOL's available to offset future Federal taxable income.  The losses were incurred in 2005, 2007 – 2013 and in 2015.  The Company generated taxable earnings in 2014 as a result of the sale of one of its prior businesses, StreetLinks.  The Company has approximately $355 million in unrealized losses on mortgage securities that have not been recognized for tax purposes.  These losses will be recognized if sold or when the securities are deemed to have no fair market value and considered worthless in accordance with the IRS tax code or related guidance.

12.    As explained above, the Debtors have significant unencumbered assets and new leadership. The Debtors intend on utilizing the protections of the Bankruptcy Code to negotiate and propose a chapter 11 plan that maximizes the value of the Debtors' assets for the benefit of all stakeholders, including its bondholders and other creditors, including claims which could arise from the litigation(s) described below.  The Debtors intend to meet with all of its

stakeholders and seek input from such parties with the goal of filing a plan that maximizes value and meets with the approval of all such stakeholders.

## Pending Litigation and Legal Proceedings

13.      On May 21, 2008, a class action case was filed in the Supreme Court of the State of New York, New York County, by the New Jersey Carpenters' Health Fund, on behalf of itself and all others similarly situated. Debtor NMI and Debtor NMFC were named as defendants, along with individual directors, several securitization trusts sponsored by the Company and several unaffiliated investment banks and credit rating agencies. The case was removed to the United States District Court for the Southern District of New York. On June 16, 2009, the plaintiff filed an amended complaint. The plaintiff seeks monetary damages, alleging that the defendants violated sections 11, 12 and 15 of the Securities Act of 1933, as amended, by making allegedly false statements regarding mortgage loans that served as collateral for securities purchased by the plaintiff and the purported class members. On August 31, 2009, the Company filed a motion to dismiss the plaintiff's claims, which the court granted on March 31, 2011, with leave to amend. The plaintiff filed a second amended complaint on May 16, 2011, and the Company again filed a motion to dismiss. On March 29, 2012, the court dismissed the plaintiff's second amended complaint with prejudice and without leave to replead. The plaintiff filed an appeal. On March 1, 2013, the appellate court reversed the judgment of the lower court, which had dismissed the case. Also, the appellate court vacated the judgment of the lower court which had held that the plaintiff lacked standing, even as a class representative, to sue on behalf of investors in securities in which plaintiff had not invested, and the appellate court remanded the case back to the lower court for further proceedings. On April 23, 2013 the plaintiff filed its memorandum with the lower court seeking a reconsideration of the earlier dismissal of plaintiff's

claims as to five offerings in which plaintiff was not invested, and on February 5, 2015 the lower court granted plaintiff's motion for reconsideration and vacated its earlier dismissal. The Debtors believe that they have meritorious defenses to the case and expects to defend the case vigorously.

14.     On June 20, 2011, the National Credit Union Administration Board, as liquidating agent of U.S. Central Federal Credit Union, filed an action against Debtor NMFC and numerous other defendants in the United States District Court for the District of Kansas, claiming that the defendants issued or underwrote residential mortgage-backed securities pursuant to allegedly false or misleading registration statements, prospectuses, and/or prospectus supplements. On August 24, 2012, the plaintiff filed an amended complaint making essentially the same claims against NMFC. NMFC filed a motion to dismiss the amended complaint which was denied on September 12, 2013. The defendants had claimed that the case should be dismissed based upon a statute of limitations and sought an appeal of the court's denial of this defense. An interlocutory appeal of this issue was allowed, and on August 27, 2013, the Tenth Circuit affirmed the lower court's denial of defendants' motion to dismiss the plaintiff's claims as being time barred; the appellate court held that the Extender Statute, 12 U.S.C. §1787(b)(14) applied to plaintiff's claims. On June 16, 2014, the United States Supreme Court granted a petition of NMFC and its co-defendants for certiorari, vacated the ruling of the Tenth Circuit, and remanded the case back to that court for further consideration. On August 19, 2014, the Tenth Circuit reaffirmed its prior decision, and on October 2, 2014 the defendants filed a petition for writ of certiorari with the Supreme Court, which was denied. On March 22, 2016, NMFC filed motions for summary judgment and plaintiff filed a motion for partial summary judgment. Those motions remain pending.  There is a trial date set for January 2017 in this case.  The Debtors believe that they have meritorious defenses to the case and expect to defend the case vigorously.

15.    On February 28, 2013 the Federal Housing Finance Agency, as conservator for the Federal Home Loan Mortgage Corporation (Freddie Mac) and on behalf of the Trustee of the NovaStar Mortgage Funding Trust, Series 2007-1 (the "Trust"), a securitization trust in which the Company retains a residual interest, filed a summons with notice in the Supreme Court of the State of New York, County of New York against Novation and NMI. The notice provides that this is a breach of contract action with respect to certain, unspecified mortgage loans and defendant's failure to repurchase such loans under the applicable agreements. Plaintiff alleges that defendants, from the closing date of the transaction that created the Trust, were aware of the breach of the representations and warranties made and failed to notice and cure such breaches, and due to the failure of defendants to cure any breach, notice to defendants would have been futile. Plaintiff seeks specific performance of repurchase obligations of an unspecified number of the 11,400 loans backing the underlying $1.813 billion offering; compensatory, consequential, recessionary and equitable damages for breach of contract; specific performance and damages for anticipatory breach of contract; and indemnification (indemnification against NMI only). On October 9, 2013, Novation and NMI filed a motion to dismiss plaintiff's complaint. This motion to dismiss was withdrawn after plaintiff filed an amended complaint on January 28, 2014, and on March 4, 2014 Novation and NMI filed a motion to dismiss the amended complaint. That motion remains pending. The Debtors believe that they have meritorious defenses to the case and expect to defend the case vigorously.

### Unsecured Indebtedness

16.    The Debtors have no secured debt. The Debtors assets are unencumbered.

17.    Novation has outstanding three series of unsecured senior notes (collectively, the "Unsecured Notes"), each dated March 22, 2011, between Novation and The Bank of New York Mellon Trust Company, N.A., as Trustee (the "Trustee")(collectively, the "Indentures") with an

aggregate principal balance of $85.9 million. The Unsecured Notes accrued interest at a rate of 1.0% per annum until January 1, 2016 and since then have accrued interest at a rate of three-month LIBOR plus 3.5% per annum. Interest on the Senior Notes is payable on a quarterly basis and no principal payments are due until maturity on March 30, 2033.

18.    Recognizing the impact of the higher interest rate on Novation's resources, Novation reached out to the managers of the Senior Notes to discuss options for restructuring the Senior Notes beginning in December of 2015.  The managers were generally unresponsive to these negotiation efforts. Novation did not make the quarterly interest payments due on March 30, 2016 and June 30, 2016, totaling $1.8 million. Novation received notices of acceleration with respect to the Unsecured Notes, declaring all principal and unpaid interest immediately due and payable. The Debtors actively pursued negotiations with the holders of the Unsecured Notes to either cure the defaults under the terms of the Indentures or alternatively to otherwise modify or restructure the Unsecured Notes outside of court.  Such holders did not agree to any of the proposals made.

19.    The Debtors are hopeful that they can reach agreement with the holders of the Unsecured Notes on a consensual repayment plan.  Alternatively, as the bonds do not mature until 2033 and have very favorable economic terms, the Debtors may seek to reinstate the bonds to the maximum extent allowable under the Bankruptcy Code.  The Debtor Novation can easily cure the payment defaults, having significant unencumbered cash, operating cash flow, and other significant assets described above.

20.    The Debtors are in the process of implementing a strategy and plan to acquire an operating business (or businesses) or making other investments, which plan will be implemented as part of these proceedings.

**Evidentiary Support for First Day Motions[2]**

21.    Concurrently with the filing of its chapter 11 petition, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors operations during the pendency these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on other members of the Debtors' management and the Debtors' professional advisors.

22.    Accordingly, on behalf of the Debtors, I respectfully submit that the Motions should be approved.

**Debtors' Motion for Entry of an Order Directing Joint Administration of
Their Chapter 11 Cases (the "Joint Administration Motion")**

23.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Novation Companies, Inc., and also request that an entry be made on the docket the chapter 11 cases to reflect the joint administration of these chapter 11 cases.

24.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the

---

[2]  Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect all of the Debtors.  Among other things, the entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

25.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**Debtors' Motion For Authorization To File Consolidated Mailing Matrix And Consolidated List Of 20 Largest Unsecured Creditors (the "Matrix Consolidation Motion")**

26.     Pursuant to Rule 1007-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Bankruptcy Rules") a chapter 11 debtor must file a "master mailing matrix" containing the names and addresses of the debtor, all creditors and the taxing authority for each county in which the debtor holds an interest in real estate.  Pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") a chapter 11 debtor must file a list of its 20 largest unsecured creditors.

27.     By this motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated mailing matrix and a consolidated list of their 20 largest unsecured creditors.

28.     There are a significant number of creditors and other parties in interest in these cases. As set forth in the First Day Declaration, Novation Companies, Inc., the lead debtor in these cases, is a company organized under the laws of the State of Maryland with headquarters in Kansas City, Missouri.  Novation Companies, Inc., is the direct or indirect holding company to the other Debtors herein.

29.     The creditors of each of the Debtors will want to be aware of the proceedings of the cases of all four (4) Debtors. Therefore, filing a consolidated list of the 20 largest unsecured

creditors and a consolidated mailing matrix will be beneficial to creditors by providing comprehensive notice for all four (4) of the Debtors' chapter 11 cases. A consolidated list of the 20 largest unsecured creditors and a consolidated matrix is also consistent with the joint administration of the Debtors' cases.

30.    Accordingly, on behalf of the Debtors, I respectfully submit that the Matrix Consolidation Motion should be approved.

**Debtors' Motion Pursuant to Sections 1105(a) and 345(b) of the Bankruptcy Code, Fed R. Bankr. P. 2015 Authorizing the Debtors(A) to Continue Existing Cash Management, and (B) To Maintain Existing Bank Accounts and Business Forms (the "Cash Management Motion")**

31.    The Debtors request the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

32.    In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions.  If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' businesses at this critical time.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure

that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

33.     In addition, the Debtors further request that the Court authorize the Banks to: a accept, honor, and rely upon all representations from the Debtors as to which checks should be honored or dishonored consistent with orders entered by this Court, whether the checks are dated prior to, on, or subsequent to the Petition Date and whether or not the Bank believes that payment is authorized by some other order of this Court; provided, that the Bank shall not be held liable for improperly honoring or dishonoring any check, draft, or automated clearing house payment presented, issued, or drawn on the Bank Accounts on account of a claim (as such term is defined in 11 U.S.C. § 101(5)) arising before the Petition Date, which, at the direction of the Debtors was requested to be honored or dishonored, as the case may be, unless the Bank's actions were grossly negligent.

34.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

35.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**Debtors' Motion Pursuant to Sections 105(a), 363, and 507(a) for (A) an Order Authorizing the Debtors to (I) Pay Wages, Salaries, and Other Compensation, (II) Maintain Benefits, and (III) Pay Reimbursable Employee Expenses and (B) An Order Authorizing and Directing Bank and Other Financial Institutions to Pay All Checks and Electronic Payment Requests <u>Made by the Debtors Relating to the Foregoing (the "Wages and Benefits Motion")</u>**

36.     The Debtors request the authority, in their sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employees and the Benefits.

37.     As discussed above, as of the Petition Date, the Debtors' workforce is comprised of six Employees (the "<u>Employees</u>").  Five Employees are paid on salary basis, and one Employee is hourly.  The Employees are employed through ADP, LLC.

38.     The Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors.  In the absence of such payments, the Debtors believe their Employees may seek alternative employment opportunities, thereby hindering the Debtors' ability to meet their customer obligations and likely diminishing creditors' confidence in the Debtors.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

39.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly,

13

on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

**Debtors' Motion for Entry of an Order Authorizing Debtor Novation Companies, Inc. to Reject Unexpired Leases *nunc pro tunc* to the Petition Date (the "Lease Motion")**

40.     Debtor NCI seeks to reject two leases to which NCI is a lessee.

41.     NCI is a subtenant to that certain sublease agreement (the "Tampa Sublease"), dated as of April 15, 2014, between itself and Streetlinks LLC (the "Sublessor") for property located at 5701 East Hillsborough Avenue, Suite 1100, Tampa, Florida 33610 (the "Tampa Property").[3]

42.     NCI is also a lessee to that certain equipment lease (the "Equipment Lease" and, together with the Tampa Sublease, the "Leases"), dated as of August 21, 2012, between itself and Richo Americas Corporation, provided by GE Capital Information Technology Solutions (the "Lessor" and, together with the Sublessor, the "Lessors"), for a printer copier (the "Equipment").

43.     The Tampa Property and Equipment are no longer necessary to NCI's ongoing business operations and present a burdensome liability.  NCI will save approximate $988,000[4] by rejecting the Leases.

---

[3] The sublease relates to that certain master office lease, dated as of May 17, 2012, among NNN Netpark, LLC, NNN Netpark 1, NNN Netpark 2, LLC, NNN Netpark 3, LLC, NNN Netpark 4, LLC, NNN Netpark 5, LLC, NNN Netpark 6, LLC, NNN Netpark 7, LLC, NNN Netpark 8, LLC, NNN Netpark 9, LLC, NNN Netpark 10, LLC, NNN Netpark 12, LLC, NNN Netpark 13, LLC, NNN Netpark 14, LLC, NNN Netpark 15, LLC, NNN Netpark 16, LLC, NNN Netpark 17, LLC, NNN Netpark 18, LLC, NNN Netpark 19, LLC, NNN Netpark 20, LLC, NNN Netpark 21, LLC, NNN Netpark 22, LLC, NNN Netpark 23, LLC, NNN Netpark 24, LLC, NNN Netpark II, LLC, NNN Netpark II 1, LLC, NNN Netpark II 2, LLC, NNN Netpark II 3, LLC, NNN Netpark II 4, LLC, NNN Netpark II 5, LLC, NNN Netpark II 6, LLC, NNN Netpark II 7, LLC, NNN Netpark II 8, LLC, NNN Netpark II 9, LLC, and NNN Netpark II 10, LLC as Landlords, acting by and through Daymark Properties Realty, Inc. as Authorized Agent, and Streetlinks LLC as Tenant.

[4] The total due for the remainder of the Tampa Sublease and the termination quote for the Equipment Lease.

44.     NCI hopes to minimize unnecessary post-petition obligations by rejecting these burdensome Leases under section 365, and seek that such rejection be effective *nunc pro tunc* to the Petition Date.

45.     I believe that the relief requested in the Lease Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lease Motion should be approved.

**Debtors' Application Pursuant to Section 327(A) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Employ and Retain Olshan Frome Wolosky LLP as Co-Counsel for the Debtors and the Debtors in Possession (the "Olshan Retention")**

46.     The Debtors seek to employ and retain Olshan as their bankruptcy co-counsel with regard to the filing and prosecution of these chapter 11 cases and all related proceedings. Accordingly, the Debtors respectfully request entry of an order pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing them to employ and retain Olshan as their bankruptcy counsel under a general retainer to perform the legal services that will be necessary during these chapter 11 cases, pursuant to the terms set forth in this Application and the Friedman Declaration, effective as of the Petition Date.

47.     The Debtors seek to retain Olshan as their counsel because of its prior and ongoing representation of and familiarity with the Debtors and because of its extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and because of Olshan's expertise, experience and knowledge practicing before this Court. The Debtors also seek to retain Shapiro Sher Guinot & Sandler as its co-counsel due to its experience and knowledge in the field of

15

debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and its expertise, experience and knowledge practicing before this Court.

48.     In preparing for its representation of the Debtors in this case, Olshan has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these chapter 11 cases.

49.     I believe that the relief requested in the Olshan Retention is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Olshan Retention should be approved.

**Application Pursuant to Section 327(A) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Employ and Retain Shapiro Sher Guinot & Sandler as Co-Counsel for the Debtors and the Debtors in Possession (the "SSGS Retention")**

50.     The Debtors seek to employ and retain Shapiro Sher as their bankruptcy co-counsel with regard to the filing and prosecution of these chapter 11 cases and all related proceedings. Accordingly, the Debtors respectfully request entry of an order pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing them to employ and retain SSGS as their bankruptcy co- counsel under a general retainer to perform the legal services that will be necessary during these chapter 11 cases, pursuant to the terms set forth in this Application and the Sher Declaration, effective as of the Petition Date.

51.     The Debtors seek to retain Shapiro Sher as their co-counsel because of its extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and because of Shapiro Sher's expertise, experience and knowledge practicing before this Court.  The Debtors also seek to retain Olshan Frome Wolosky LLP due to its prior representation of and familiarity with the

16

Debtors, as well as its experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

52.     In preparing for its representation of the Debtors in this case, Shapiro Sher has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these chapter 11 cases.

53.     I believe that the relief requested in the SSGS Retention is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the SSGS Retention should be approved.

**Debtors' Motion for Entry of an Order Pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code (A) Limiting certain Transfers of Claims Against the Debtors and (B) Approving Related Notice Procedures (the "NOLs Motion")**

54.     As more fully described in the NOLs Motion, the Debtors have had significant operating losses in the recent past. Since calendar tax year 2005, the Debtors have not incurred significant federal income tax liability and in fact have incurred substantial net operating losses and net built-in losses on certain mortgage securities (collectively, the "NOLs").[5] The Debtors' NOLs are an extremely valuable asset because under the Internal Revenue Code, the Debtors can carry forward their NOLs to offset their future taxable income for up to twenty (20) taxable years and thereby reduce their future aggregate tax obligations.[6]

55.     The Debtors' NOLs are currently estimated to be approximately $728 million, which, based on the applicable 35% Federal corporate tax rate now in effect, represent

---

[5] NOLs can be used as either "carrybacks" (where the corporation uses the NOLs to offset taxable income for up to two previous taxable years) or "carry overs" to offset taxable income for up to twenty taxable years into the future).

[6] *See* 26 U.S.C. § 172.

approximately $254.8 million in potential tax savings to be utilized in future years. The NOLs consist of approximately $370 million in losses incurred in 2005, 2007-13 and 2015 and (ii) approximately $355 million in unrealized losses that have not yet been recognized. These tax savings -- and the accompanying increase in the Debtors' cash flow -- will greatly facilitate the Debtors' successful reorganization. As one bankruptcy court has recognized, "[W]hat is certain is that the NOL has a potential value, as yet undetermined, which will be of benefit to creditors and will assist [the debtors] in their reorganization process. This asset is entitled to protection while [the debtors] move forward toward their reorganization." *See In re Phar-Mor, Inc.*, 152 B.R. 924, 927 (Bankr. N.D. Ohio 1993).

56.     The Debtors request that the Court order that certain notice and waiting periods govern certain significant transfers of claims against, the Debtors. This will provide the Debtors with advance notice of certain transfers that may jeopardize their NOLs, and will enable the Debtors, if necessary, to obtain substantive relief from this Court to protect their NOLs. The limited relief requested in the NOLs Motion will enable Debtors to closely monitor certain transfers claims, and ensure that the Debtors are in a position to act expeditiously to prevent such transfers if necessary, and thus allow the Debtors to protect and preserve their NOLs. Specifically, the Debtors request that the Court enter an Order approving the procedures set forth on Exhibit B to the NOLs Motion.

57.     I believe that the relief requested in the NOLs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the NOLs Motion should be approved.

**Debtors' Motion Pursuant To Bankruptcy Rule 1007(C) For An Extension Of Time To File Schedules Of Assets And Liabilities, Schedules Of Executory Contracts And Unexpired Leases, And Statements Of Financial Affairs (the "Schedules Motion")**

58.     Due to the complexity of their organizations, the Debtors anticipate that they will be unable to complete their Schedules in the 15 days provided under Bankruptcy Rule 1007(c). In view of the amount of work entailed in completing the Schedules and the competing demands upon the Debtors' employees and professionals to assist in the Debtors' chapter 11 cases during the initial post-petition period, the Debtors will not be able to properly and accurately complete the Schedules within the required 15-day time period.

59.     At present, the Debtors anticipate that they will require at least an additional 30 days to complete their Schedules. The Debtors therefore request that the Court extend the 15-day period by an additional 30 days.

60.     The Debtors submit that the complexity of the Debtors' organization, the substantial amount of information that the Debtors must assemble and compile, and the number of employee and professional hours required to complete the Schedules, all constitute good and sufficient cause for granting the requested extension of time.

61.     I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Motion should be approved.

**DEBTORS MOTION FOR ENTRY OF AN ADMINISTRATIVE ORDER PURSUANT TO 11 U.S.C. §§ 105, 328 AND 331 ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF PROFESSIONALS**

62.     The Debtors request the entry of an order establishing an orderly, regular process for the allowance and payment of compensation and reimbursement of reasonable, necessary expenses for attorneys and other professionals whose retentions are approved by this Court

pursuant to sections 327, 328, or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.

63.     The Debtors believe this will allow them to monitor the costs of administration and is an efficient and appropriate cash management procedure.  This procedure will also allow the Court and parties-in-interest to monitor and ensure the reasonableness and necessity of the compensation and reimbursement sought.   Accordingly, on behalf of the Debtors, I respectfully submit that the Administrative Fee Motion should be approved.

64.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: July 20, 2016

NOVATION COMPANIES, INC.,
on behalf of itself and its affiliated Debtors
and Debtors in Possession

By: /s/ *Rodney E. Schwatken*
    Name: Rodney E. Schwatken
    Title: Chief Executive Officer