IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| NOVATION COMPANIES, INC., *et al.*,[1] | Case Nos. 16-19745, 19747-19749 DER |
| | (Jointly Administered) |
| Debtors. | |

**OBJECTION OF THE CREDITORS' COMMITTEE TO THE DISCLOSURE STATEMENT REGARDING JOINT CHAPTER 11 PLAN OF REORGANIZATION OF (I) NOVATION COMPANIES, INC. AND (II) NOVASTAR MORTGAGE LLC**

The Creditors' Committee (the "Committee"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Disclosure Statement Regarding Joint Chapter 11 Plan of Reorganization of (i) Novation Companies, Inc. and (ii) NovaStar Mortgage, LLC* [Doc. No. 303] (the "Disclosure Statement").[2]  In support of the Objection, the Committee respectfully states as follows:

**Preliminary Statement**

1.      The Committee files this Objection because the Disclosure Statement fails to provide adequate information and parts of the Plan are patently not confirmable.

2.      The Plan proposes to pay unsecured creditors, other than the Holders of the Notes and Holders of the RMBS Litigation Claims, in full with cash on hand over one year.  The Plan

---

[1]      The Debtors in these chapter 11 cases are: (i) Novation Companies, Inc. f/k/a NovaStar Financial, Inc., (ii) NovaStar Mortgage LLC f/k/a NovaStar Mortgage, Inc., (iii) NovaStar Mortgage Funding Corporation and (iv) 2114 Central, LLC f/k/a Advent Financial Services, LLC.

[2]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Disclosure Statement or the *Debtors' Joint Chapter 11 Plan of Reorganization of (i) Novation Companies, Inc. and (ii) NovaStar Mortgage LLC* [Doc. No. 302] (the "Plan"), as applicable.

proposes to reinstate the Notes, while existing equity holders would retain their interests. Although neither the Plan nor the Disclosure Statement is clear about the proposed treatment of the RMBS Litigation Claims, the Debtors' financial projections suggest that the Holders of the RMBS Litigation Claims would receive nothing.

3.     To achieve a sufficiently high return on their assets to make the interest payments on the reinstated Notes that would be payable over the next sixteen years and then payoff the approximately $85.9 million principal balance in 2033, the Debtors (i) propose to invest in a new business in the healthcare industry that they project will have constant annual growth of 5% and fixed expenses as a percentage of revenue for the next sixteen years; (ii) forecast that the Residual Bonds will provide $46.7 million in cash flow; and (iii) forecast that they will achieve a 10% return on the investment of excess cash each year for the next sixteen years.

4.     As currently drafted, the Disclosure Statement omits many of the material risks that could jeopardize the success of the Plan.  The Disclosure Statement thus fails to provide adequate information as required by Bankruptcy Code section 1125.

5.     As set forth more fully herein, the Disclosure Statement fails to provide adequate information concerning:

- the HCS Transaction, the Debtors' related financial projections, and related material risks;

- the treatment of the RMBS Litigation Claims and related material risks;

- the Residual Bonds and related material risks;

- the Debtors' proposed 10% investment return rate for excess cash and related material risks;

- reinstatement and cure of the Notes and related material risks;

- the reorganized Debtors' proposed officers, directors, and other insiders;

- the potential divestment of HCS by Holdings and related material risks;

2

- Oberon's relationship with Butler/HCS; and

- the Third-Party Releases.

6.      To comply with the requirements of section 1125 of the Bankruptcy Code, the Disclosure Statement must be revised to provide adequate information about each of these issues.

7.      In addition, the Disclosure Statement should be denied because the Plan is patently not confirmable as submitted.  Specifically, the Plan is patently not confirmable because the Plan (i) does not provide for the payment of default interest on the Notes, which is required to reinstate the Notes under Bankruptcy Code section 1123(d); (ii) purports to leave Class 2 unimpaired while impairing those Holders' rights through the Third Party Release; and (iii) impermissibly artificially impairs Classes 3a and 3b by proposing to pay creditors in those Classes in full in cash over one year even though such creditors could be paid immediately.

## Background

### A.      General Background

8.      On July 20, 2016 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On July 25, 2016, the Court entered an order directing joint administration of the Debtors' bankruptcy cases under Case No. 16-19745-DER (the "Bankruptcy Cases").

9.      Throughout these Bankruptcy Cases, the Debtors have pursued a strategy of using their liquid cash and securities to attempt to purchase an operating business.  The Disclosure Statement indicates that the Debtors evaluated 43 different operating businesses as potential acquisition targets throughout these Bankruptcy Cases.  Disclosure Statement, at § 4.03(1).

### B.      The Debtors' Proposed Reorganization

10.      Ultimately, on February 1, 2017, Debtor Novation Companies, Inc. ("Novation") and Novation's non-Debtor subsidiary Novation Holding, Inc. ("Holding"), entered into a Stock

3

Purchase Agreement (the "Purchase Agreement"), with Healthcare Staffing, Inc. ("HCS"), and Butler America, LLC ("Butler"). Through the Purchase Agreement, which is attached as Exhibit D to the Disclosure Statement, the Debtors seek to acquire all of Butler's interest in HCS (the "HCS Transaction").

11.     On February 14, 2016, the Debtors filed the Plan and the Disclosure Statement.

12.     Through the Plan, Novation and NovaStar Mortgage LLC f/k/a NovaStar Mortgage, Inc. ("NMI", and together with Novation, the "Plan Debtors") are seeking Court approval of the Purchase Agreement in order to close the HCS Transaction.

13.     In addition to completing the HCS Transaction, the Plan also contemplates reinstating the notes issued under the Indentures (the "Notes") pursuant to section 1124 of the Bankruptcy Code. Disclosure Statement § 2.02. The Debtors propose to make the interest payments due over the life of the Notes of over $50 million, and the ultimate principal payments on the Notes of over $85 million, from (i) the excess cash flows from the ownership of HCS; (ii) the cash flows the Debtors project that they will receive from certain of the Debtors' overcollateralization and residual bonds (collectively, the "Residual Bonds"); and (iii) interest earned on excess cash. *See* Disclosure Statement, §§ 2.02, 2.03, and Disclosure Statement, Exhibit B; *see also* Schedules of Assets and Liabilities of Novation [Doc. No. 97] (the "Novation Schedules"), at Part 4, No. 16.

## Objection

### A.     Legal Standard

14.     This Court should not approve the Disclosure Statement because it fails to provide "adequate information" as required by section 1125 of the Bankruptcy Code. Section 1125 defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the

debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1); *see also In re A.H. Robins Co., Inc.*, 163 F.3d 598 (Table), No. 98-1080, 1998 WL 637401, at *3 (4th Cir. 1998) (unpublished decision) (disclosure statement must provide "sufficient information to permit a reasonable, typical creditor to make an informed judgment").

15. Section 1125 of the Bankruptcy Code further provides that "in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1). Courts have identified a nonexclusive list of categories of information that generally should be included in a disclosure statement. *See, e.g.*, *Scioto Valley Mortgage Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (identifying nineteen different types of information that should be addressed in a disclosure statement). Importantly, these categories include, among others:

- the anticipated future business performance of the debtor,

- the source of the information provided in the disclosure statement,

- information regarding future management of the reorganized debtor,

- information regarding claims against the estate,

- information relevant to the risks being taken by the creditors, and

- a summary of the plan of reorganization, along with any financial information, data, valuations or projections relevant to the creditors' ability to evaluate the merits of the proposed plan.

*See Scioto Valley Mortgage Co.*, 88 B.R. at 170-71; *In re Ferretti*, 128 B.R. 16, 18–19 (Bankr. D.N.H. 1991).

16.     The disclosure statement is a primary source of information upon which creditors should rely in making an informed judgment about how they will vote on the plan of reorganization. *See In re California Fid., Inc.*, 198 B.R. 567, 571 (9th Cir. B.A.P. 1996) ("The purpose of a disclosure statement is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan."); *In re Scioto Valley Mortgage Co.*, 88 B.R. at 170. Courts have recognized that "[t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003).

**B.    The Disclosure Statement Fails to Satisfy Section 1125(b) of the Bankruptcy Code Because the Plan is Patently Unconfirmable**

17.     Courts have held that when a disclosure statement relates to a plan that is not confirmable on its face, a court should not approve the disclosure statement and need not reserve such ruling for confirmation. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.").

18.     As courts have recognized, a plan is "patently unconfirmable" where two conditions are met: (i) there are defects in the plan that cannot be overcome by creditor voting and (ii) those defects concern matters that are not based upon disputed material facts. *Id.* at 154-55; *see also In re K Lunde, LLC*, 513 B.R. 587, 591 (Bankr. D. Colo. 2014) (analyzing patent unconfirmability at the disclosure statement stage where "theoretically voting results could overcome" the classification defect, but without the classification scheme at issue, the debtors

would be unable to secure an impaired accepting class, thereby "deem[ing] this confirmation issue appropriate for adjudication in advance of a confirmation hearing."); *In re Moorpark Adventure*, 161 B.R. 254 (Bankr. C.D. Cal. 1993) (denying approval of debtor's disclosure statement when the court determined that the plan could not be confirmed due to the debtor's improper classification).

      **(i)**      **The Plan is Patently Unconfirmable Because it Fails to Provide for the Payment of Default Interest on the Notes**

19.      The Plan provides that in connection with the reinstatement of the Notes, the Debtors will pay only non-default interest owing on the Notes. Plan § 3.02(b)(2)(B). To reinstate the Notes under section 1123 of the Bankruptcy Code, however, the Debtors must pay interest at the default rate. *In re New Investments, Inc.*, 840 F.3d 1137, 1139-42 (9th Cir. 2016) (holding that to render claimant unimpaired and to comply with 1123(d), post-default interest must be paid to cure a default, stating "[w]e hold that *Entz-White*'s rule of allowing a curing debtor to avoid a contractual post-default interest rate in a loan agreement is no longer valid in light of §1123(d)."); *Sagamore Partners, Ltd.*, 620 F. App'x 864, 869 (11th Cir. 2015) (holding that outstanding default rate interest must be paid as a condition for reinstating a loan); *In re 139-141 Owners Corp.*, 313 B.R. 364, 368-69 (S.D.N.Y. 2004) (upholding bankruptcy court's determination that default interest was payable upon reinstatement). Accordingly, when a debtor proposes to cure a default and reinstate a debt, if the underlying agreement provides for the payment of a higher interest rate upon default and "applicable nonbankruptcy law" allows for higher interest upon default, interest must be paid at the default rate to comply with section 1123(d) of the Bankruptcy Code. *In re New Investments, Inc.*, 840 F.3d at 1140.

20.      Here, each of the Indentures provides for "Additional Interest" to be paid upon default. Indenture, at § 3.1(a). Under the Indentures, in addition to the interest otherwise owing,

"Additional Interest" accrues upon default on any amounts payable under the Notes at the rate of the normal interest rate, compounded quarterly. *Id*. Relevant pages of each Indenture are attached hereto as <u>Exhibit B</u>. Each notice of acceleration sent by the Trustee (each a "<u>Notice of Acceleration</u>") indicated that "Additional Interest" was due and payable. Copies of the Notices of Acceleration are attached hereto as <u>Exhibit C</u>.

21.     New York law, which governs each Indenture, allows for loan agreements to carry default interest rates such as those included in the Indentures. *See, e.g.*, *In re South Side House, LLC*, 451 B.R. 248, 264 (Bankr. E.D.N.Y. 2011) (quoting *U.S. Trust Co. of N.Y. v. LTV Steel Co. (In re Chateaugay Corp.)*, 150 B.R. 529, 542, *aff'd*, 170 B.R. 551 (S.D.N.Y. 1994)) ("[I]t is well established that 'contractual provisions providing for an increased interest rate on default are enforceable under New York law.'").

22.     Payment of the default rate interest, which means payment of the interest otherwise owing plus the Additional Interest, would require the Debtors to pay a total of at least $8.1 million to cure the outstanding interest amounts owed under the Notes through March 30, 2017, which is at least $3.6 million more than the Debtors' $4,480,000 estimate in Section 2.02 of the Disclosure Statement.

23.     The Plan fails to provide for the payment of default interest in connection with the reinstatement of the Notes as required by Bankruptcy Code section 1123(d). As a result, the Plan is patently unconfirmable and the Disclosure Statement should be denied unless the Plan is modified to provide for the payment of default interest in connection with the reinstatement of the Notes.

**(ii)     The Plan is Patently Unconfirmable Because the Plan Incorrectly States That the Class 2 Claims Are Unimpaired**

24.     Section 1124 of the Bankruptcy Code provides that a claim or interest is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights" of the holder of the claim or interest.  11 U.S.C. § 1124(1).

25.     Section 10.06(b) of the Plan (the "Third Party Release"), provides that "each holder of a claim that does not vote to reject the Plan and any person who receives a distribution under the Plan" will release certain non-debtor parties, such as the Plan Debtors' officers and directors (the "Released Parties") from any liability for an event occurring on or prior to the Effective Date.

26.     Accordingly, in addition to impairing the Class 2 Claims by failing to provide for the payment of default rate interest, the Plan impairs the Class 2 Claims through the Third Party Release.  Specifically, the Third Party Release would alter the legal, equitable, and contractual rights of the Holders of the Noteholder Claims.

27.     Absent revising the Plan to indicate that the Third Party Release does not apply to the Noteholder Claims, the Noteholder Claims would be impaired, and therefore the Holders of the Noteholder Claims would be entitled to vote on the Plan.  Thus, unless the Plan is revised either to provide that the Third Party Release does not apply to the Noteholder Claims, or to provide that Class 2 is impaired and is entitled to vote, the Plan is patently unconfirmable because it does not authorize an impaired Class – the Class 2 Noteholder Claims – to vote.

28.     In addition, if the Plan is revised to provide that Class 2 is impaired and is entitled to vote, absent providing an opt-out right concerning the Third Party Release to Class 2, the Plan would be patently unconfirmable because it would unfairly discriminate against Class 2.  The proposed ballots attached to the *Debtors' Motion to Establish Solicitation and Voting Procedures*

*With Respect to Plan of Confirmation* [Doc. No. 345] (the "Solicitation Procedures Motion") suggest that other voting Classes could opt-out of the Third Party Release. This opt-out language conflicts with the language of the Third Party Release, which indicates that the Third Party Release applies to any Person who receives a distribution under the Plan. Nevertheless, if the Debtors intend to allow other voting Classes to opt-out of the Third Party Release, and if the Plan is revised to provide that Class 2 is impaired and can vote, then Class 2 also must receive such opt-out rights. Without such opt-out rights, the Plan would be patently unconfirmable because it would unfairly discriminate against Class 2.

      **(iii)**    **The Plan is Patently Unconfirmable Because the Plan Artificially Impairs Classes 3a and 3b**

29.    The Debtors propose to pay Class 3a and Class 3b (together, "Class 3") "in full over a one year period, with payments made quarterly, together with interest at the Federal Judgment Rate." Plan § 3.02(b). This treatment is inappropriate. The Debtors' projections indicate that the Debtors would have sufficient assets to pay all Class 3 Claims in full on the Effective Date. Thus, the Debtors should do so.

30.    The Debtors do not include any information or identify any valid business justification in the Disclosure Statement or the Plan for this impairment of Class 3. The only apparent explanation for impairing Class 3 is to manufacture an impaired accepting Class of creditors in case another Class of creditors, for example the Class 2 Noteholder Claims, are authorized to vote on the Plan because they are deemed to be impaired.

31.    The Plan is patently not confirmable because it artificially impairs Class 3 in an apparent attempt to manufacture votes in favor of the Plan. "'Artificial' impairment occurs when a plan imposes an insignificant or *de minimis* impairment on a class of claims to qualify those claims as impaired under § 1124." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir.

2004). Courts have recognized that a class of claims should not be considered impaired for the purposes of 1129(a)(10) if the impairment is the result of the plan proponents' exercise of "discretion" and not "driven by economic need." *In re Windsor on the River Assocs. Ltd.*, 7 F.3d 127, 132 (8th Cir. 1993) ("If this impairment has been manufactured, then the plan must be regarded as having circumvented the purpose of the statute, namely, consensual reorganization.").

32.     Courts within the Fourth Circuit, including the United States Bankruptcy Court for the District of Maryland, have refused to allow debtors to manufacture an impaired accepting class in an effort to manipulate the Bankruptcy Code. *See, e.g.*, *In re North Washington Center Ltd. P'ship*, 165 B.R. 805 (Bankr. D. Md. 1994) (citing favorably to the rationale in *In re Windsor* and finding artificial impairment where the debtor proposed to pay creditors 80% of their claims, despite the fact that the debtor lacked justification for this impairment and had the ability to pay creditors 100% of their claims upon confirmation). Other courts within the Fourth Circuit have similarly recognized that proposing to pay claims over time or at some later date when the debtor has the funds to pay such claims in full at confirmation constitutes artificial impairment. *See, e.g.*, *In re DeLuca*, 194 B.R. 797 (Bankr. E.D. Va. 1996) (citing favorably to *In re North Washington*); *In re Dunes Hotel Assocs.*, 188 B.R. 174 (Bankr. D.S.C. 1995); *In re Swartville, LLC*, No. 11-086676-8-SWH, 2012 WL 3564171 (Bankr. E.D.N.C. Aug. 17, 2012).

33.     Thus, because the Plan proposes to artificially impair Class 3, the Plan is patently unconfirmable and the Disclosure Statement should be denied unless the Plan is modified to remove the artificial impairment and to provide for the payment in full of the Class 3 Claims on the Effective Date.

### C.    The Disclosure Statement Fails to Provide Adequate Information[3]

#### (i)    Inadequate Information Concerning the HCS Transaction, the Debtors' Related Financial Projections, and Related Material Risks

34.    Courts have recognized that, to be approved, a disclosure statement must supply detailed information about the financial projections of operations post-confirmation, including assumptions utilized and applicable risk factors:

> The Debtor should provide the projection of operations subsequent to confirmation so that the Court may determine the feasibility of the plan. The Debtor is required to make a full, clear, and complete disclosure of all underlying assumptions. The Debtor must provide sufficient financial information to determine if the projections for operations subsequent to confirmation are feasible. If the plan assumes an increase in income, the basis for this assumption must be set forth. If the future operations contain a risk of loss of income or anticipated financial instability, the factors that may cause a loss or diminution of income should be set forth.

*In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983).

35.    A disclosure statement also must contain a complete description of the relevant material risk factors associated with a plan. *See In re Babayoff*, 445 B.R. 64, 78 (Bankr. E.D.N.Y. 2011) ("Similarly, where a disclosure statement omits a meaningful liquidation analysis or description of the risk factors or tax consequences under the plan, it does not serve the bankruptcy purpose of enabling a creditor to make an informed decision about the plan.").

36.    Given that the Debtors propose to undertake an entirely new business venture with which the Debtors' creditors are unfamiliar, the Disclosure Statement should contain *more*

---

[3]    The Committee has received correspondence from the Debtors indicating that the Debtors intend to revise the Disclosure Statement to disclose certain additional information. Such revisions, however, would not address all of the issues identified in this Objection (collectively, the "Objection Issues"). Additionally, without reviewing the revised Disclosure Statement, the Committee does not know whether the proposed revisions would adequately address the Objection Issues related to such revisions. As a result, this Objection addresses the Disclosure Statement as filed with the Court, and does not address any proposed revisions.

disclosure than expected of a disclosure statement that describes the continuation of familiar business operations.  However, the Disclosure Statement lacks adequate information concerning the HCS Transaction, the Debtors' related financial projections, and numerous related issues that involve material risks, including but not limited to the following:

- The Exhibits and Schedules to the Purchase Agreement, which contain material terms concerning the HCS Transaction, are not included in the version of the Purchase Agreement attached as Exhibit D to the Disclosure Statement, yet the Exhibits and Schedules are necessary for the Disclosure Statement to provide adequate information.

- Disclosure that the Debtors cannot comply with Section 4.8 of the Purchase Agreement and the material risks associated with breaching this Section of the Purchase Agreement.  Section 4.8 of the Purchase Agreement contains a representation and warranty that Novation will be Solvent upon the closing of the HCS Transaction.[4]  In light of the Purchase Agreement's definition of Solvent, which requires the Debtors' assets to be valued at a fair saleable value, the Debtors will be incapable of satisfying this representation upon closing, as the present fair value of the Debtors' assets are far less than the Debtors' outstanding debts.  *See* Novation Schedules, at 1-19, 21-28.  While the Debtors suggest that the Residual Bonds will provide substantial value over time, there is no dispute that the present saleable value of the Residual Bonds is only approximately $2 million.  *See id.* at Part 4, No. 16; Debtors' Form 10-K Novation Companies, Inc., filed February 16, 2016 (the "2015 10-K"), at 32-33.  A copy of the 2015 10-K is attached hereto as Exhibit D.

- Disclosure of historical financial statements, including balance sheets showing HCS's assets and liabilities, and income and cash flow statements supporting the summary information contained on page 23 of the Disclosure Statement.  Because HCS is a private company, there is a lack of publically-available financial information for HCS and creditors will have to rely on the Disclosure Statement for this information.

---

[4]     The Purchase Agreement defines "Solvent" to mean that:

(a) the present fair saleable value of the assets owned by such Person exceeds the amount required to pay its probable liability on its existing debts as they become absolute and matured; (b) such Person does not have an unreasonably small amount of capital with which to engage in its business; and (c) such Person will be able to pay its debts and liabilities as they become due.

Purchase Agreement Art. 9.

- Information supporting the financial projections included in Exhibit B to the Disclosure Statement.

- Disclosure concerning the impact one or multiple years of declining revenue or negative income for HCS, particularly in the first few year following confirmation, would have on the Debtors' financial projections and feasibility of the Plan.

- Disclosure concerning whether any capital expenditures could be required in the first few years of operating HCS and any funds to be set aside to cover such expenses.

- Disclosure regarding the highly regulated nature of the healthcare industry, the potential volatility to healthcare businesses as a result of recent political events, and the financial impact new legislation could have on HCS, particularly in light of HCS's lack of geographic diversification.  Specifically, the healthcare and medical industries are facing significant uncertainty as a result of pending healthcare reform legislation.  In such a highly regulated industry, new legislation could have a major financial impact, particularly on a company that lacks diversification and operates in a single state.  Regulatory risks also would be highly relevant to any investor in a healthcare business in today's business and political climate.  Yet, the Disclosure Statement fails to discuss the material risks and related implications of such issues, either at a federal or state level.

- Disclosure concerning the percentage of HCS's income that is derived from Medicare and Medicaid payments, and the material risks changes to such programs would have on HCS's projected performance.

- Disclosure concerning HCS's efforts, if any, to expand operations outside of Georgia, any related regulatory requirements that HCS must satisfy to expand outside of Georgia, and the material risks of operating in a single state.

- Disclosure of how the purchase price was determined and the facts supporting the Debtors' position that the Debtors are acquiring HCS for fair market value.

- Disclosure concerning why Butler is selling all of its interests in HCS only two years after Butler originally acquired HCS, and the material risks to the Debtors associated therewith.

- Disclosure concerning the terms of employment for HCS's current CEO, who will be retained by HCS following the HCS Transaction.

- Disclosure of any relevant experience, or lack thereof, the Debtors or any of their officers and directors have managing a healthcare related business, and the material risks associated with acquiring a business operating in a field in which the Debtors have little or no experience.

14

- The experience, or lack thereof, of the Debtors' board members in utilizing NOLs in connection with the acquisition of an operating business to reduce or eliminate tax liabilities, and the related material risks.

- Information concerning the Debtors' historical losses related to the acquisition and disposition of multiple operating companies, the material risks associated with the Debtors' poor performance history in acquiring businesses, and an explanation as to why this experience will not be repeated in the HCS Transaction.

37.     A meaningful and complete discussion of each of the foregoing issues and the associated material risks is necessary for the Disclosure Statement to provide adequate information concerning the proposed HCS Transaction.

**(ii)     Inadequate Information Concerning the Treatment of the RMBS Litigation Claims and Related Material Risks**

38.     In order to meet the requirements imposed by section 1125 of the Bankruptcy Code, the Disclosure Statement must contain adequate "[i]nformation regarding claims against the estate." *Scioto Valley Mortgage Co.*, 88 B.R. at 170. The Disclosure Statement fails to include adequate information concerning the RMBS Litigation Claims.

39.     Section 4.02.13[5] of the Disclosure Statement defines the RMBS Litigation Claims[6] filed by plaintiffs in the RMBS Litigations as "RMBS Claims,"[7] and states that the

---

[5]     The Debtors' Summary and Treatment of Claims and Interests and Estimated Recoveries, which appears on pages 4-6 of the Disclosure Statement incorrectly cross-references section 4.02.12 of the Disclosure Statement concerning the RMBS Claims.

[6]     The Plan defines "RMBS Litigation Claims" as "collectively, any and all claims arising from or related to the FHA Case, the NCUAB Case, and the New Jersey Carpenters Health Fund Case, including without limitation any claims arising from indemnification or contribution from any of the parties to such cases or other third parties, which are allowed by Final Order or settlement." The last clause in this definition should be removed to avoid the suggestion that claims asserted against the Debtors that have not been allowed by Final Order or settlement are not RMBS Litigation Claims and should be included in a separate Class.

[7]     *See* Claim Nos. 19-1, 20-1, 21-1, and 22-1 against Novation and similar claims against NMI, and Claim No. 5-1 against NMI.

15

Debtors believe there is no liability on the RMBS Claims, and that the Debtors will seek to estimate each of these claims at zero.

40.    Section 4.02.13 of the Disclosure Statement references the RMBS Litigation Claims for indemnification filed by the Debtors' former officers and directors (the "Indemnification Claims"), but only states that the Debtors *may* seek disallowance or estimation of the Indemnification Claims.  As a result, the Disclosure Statement fails to identify how the Debtors *will* address the Indemnification Claims.

41.    The Disclosure Statement also fails to discuss the RMBS Litigation Claims filed by other defendants ("Other Defendants") in the RMBS Litigations, let alone identify how the Debtors propose to address such claims (the "Other Defendant Claims").  The Other Defendant Claims[8] include (i) five (5) proofs of claim asserted by Other Defendants concerning each of the three RMBS Litigations and other similar litigation matters;[9] (ii) five (5) proofs of claim asserted by Other Defendants concerning the NCUAB Case and the New Jersey Carpenters Health Fund Case;[10] and (iii) four (4) proofs of claim asserted by Other Defendants concerning the New Jersey Carpenters Health Fund Case and other similar litigation matters.[11]

---

[8]    The Other Defendant Claims were filed against each of Novation and NMI.  Accordingly, the numbers of the types of Other Defendant Claims identified herein refer to the number of claims filed against either Novation or NMI.

[9]    *See* Claim Nos. 24-1, 25-1, 26-1, 28-1, and 29-1 filed against Novation and similar claims against NMI.

[10]    *See* Claim Nos. 27-1, 30-1, 31-1, 32-1, and 33-1 filed against Novation and similar claims filed against NMI.

[11]    *See* Claim Nos. 34-1, 35-1, 36-1, and 37-1 filed against Novation and similar claims filed against NMI.

42.     To provide adequate information, the Disclosure Statement must identify how the Debtors will treat the Indemnification Claims and the Other Defendant Claims.

43.     Similarly, the Disclosure Statement must confirm that the Indemnification Claims and the Other Defendant Claims will be considered Class 4a and 4b Claims, if that is the Debtors' intent, including to the extent the Other Defendant Claims relate to litigation matters other than the RMBS Litigations.  Alternatively, if that is not the Debtors' intent, the Disclosure Statement must identify how the Debtors will treat the Other Defendant Claims to the extent they do not relate to the RMBS Litigations.

44.     The Disclosure Statement also must discuss the reported $165 million settlement concerning the New Jersey Carpenters Health Fund Case, and how such settlement will impact the potential allowance of each of the RMBS Litigation Claims, including how the payment of potentially large amounts by the Other Defendants will affect the potential allowance of the Other Defendant Claims.

45.     In addition, to provide adequate information the Disclosure Statement must disclose the implications if the RMBS Litigation Claims are not disallowed or estimated at zero or in some other nominal amount.  Such disclosure is critical because if any of the RMBS Litigation Claims are allowed in the substantial amounts in which they have been asserted, the Debtors would be unable to pay the RMBS Litigation Claims in full as contemplated by the Plan. Such a scenario would render the Plan not feasible and therefore not confirmable.  Without clearly explaining this material risk to the feasibility of the Plan, the Disclosure Statement does not contain adequate information.

### (iii)     Inadequate Information Concerning the Residual Bonds and Related Material Risks

46.     The Disclosure Statement makes projections about the performance of the Residual Bonds that are directly contradictory to the Debtors' prior analyses of the value of the Residual Bonds.  The Disclosure Statement fails to adequately explain why the Debtors' current projections are correct or why Debtors' prior analyses are incorrect.

47.     Specifically, the Debtors have ascribed a book value of less than $2 million to the Residual Bonds in the Novation Schedules.  *See* Novation Schedules, at 11.  Importantly, in valuing the Residual Bonds for the Debtors' 2015 10-K, the Debtors "use[d] a weighted average life of 2 years from the reporting date for the expected future estimated cash flows [on certain of the Residual Bonds]."  2015 10-K at 33.

48.     To contain adequate information, the Disclosure Statement must identify why an average life of 2 years was appropriate for purposes of the 2015 10-K and the Novation Schedules, but it is reasonable for the Debtors, and creditors, to believe that the Residual Bonds will continue to pay through the time periods of up to sixteen years identified in Exhibit B to, and Section 2.03 of, the Disclosure Statement.  Without providing a clear explanation for this issue, creditors cannot form an opinion about the true value of the Residual Bonds.  *See* 7 *Collier on Bankruptcy* ¶1125.02[2] (16th ed. 2016) ("[O]pinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate a decision."); *see also, e.g.*, *In re East Redley Corp.*, 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982).

49.     Adequate disclosure concerning the Residual Bonds is absolutely critical because not only does Exhibit B to the Disclosure Statement indicate that the Debtors believe that they

will receive approximately $46.7 million[12] concerning the Residual Bonds, but the 10% annual interest the Debtors indicate that they will receive based on the excess cash on hand due to the Residual Bonds equals another approximately $71.5 million through 2033.  Consequently, the aggregate amounts the Debtors project to receive from the Residual Bonds and investment of related excess cash on hand total approximately $118.1 million, which represents a significant majority of the total cash flow the Debtors project to receive and have available to repay the principal on the Notes in 2033.  As a result, this is an extremely important issue that the Disclosure Statement must adequately explain.  Such explanation should discuss the material risks to the feasibility of the Plan if the Residual Bonds do not produce the cash flows identified by the Debtors over the next sixteen years, including the material risks of the Residual Bonds ceasing to provide cash flows and why the Residual Bonds might cease providing cash flows, such as if the servicers of the Residual Bonds exercise their clean-up call rights.  Absent this critical information concerning the Residual Bonds and the related material risks, the Disclosure Statement fails to provide adequate information.

   **(iv)    Inadequate Information Concerning the 10% Investment Return Rate for Excess Cash and Related Material Risks**

   50.    The Disclosure Statement fails to provide adequate information concerning why the Debtors estimate a 10% rate of return for investing the Debtors' excess cash on hand each year for the next sixteen years or the basis for such estimate.  The Disclosure Statement also fails to provide adequate information concerning what the Debtors intend to invest in to obtain such a

---

[12]    Although Exhibit B to the Disclosure Statement only identifies $46.7 million in proceeds from the Residual Bonds, Section 2.03 the Disclosure Statement states that "the [Residual Bonds] will generate more than $50 million in aggregate cash flow over the next sixteen years, the same term as the Indentures which are to be reinstated."  Section 2.03 of the Disclosure Statement and/or Exhibit B to the Disclosure Statement should be modified to correct this discrepancy.

rate of return, or the material risks associated with the Debtors failing to obtain this exceptionally high rate of return.

51.     The Debtors project to receive substantial amounts of income based on the estimated 10% rate of return.  *See*  Disclosure Statement, at Exhibit B.  In fact, this incredibly high rate of return compounded over as many as sixteen years is a critical component to the Debtors' projections that the Debtors will be able to  pay the amounts required by the Plan

52.     Given the importance of the Debtors' 10% rate of return estimate, to provide adequate information the Disclosure Statement must identify (i) why the Debtors estimate a 10% rate of return for investing the Debtors' excess cash, (ii) the basis for such estimate; (iii) the Debtors' historical rate of return for investing excess cash, (iv) what the Debtors intend to invest in to obtain such a rate of return, and (v) the material risks of and associated with the Debtors failing to obtain this rate of return.

**(v)     Inadequate Information Concerning Reinstatement and Cure of the Notes and Related Material Risks**

53.     As discussed above, the Plan provides that in connection with the reinstatement of the Notes, the Debtors will pay only non-default interest owing on the Notes.  Section 2.02 of the Disclosure Statement indicates that the Debtors estimate that the approximate amount necessary to cure the arrears under the Notes is $4,480,000.  Not only does the Disclosure Statement fail to include adequate information concerning the calculation of this amount, but this estimate does not include the default rate interest, including the "Additional Interest," owing on the Notes.

54.     To the extent the Court approves the Disclosure Statement without requiring a modification to the Plan to require the payment of default interest to reinstate of the Notes, the Disclosure Statement would fail to provide adequate information concerning the material risk that the Debtors will be forced to pay default interest to reinstate the Notes, or how the payment

of such default interest will affect the Debtors' ability to make the other payments required by the Plan.

55.    As discussed above, applicable case law indicates that there is a material risk that the Debtors will be forced to pay default interest to reinstate the Notes under section 1123 of the Bankruptcy Code.   *See*, *e.g.*, *In re New Investments, Inc.*, 840 F.3d at 1139-42; *Sagamore Partners, Ltd.*, 620 F. App'x at 869.

56.    Absent an adequate discussion of the material risk that the Debtors will be required to pay default rate interest to reinstate the Notes, and of how the Debtors will be able to make the other required payments under the Plan under such circumstances, the Disclosure Statement fails to provide adequate information.

### (vi)    Inadequate Information Concerning the Debtors' Officers, Directors, and Other Insiders

57.    Case law requires that disclosure statements include "[i]nformation regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor." *Scioto Valley Mortgage Co.*, 88 B.R. at 170. The Disclosure Statement must include information concerning the experience of the reorganized debtors' proposed management, or it cannot be approved under section 1125 of the Bankruptcy Code.   *See, e.g.*, *In re Adana Mortg. Bankers, Inc.*, 14 B.R. 29, 30 (Bankr. N.D. Ga. 1981) (disapproving disclosure statement, in part, because it did not include a description of the experience of proposed management of the debtor's business).   Additionally, "[t]he disclosure statement must describe fully, completely, and in detail all transactions with insiders.  If there are no such transactions Debtors must so state." *In re Malex*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983).

58.     The Disclosure Statement fails to identify whether the current officers and board will remain in place.  Nor does it include any information concerning the relevant experience of these individuals, including any experience in the healthcare field, their holdings, and the benefits, if any, they will receive if the Plan is confirmed and the HCS Transaction is completed.

59.     The Disclosure Statement also fails to address the charges brought by the Securities and Exchange Commission (the "SEC") in an administrative proceeding (the "SEC Proceeding") against two of the Debtors' current board members, Jeffrey Eberwein and Charles Gillman, or the consent order (the "Consent Order") entered in the SEC proceeding.  A copy of the Consent Order, which sets forth the alleged violations in greater detail, is attached hereto as Exhibit E.  In the SEC Proceeding, the SEC charged these board members with multiple violations of reporting requirements imposed by federal law in connection with a number of public companies in which these board members have an interest.  To provide adequate information concerning the Debtors' insiders, the Disclosure Statement should disclose the SEC Proceeding, the Consent Order, and why the continued service of the board members at issue does not pose any risk to the Debtors.

60.     In addition, the Disclosure Statement should identify the identities of the current and former officers and directors of HCS and their relationships, if any, with any current and former officers and directors of the Debtors.

**(vii)    Inadequate Information Concerning the Potential Divestment of HCS and Related Material Risks**

61.     The Debtors' financial projections all inherently assume that Holding, directly, and Novation, indirectly, will continue to own HCS through 2033.  The Plan, however, does not require that Holding must own HCS through 2033.  The Disclosure Statement fails to disclose that Holding could sell HCS at any time and fails to discuss the related material risks.

22

62.     Unless the Plan is modified to eliminate or limit the ability of Holding to sell HCS, in order to provide adequate information the Disclosure Statement must disclose the ability of Holding to sell HCS at any time, and explain the material risks associated with such divestiture including the risks to the Debtors' ability to make the payments required by the Plan.

**(viii)   Inadequate Information Concerning Oberon's Relationship with Butler/HCS**

63.     The Disclosure Statement fails to provide information concerning the fact that both before and after the Petition Date the Debtor's investment banker, Oberon Securities, LLC ("Oberon"), represented Butler with respect to the sale of HCS.  The Disclosure Statement also fails to include information about the longstanding relationship between Oberon and Butler and its affiliates, which has existed at least since 2009.[13]  Nor does the Disclosure Statement explain why after Oberon ceased representing Butler as Butler's investment banker concerning the sale of HCS, Butler did not retain another investment banker for the HCS Transaction.

64.     In the *Supplemental Declaration of Adam Breslawsky of Oberon Securities, LLC as Investment Banker for the Debtors* [Doc. No. 262] (the "Breslawsky Declaration"), the Debtors disclosed that Butler was a client of Oberon, and that Oberon has represented Butler in connection with Butler's efforts to sell HCS.  The Breslawsky Declaration, however, does not provide any specific detail concerning when Oberon was first engaged by Butler or its affiliates, when Oberon terminated its relationship with Butler, how Oberon terminated its relationship

---

[13]     Oberon has a longstanding relationship with Butler, having represented at least one Butler affiliate as early as 2009.  *See In re Ablest Inc., et al.*, Case No. 14-10717, Doc. No. 88 (Bankr. D. Del. Apr. 8, 2014), *Application of the Debtors for an Order Pursuant to 11 U.S.C. §§ 327(A) And 328(A), Fed. R. Bankr. P. 2014(A) and 2016, and Local Bankruptcy Rule 2014-1 and 2016-2, Authorizing the Retention and Employment of Oberon Securities, LLC as the Debtors' Investment Banker and Financial Advisor, Nunc Pro Tunc to the Petition Date* (the "Ablest Retention Application").  The Declaration of Adam Breslawsky and the Engagement Letters attached to the Ablest Retention Application indicate that Oberon began representing the debtors in that case, a staffing company and affiliate of Butler, in 2009.

with Butler, whether Oberon was still retained by Butler after the Petition Date (including in connection with Butler's efforts to sell HCS), or whether Oberon received any payments from Butler while also representing the Debtors.

65.    The late timing of the Breslawsky Declaration only strengthens the need for the Disclosure Statement to provide a complete explanation of the relevant facts.  Specifically, the Purchase Agreement states that the Debtors entered into a confidentiality agreement with Butler on September 7, 2016, over four months before the Breslawsky Declaration was filed on January 18, 2017.  *See* Stock Purchase Agreement § 5.2(a).

66.    Absent information disclosing (i) the relevant facts concerning Oberon's representation of Butler concerning the sale of HCS, including when Oberon received payments from Butler or its affiliates and when and how Oberon terminated its engagement with Butler, (ii) the relevant facts concerning the longstanding relationship between Oberon and Butler, (iii) why Butler did not replace Oberon with a different investment banker for the HCS Transaction, and (iv) why each of the foregoing does not create material risks concerning the HCS Transaction, the Disclosure Statement fails to include adequate information.

**(ix)    Inadequate Information Concerning the Third-Party Release**

67.    The Disclosure Statement fails to provide information concerning (i) the material risk that the Third Party Release might not be approved, (ii) why the Third Party Release should be authorized under these facts and circumstances, or (iii) the ramifications if the Third Party Release is not approved.  In fact, in the Disclosure Statement the Debtors fail to provide any explanation justifying the Third Party Release.

68.    Although releases such as the Third Party Release are permissible in some circumstances, the Fourth Circuit has recognized that such releases are not appropriate in every case, or even in most cases.  *See In re A.H. Robins Co., Inc.*, 880 F.2d 694, 702 (4th Cir. 1989).

24

Whether the Third Party Release is appropriate is dependent on the facts and circumstances of this case. *Nat'l Heritage Foundation v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014); *Behrmann v. Nat'l Heritage Foundation*, 663 F.3d 704, 711 (4th Cir. 2011).

69.     Absent disclosure of the material risk that the Third Party Release might not be approved, the facts and circumstances that justify the Third Party Release, and the ramifications if the Third Party Release is not approved, the Disclosure Statement fails to provide adequate information.[14]

### Reservation of Rights

70.     After filing this Objection the Committee intends to work with the Debtors in an attempt to reduce, if not eliminate, the Committee's objections through revisions to the Disclosure Statement and/or the Plan.    Nevertheless, the Committee reserves all rights concerning the Disclosure Statement and the Plan, including without limitation all rights concerning additional objections and any hearings concerning the Disclosure Statement or the Plan.

[Remainder of page intentionally left blank]

---

[14]     Similarly, the proposed ballots attached to the Solicitation Procedures Motion contain language that suggests that a voter could opt-out of the Third Party Release, but the language of the Third Party Release indicates that the Third Party Release applies to any Person who receives a distribution under the Plan.  This conflict should be clarified and corrected in the Plan, the Disclosure Statement, and the ballots.

## Conclusion

WHEREFORE, the Committee respectfully requests that this Court sustain this Objection, deny approval of the Disclosure Statement, and grant such other and further relief as the Court deems just and proper.

Dated: March 22, 2017                    Respectfully submitted,

*/s/ Thomas C. Goodhue*
Thomas C. Goodhue, Esq. (MD No. 19305)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
Tel:    (202) 419-2147
Fax:    (202) 778-7449
Email: tgoodhue@hunton.com

-and-

Tyler P. Brown, Esq. (admitted *pro hac vice*)
Jason W. Harbour, Esq. (admitted *pro hac vice*)
Nathan Kramer, Esq. (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Tel:    (804) 788-8200
Fax:    (804) 788-8218
Email: tpbrown@hunton.com
          jharbour@hunton.com
          nkramer@hunton.com

*Counsel for the Creditors' Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2017, the foregoing was filed in the above-captioned case with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all registered users in this case.  I further certify that a copy of the foregoing will be sent by electronic mail and first class mail, postage prepaid, to the following:

Joel I. Sher
Shapiro Sher Guinot & Sandler
250 W. Pratte Street, Suite 2000
Baltimore, Maryland 21201
jis@shapirosher.com

Adam H. Friedman
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019
AFriedman@olshanlaw.com

Edmund A. Goldberg
Office of U.S. Trustee
101 W. Lombard Street, Suite 2625
Baltimore, MD 21201
Edmund.A.Goldberg@usdoj.gov


Dated:  March 22, 2017                    */s/ Thomas C. Goodhue*
                                          Thomas C. Goodhue

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| NOVATION COMPANIES, INC., *et al.*,[1] | Case Nos. 16-19745, 19747-19749 DER |
| Debtors. | (Jointly Administered) |

**ORDER DENYING APPROVAL OF THE DISCLOSURE STATEMENT REGARDING
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF (I) NOVATION
COMPANIES, INC. AND (II) NOVASTAR MORTGAGE LLC**

Upon consideration of the (i) *Disclosure Statement Regarding Joint Chapter 11 Plan of Reorganization of (i) Novation Companies, Inc. and (ii) NovaStar Mortgage, LLC* [Doc. No. 303] (the "Disclosure Statement"), (ii) *Objection of the Creditors' Committee to the Disclosure Statement Regarding Joint Chapter 11 Plan of Reorganization of (i) Novation Companies, Inc. and (ii) NovaStar Mortgage, LLC* (the "Objection"),[2] and (iii) evidence submitted and arguments made at the hearing on the Disclosure Statement (the "Hearing") and the record in these cases,

---

[1]    The Debtors in these chapter 11 cases are: (i) Novation Companies, Inc. f/k/a NovaStar Financial, Inc., (ii) NovaStar Mortgage LLC f/k/a NovaStar Mortgage, Inc., (iii) NovaStar Mortgage Funding Corporation and (iv) 2114 Central, LLC f/k/a Advent Financial Services, LLC.

[2]    Capitalized terms, unless otherwise defined herein, shall have the meanings ascribed to them in the Objection.

the Court finds that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) venue of this chapter 11 case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and (d) notice of the Disclosure Statement and the Objection was sufficient under the circumstances.  For the reasons set forth at the Hearing, and the Court having determined that the Disclosure Statement does not satisfy standard of section 1125 of the Bankruptcy Code,

**IT IS HEREBY ORDERED THAT:**

1.    The Disclosure Statement is DENIED.

2.    The Objection is SUSTAINED.

3.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

cc:    Joel I. Sher, Esq.
      SHAPIRO SHER GUINOT & SANDLER
      250 W. Pratte Street, Suite 2000
      Baltimore, Maryland 21201

      Adam H. Friedman, Esq.
      OLSHAN FROME WOLOSKY LLP
      1325 Avenue of the Americas
      New York, NY 10019

      Thomas C. Goodhue, Esq.
      HUNTON & WILLIAMS LLP
      2200 Pennsylvania Ave., NW
      Washington, DC 20037

      Tyler P. Brown, Esq.
      Jason W. Harbour, Esq.
      Nathan Kramer, Esq.
      HUNTON & WILLIAMS LLP
      Riverfront Plaza, East Tower
      951 East Byrd Street
      Richmond, Virginia 23219

Edmund A. Goldberg, Esq.
Office of U.S. Trustee
101 W. Lombard Street, Suite 2625
Baltimore, MD 21201

**END OF ORDER**

# EXHIBIT B

**EXECUTION COPY**

**INDENTURE**

between

**NOVASTAR FINANCIAL, INC.**

and

**THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION,**
*as Trustee*

_____

Dated as of March 22, 2011

_____

Series 1

INDENTURE, dated as of March 22, 2011, between NovaStar Financial, Inc., a Maryland corporation (the "*Company*"), and The Bank of New York Mellon Trust Company, National Association, a national banking association, as Trustee (in such capacity, the "*Trustee*").

## RECITALS OF THE COMPANY

WHEREAS, NovaStar Mortgage, Inc., a Virginia corporation ("*Mortgage*"), the Company, the holders of certain preferred securities issued by NovaStar Capital Trust II/B, a Delaware statutory trust (the "*Trust*"), the holders of certain junior subordinated securities issued by Mortgage, and certain other parties entered into that certain Exchange Agreement, dated as of March 22, 2011 (the "*Exchange Agreement*"); and

WHEREAS, the Company has duly authorized the execution and delivery of this Indenture to provide for the issuance of its unsecured senior notes (the "*Senior Notes*" or the "*Securities*") and to provide the terms and conditions upon which the Senior Notes are to be authenticated, issued and delivered; and

WHEREAS, all things necessary to make this Indenture a valid agreement of the Company, in accordance with its terms, have been done.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the Exchange (as hereinafter defined), it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Senior Notes, as follows:

## ARTICLE I

## DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.1.  *Definitions.*

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this <u>Article I</u> have the meanings assigned to them in this <u>Article I</u>;

(b)    the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(c)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(d)    unless the context otherwise requires, any reference to an "Article", a "Section", a "Schedule" or an "Exhibit" refers to an Article, a Section, a Schedule or an Exhibit, as the case may be, of this Indenture;

(e)    the words "hereby," "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(f)    a reference to the singular includes the plural and vice versa; and

(g)    the masculine, feminine or neuter genders used herein shall include the masculine, feminine and neuter genders.

*"Act"* when used with respect to any Holder, has the meaning specified in Section 1.4(a).

*"Additional Equity Event"* means the consummation by the Company and/or its Subsidiaries of one or more equity offerings on or before January 1, 2016 with net aggregate proceeds of $40,000,000 or more.

*"Additional Interest"* means the interest, if any, that shall accrue on any amounts payable on the Senior Notes, the payment of which has not been made on the applicable Interest Payment Date and which shall accrue at the rate per annum specified or determined as specified in such Security, in each case to the extent legally enforceable.

*"Affiliate"* of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

*"Applicable Depositary Procedures"* means, with respect to any transfer or transaction involving a Global Security or beneficial interest therein, the rules and procedures of the Depositary for such Security, in each case to the extent applicable to such transaction and as in effect from time to time.

*"Approved Transaction"* means, (a) in the event that the Series C Offer and/or the Series D Exchange (each as defined in the Form S-4) are not consummated in the manner set forth in the Form S-4, an alternative transaction resulting in the Company acquiring substantially all of the Company's outstanding Series C Preferred Stock and Series D Preferred Stock, (b) any dividend or distribution by a Subsidiary to the Company and (c) any dividend or distribution by a Subsidiary to other equity owners in such Subsidiary in proportion to such other equity owners) percentage of ownership of such Subsidiary.

*"Authenticating Agent"* means any Person authorized by the Trustee pursuant to Section 6.11 to act on behalf of the Trustee to authenticate the Senior Notes.

*"Bankruptcy Code"* means Title 11 of the United States Code or any successor statute(s) thereto, or any similar federal or state law for the relief of debtors, in each case as amended from time to time.

SECTION 2.5.  *Definitive Securities.*

The Senior Notes issued on the Original Issue Date shall be in definitive form.  The definitive Securities shall be printed, lithographed or engraved, or produced by any combination of these methods, if required by any securities exchange on which the Senior Notes may be listed, on a steel engraved border or steel engraved borders or may be produced in any other manner permitted by the rules of any securities exchange on which the Senior Notes may be listed, all as determined by the officers executing such Securities, as evidenced by their execution of such Securities.

## ARTICLE III

## THE SENIOR NOTES

SECTION 3.1.  *Payment of Principal and Interest.*

(a)     The unpaid principal amount of the Senior Notes shall bear interest

(i)     Beginning as of January 1, 2011 (the "*Original Interest Accrual Date*") through January 1, 2016, at the rate of one percent (1.0%) per annum (the "*Discounted Rate*"), unless an Additional Equity Event shall have occurred, in which case interest for any Interest Period ending after the occurrence of such Additional Equity Event shall accrue at a variable rate equal to LIBOR plus 3.50% per annum (the "*Full Rate*"); and

(ii)     After January 1, 2016, at the Full Rate,

such interest to accrue from the Original Interest Accrual Date or from the most recent Interest Payment Date to which interest has been paid or duly provided for, and any overdue principal, premium, if any, or any overdue installment of interest shall bear Additional Interest at the rate equal to the interest rate then applicable to unpaid principal amounts as provided in clauses (i) or (ii) above compounded quarterly from the dates such amounts are due until they are paid or funds for the payment thereof are made available for payment.

(b)     On the Exchange Date, interest may be prepaid by the Company, such prepayment of interest to be applied to interest payable on the next occurring Interest Payment Date.

(c)     Interest and Additional Interest on any Security that is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, except that interest and any Additional Interest payable on the Stated Maturity (or any date of principal repayment upon early maturity) of the principal of a Security or on a Redemption Date shall be paid to the Person to whom principal is paid.  The initial payment of interest on any Security that is issued between a Regular Record Date and the related Interest Payment Date shall be payable as provided in such Security.

(d)     Any interest on any Security that is due and payable, but is not timely paid or duly provided for, on any Interest Payment Date for Securities (herein called "*Defaulted Interest*") shall forthwith cease to be payable to the registered Holder on the relevant Regular Record Date by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in paragraph (i) or (ii) below:

(i)     The Company may elect to make payment of any Defaulted Interest to the Persons in whose names the Senior Notes (or their respective Predecessor Securities) are registered at the close of business on a Special Record Date for the payment of such Defaulted Interest (a "*Special Record Date*"), which shall be fixed in the following manner.  At least thirty (30) days prior to the date of the proposed payment, the Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Security and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest.  Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than fifteen (15) days and not less than ten (10) days prior to the date of the proposed payment and not less than ten (10) days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first class, postage prepaid, to each Holder of a Security at the address of such Holder as it appears in the Securities Register not less than ten (10) days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been so mailed, such Defaulted Interest shall be paid to the Persons in whose names the Senior Notes (or their respective Predecessor Securities) are registered on such Special Record Date; or

(ii)     The Company may make payment of any Defaulted Interest in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Senior Notes may be listed, traded, or quoted and, upon such notice as may be required by such exchange or automated quotation system (or by the Trustee if the Senior Notes are not listed), if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such payment shall be deemed practicable by the Trustee.

(e)     Payments of interest on the Senior Notes shall include interest accrued to but excluding the respective Interest Payment Dates.  Interest payments for the Senior Notes shall be computed and paid on the basis of a 360-day year and the actual number of days elapsed in the relevant interest period.

(f)     Payment of principal of, premium, if any, and interest on the Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  Payments of principal, premium, if any,

and interest due at the Maturity of such Securities shall be made at the Place of Payment upon surrender of such Securities to the Paying Agent and payments of interest shall be made subject to such surrender where applicable, by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Paying Agent at least ten (10) Business Days prior to the date for payment by the Person entitled thereto unless proper written transfer instructions have not been received by the relevant record date, in which case such payments shall be made by check mailed to the address of such Person as such address shall appear in the Security Register.

(g)    The parties hereto acknowledge and agree that the Holders have certain rights to direct the Company to modify the Interest Payment Dates and corresponding Redemption Date and Stated Maturity of the Senior Notes or a portion of the Senior Notes pursuant to Section 6.10 of the Exchange Agreement.  In the event any such modifications are made to the Senior Notes or a portion of the Senior Notes, appropriate changes to the form of Security set forth in Article II hereof shall be made prior to the issuance and authentication of new or replacement Senior Notes.  Any such modification of the Interest Payment Dates and corresponding Redemption Date and Stated Maturity with respect to any Securities or tranche of Securities shall not require or be subject to the consent of the Trustee.  All reasonable expenses in connection with such modification shall be paid by the applicable Holder (or the successor to such Holder's interest in the Senior Notes).

(h)    Subject to the foregoing provisions of this Section 3.1, each Security delivered under this Indenture upon transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, that were carried by such other Security.

(i)    The Senior Notes will rank *pari passu* with each other and the Company's other senior unsecured obligations from time to time outstanding

SECTION 3.2. *Denominations.*

The Senior Notes shall be in registered form without coupons and shall be issuable in minimum denominations of $100,000 and any integral multiple of $1,000 in excess thereof.

SECTION 3.3. *Execution, Authentication, Delivery and Dating.*

(a)    At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities in an aggregate principal amount (including all then Outstanding Securities) not in excess of Twenty-Seven Million, Five Hundred Thousand Dollars ($27,500,000) executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Securities, and the Trustee in accordance with the Company Order shall authenticate and deliver such Securities.  In authenticating such Securities, and accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall be entitled to receive, and shall be fully protected in relying upon:

(i)    a copy of any Board Resolution relating thereto; and

SECTION 5.2.  *Acceleration of Maturity; Rescission and Annulment.*

(a)      If an Event of Default occurs and is continuing, then and in every such case the Trustee or the Holders of not less than twenty-five percent (25%) in aggregate principal amount of the Outstanding Securities may declare the principal amount of all the Senior Notes to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by Holders).

(b)      At any time after such a declaration of acceleration with respect to Securities has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this <u>Article V</u>, the Holders of a majority in aggregate principal amount of the Outstanding Securities, by written notice to the Trustee, the Company and the Trustee, may rescind and annul such declaration and its consequences if:

(i)      the Company has paid or deposited with the Trustee a sum sufficient to pay:

(A)      all overdue installments of interest on all Securities,

(B)      any accrued Additional Interest on all Securities,

(C)      the principal of and any premium on any Securities that have become due otherwise than by such declaration of acceleration and interest (including any Additional Interest) thereon at the rate borne by the Senior Notes, and

(D)      all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel; and

(ii)      all Events of Default with respect to Securities, other than the non-payment of the principal of Securities that has become due solely by such acceleration, have been cured or waived as provided in <u>Section 5.13</u>.

SECTION 5.3.  *Collection of Indebtedness and Suits for Enforcement by Trustee.*

(a)      The Company covenants that if:

(i)      default is made in the payment of any installment of interest (including any Additional Interest) on any Security when such interest becomes due and payable and such default continues for a period of thirty (30) days, or

(ii)      default is made in the payment of the principal of and any premium on any Security at the Maturity thereof,

the Company will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of such Securities, the whole amount then due and payable on such Securities for principal and any premium and interest (including any Additional Interest) and, in addition thereto, all amounts owing the Trustee under <u>Section 6.6</u>.

- 33 -

**EXECUTION COPY**

**INDENTURE**

between

**NOVASTAR FINANCIAL, INC.**

and

**THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION,**
*as Trustee*

_____

Dated as of March 22, 2011

_____

Series 2

INDENTURE, dated as of March 22, 2011, between NovaStar Financial, Inc., a Maryland corporation (the "*Company*"), and The Bank of New York Mellon Trust Company, National Association, a national banking association, as Trustee (in such capacity, the "*Trustee*").

## RECITALS OF THE COMPANY

WHEREAS, the Company has duly authorized the execution and delivery of this Indenture to provide for the issuance of its unsecured senior notes (the "*Senior Notes*" or the "*Securities*") and to provide the terms and conditions upon which the Senior Notes are to be authenticated, issued and delivered; and

WHEREAS, all things necessary to make this Indenture a valid agreement of the Company, in accordance with its terms, have been done.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Senior Notes, as follows:

## ARTICLE I

## DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.1.  *Definitions.*

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a)      the terms defined in this <u>Article I</u> have the meanings assigned to them in this <u>Article I</u>;

(b)      the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(c)      all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(d)      unless the context otherwise requires, any reference to an "Article", a "Section", a "Schedule" or an "Exhibit" refers to an Article, a Section, a Schedule or an Exhibit, as the case may be, of this Indenture;

(e)      the words "hereby," "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(f)      a reference to the singular includes the plural and vice versa; and

- 1 -

(g)    the masculine, feminine or neuter genders used herein shall include the masculine, feminine and neuter genders.

*"Act"* when used with respect to any Holder, has the meaning specified in <u>Section 1.4(a)</u>.

*"Additional Equity Event"* means the consummation by the Company and/or its Subsidiaries of one or more equity offerings on or before January 1, 2016 with net aggregate proceeds of $40,000,000 or more.

*"Additional Interest"* means the interest, if any, that shall accrue on any amounts payable on the Senior Notes, the payment of which has not been made on the applicable Interest Payment Date and which shall accrue at the rate per annum specified or determined as specified in such Security, in each case to the extent legally enforceable.

*"Affiliate"* of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

*"Applicable Depositary Procedures"* means, with respect to any transfer or transaction involving a Global Security or beneficial interest therein, the rules and procedures of the Depositary for such Security, in each case to the extent applicable to such transaction and as in effect from time to time.

*"Approved Transaction"* means, (a) in the event that the Series C Offer and/or the Series D Exchange (each as defined in the Form S-4) are not consummated in the manner set forth in the Form S-4, an alternative transaction resulting in the Company acquiring substantially all of the Company's outstanding Series C Preferred Stock and Series D Preferred Stock, (b) any dividend or distribution by a Subsidiary to the Company and (c) any dividend or distribution by a Subsidiary to other equity owners in such Subsidiary in proportion to such other equity owners) percentage of ownership of such Subsidiary.

*"Authenticating Agent"* means any Person authorized by the Trustee pursuant to <u>Section 6.11</u> to act on behalf of the Trustee to authenticate the Senior Notes.

*"Bankruptcy Code"* means Title 11 of the United States Code or any successor statute(s) thereto, or any similar federal or state law for the relief of debtors, in each case as amended from time to time.

*"Board of Directors"* means the board of directors of the Company or any duly authorized committee of that board.

*"Board Resolution"* means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification.

The Senior Notes issued on the Original Issue Date shall be in definitive form. The definitive Securities shall be printed, lithographed or engraved, or produced by any combination of these methods, if required by any securities exchange on which the Senior Notes may be listed, on a steel engraved border or steel engraved borders or may be produced in any other manner permitted by the rules of any securities exchange on which the Senior Notes may be listed, all as determined by the officers executing such Securities, as evidenced by their execution of such Securities.

## ARTICLE III

## THE SENIOR NOTES

SECTION 3.1.  *Payment of Principal and Interest.*

(a)    The unpaid principal amount of the Senior Notes shall bear interest

(i)    Beginning as of January 1, 2011 (the "*Original Interest Accrual Date*") through January 1, 2016, at the rate of one percent (1.0%) per annum (the "*Discounted Rate*"), unless an Additional Equity Event shall have occurred, in which case interest for any Interest Period ending after the occurrence of such Additional Equity Event shall accrue at a variable rate equal to LIBOR plus 3.50% per annum (the "*Full Rate*"); and

(ii)    After January 1, 2016, at the Full Rate,

such interest to accrue from the Original Interest Accrual Date or from the most recent Interest Payment Date to which interest has been paid or duly provided for, and any overdue principal, premium, if any, or any overdue installment of interest shall bear Additional Interest at the rate equal to the interest rate then applicable to unpaid principal amounts as provided in clauses (i) or (ii) above compounded quarterly from the dates such amounts are due until they are paid or funds for the payment thereof are made available for payment.

(b)    [Intentionally Omitted].

(c)    Interest and Additional Interest on any Security that is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, except that interest and any Additional Interest payable on the Stated Maturity (or any date of principal repayment upon early maturity) of the principal of a Security or on a Redemption Date shall be paid to the Person to whom principal is paid. The initial payment of interest on any Security that is issued between a Regular Record Date and the related Interest Payment Date shall be payable as provided in such Security.

(d)    Any interest on any Security that is due and payable, but is not timely paid or duly provided for, on any Interest Payment Date for Securities (herein called "*Defaulted Interest*") shall forthwith cease to be payable to the registered Holder on the relevant Regular Record Date

by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in paragraph (i) or (ii) below:

      (i)      The Company may elect to make payment of any Defaulted Interest to the Persons in whose names the Senior Notes (or their respective Predecessor Securities) are registered at the close of business on a Special Record Date for the payment of such Defaulted Interest (a "*Special Record Date*"), which shall be fixed in the following manner. At least thirty (30) days prior to the date of the proposed payment, the Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Security and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest. Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than fifteen (15) days and not less than ten (10) days prior to the date of the proposed payment and not less than ten (10) days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first class, postage prepaid, to each Holder of a Security at the address of such Holder as it appears in the Securities Register not less than ten (10) days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been so mailed, such Defaulted Interest shall be paid to the Persons in whose names the Senior Notes (or their respective Predecessor Securities) are registered on such Special Record Date; or

      (ii)      The Company may make payment of any Defaulted Interest in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Senior Notes may be listed, traded, or quoted and, upon such notice as may be required by such exchange or automated quotation system (or by the Trustee if the Senior Notes are not listed), if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such payment shall be deemed practicable by the Trustee.

      (e)      Payments of interest on the Senior Notes shall include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for the Senior Notes shall be computed and paid on the basis of a 360-day year and the actual number of days elapsed in the relevant interest period.

      (f)      Payment of principal of, premium, if any, and interest on the Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal, premium, if any, and interest due at the Maturity of such Securities shall be made at the Place of Payment upon surrender of such Securities to the Paying Agent and payments of interest shall be made subject to such surrender where applicable, by wire transfer at such place and to such account at a

banking institution in the United States as may be designated in writing to the Paying Agent at least ten (10) Business Days prior to the date for payment by the Person entitled thereto unless proper written transfer instructions have not been received by the relevant record date, in which case such payments shall be made by check mailed to the address of such Person as such address shall appear in the Security Register.

(g)    [Intentionally Omitted].

(h)    Subject to the foregoing provisions of this Section 3.1, each Security delivered under this Indenture upon transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, that were carried by such other Security.

(i)    The Senior Notes will rank *pari passu* with each other and the Company's other senior unsecured obligations from time to time outstanding

SECTION 3.2.  *Denominations.*

The Senior Notes shall be in registered form without coupons and shall be issuable in minimum denominations of $100,000 and any integral multiple of $1,000 in excess thereof.

SECTION 3.3.  *Execution, Authentication, Delivery and Dating.*

(a)    At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities in an aggregate principal amount (including all then Outstanding Securities) not in excess of Twenty-Seven Million, Five Hundred Thousand Dollars ($27,500,000) executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Securities, and the Trustee in accordance with the Company Order shall authenticate and deliver such Securities.  In authenticating such Securities, and accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall be entitled to receive, and shall be fully protected in relying upon:

(i)    a copy of any Board Resolution relating thereto; and

(ii)    an Opinion of Counsel stating that: (1) such Securities, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute, and the Indenture constitutes, valid and legally binding obligations of the Company, each enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; (2) the Securities have been duly authorized and executed by the Company and have been delivered to the Trustee for authentication in accordance with this Indenture; (3) the Securities are not required to be registered under the Securities Act; and (4) the Indenture is not required to be qualified under the Trust Indenture Act.

(a)     default in the payment of any interest upon any Security, including any Additional Interest in respect thereof, when it becomes due and payable, and continuance of such default for a period of thirty (30) days; or

(b)     default in the payment of the principal of or any premium on any Security at its Maturity; or

(c)     default in the performance, or breach, of any covenant or warranty of the Company in this Indenture and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the Holders of at least twenty-five percent (25%) in aggregate principal amount of the Outstanding Securities a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(d)     the entry by a court having jurisdiction in the premises of a decree or order adjudging the Company a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Company under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of sixty (60) consecutive days; or

(e)     the institution by the Company of proceedings to be adjudicated a bankrupt or insolvent, or the consent by the Company to the institution of bankruptcy or insolvency proceedings against it, or the filing by the Company of a petition or answer or consent seeking reorganization or relief under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due and its willingness to be adjudicated a bankrupt or insolvent, or the taking of corporate action by the Company in furtherance of any such action.

SECTION 5.2.  *Acceleration of Maturity; Rescission and Annulment.*

(a)     If an Event of Default occurs and is continuing, then and in every such case the Trustee or the Holders of not less than twenty-five percent (25%) in aggregate principal amount of the Outstanding Securities may declare the principal amount of all the Senior Notes to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by Holders).

(b)     At any time after such a declaration of acceleration with respect to Securities has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article V, the Holders of a majority in aggregate

principal amount of the Outstanding Securities, by written notice to the Trustee, the Company and the Trustee, may rescind and annul such declaration and its consequences if:

> (i)    the Company has paid or deposited with the Trustee a sum sufficient to pay:

>> (A)    all overdue installments of interest on all Securities,

>> (B)    any accrued Additional Interest on all Securities,

>> (C)    the principal of and any premium on any Securities that have become due otherwise than by such declaration of acceleration and interest (including any Additional Interest) thereon at the rate borne by the Senior Notes, and

>> (D)    all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel; and

> (ii)    all Events of Default with respect to Securities, other than the non-payment of the principal of Securities that has become due solely by such acceleration, have been cured or waived as provided in Section 5.13.

SECTION 5.3.  *Collection of Indebtedness and Suits for Enforcement by Trustee.*

(a)    The Company covenants that if:

> (i)    default is made in the payment of any installment of interest (including any Additional Interest) on any Security when such interest becomes due and payable and such default continues for a period of thirty (30) days, or

> (ii)    default is made in the payment of the principal of and any premium on any Security at the Maturity thereof,

the Company will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of such Securities, the whole amount then due and payable on such Securities for principal and any premium and interest (including any Additional Interest) and, in addition thereto, all amounts owing the Trustee under Section 6.6.

(b)    If the Company fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceeding to judgment or final decree, and may enforce the same against the Company or any other obligor upon such Securities and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Senior Notes, wherever situated.

(c)    If an Event of Default with respect to Securities occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the

- 33 -

**EXECUTION COPY**

**INDENTURE**

between

**NOVASTAR FINANCIAL, INC.**

and

**THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION,**
*as Trustee*

_____

Dated as of March 22, 2011

_____

Series 3

INDENTURE, dated as of March 22, 2011, between NovaStar Financial, Inc., a Maryland corporation (the "*Company*"), and The Bank of New York Mellon Trust Company, National Association, a national banking association, as Trustee (in such capacity, the "*Trustee*").

## RECITALS OF THE COMPANY

WHEREAS, NovaStar Mortgage, Inc., a Virginia corporation ("*Mortgage*"), the Company, the holders of certain preferred securities issued by NovaStar Capital Trust II/B, a Delaware statutory trust (the "*Trust*"), the holders of certain junior subordinated securities issued by Mortgage, and certain other parties entered into that certain Exchange Agreement, dated as of March 22, 2011 (the "*Exchange Agreement*"); and

WHEREAS, the Company has duly authorized the execution and delivery of this Indenture to provide for the issuance of its unsecured senior notes (the "*Senior Notes*" or the "*Securities*") and to provide the terms and conditions upon which the Senior Notes are to be authenticated, issued and delivered; and

WHEREAS, all things necessary to make this Indenture a valid agreement of the Company, in accordance with its terms, have been done.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the Exchange (as hereinafter defined), it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Senior Notes, as follows:

## ARTICLE I

## DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.1.  *Definitions.*

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this <u>Article I</u> have the meanings assigned to them in this <u>Article I</u>;

(b)    the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(c)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(d)    unless the context otherwise requires, any reference to an "Article", a "Section", a "Schedule" or an "Exhibit" refers to an Article, a Section, a Schedule or an Exhibit, as the case may be, of this Indenture;

(e)      the words "hereby," "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(f)      a reference to the singular includes the plural and vice versa; and

(g)      the masculine, feminine or neuter genders used herein shall include the masculine, feminine and neuter genders.

"*Act*" when used with respect to any Holder, has the meaning specified in Section 1.4(a).

"*Additional Equity Event*" means the consummation by the Company and/or its Subsidiaries of one or more equity offerings on or before January 1, 2016 with net aggregate proceeds of $40,000,000 or more.

"*Additional Interest*" means the interest, if any, that shall accrue on any amounts payable on the Senior Notes, the payment of which has not been made on the applicable Interest Payment Date and which shall accrue at the rate per annum specified or determined as specified in such Security, in each case to the extent legally enforceable.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Applicable Depositary Procedures*" means, with respect to any transfer or transaction involving a Global Security or beneficial interest therein, the rules and procedures of the Depositary for such Security, in each case to the extent applicable to such transaction and as in effect from time to time.

"*Approved Transaction*" means, (a) in the event that the Series C Offer and/or the Series D Exchange (each as defined in the Form S-4) are not consummated in the manner set forth in the Form S-4, an alternative transaction resulting in the Company acquiring substantially all of the Company's outstanding Series C Preferred Stock and Series D Preferred Stock, (b) any dividend or distribution by a Subsidiary to the Company and (c) any dividend or distribution by a Subsidiary to other equity owners in such Subsidiary in proportion to such other equity owners) percentage of ownership of such Subsidiary.

"*Authenticating Agent*" means any Person authorized by the Trustee pursuant to Section 6.11 to act on behalf of the Trustee to authenticate the Senior Notes.

"*Bankruptcy Code*" means Title 11 of the United States Code or any successor statute(s) thereto, or any similar federal or state law for the relief of debtors, in each case as amended from time to time.

exchanged, the temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities.

SECTION 2.5.  *Definitive Securities.*

The Senior Notes issued on the Original Issue Date shall be in definitive form.  The definitive Securities shall be printed, lithographed or engraved, or produced by any combination of these methods, if required by any securities exchange on which the Senior Notes may be listed, on a steel engraved border or steel engraved borders or may be produced in any other manner permitted by the rules of any securities exchange on which the Senior Notes may be listed, all as determined by the officers executing such Securities, as evidenced by their execution of such Securities.

## ARTICLE III

## THE SENIOR NOTES

SECTION 3.1.  *Payment of Principal and Interest.*

(a)    The unpaid principal amount of the Senior Notes shall bear interest

   (i)    Beginning as of January 1, 2011 (the "*Original Interest Accrual Date*") through January 1, 2016, at the rate of one percent (1.0%) per annum (the "*Discounted Rate*"), unless an Additional Equity Event shall have occurred, in which case interest for any Interest Period ending after the occurrence of such Additional Equity Event shall accrue at a variable rate equal to LIBOR plus 3.50% per annum (the "*Full Rate*"); and

   (ii)    After January 1, 2016, at the Full Rate,

such interest to accrue from the Original Interest Accrual Date or from the most recent Interest Payment Date to which interest has been paid or duly provided for, and any overdue principal, premium, if any, or any overdue installment of interest shall bear Additional Interest at the rate equal to the interest rate then applicable to unpaid principal amounts as provided in clauses (i) or (ii) above compounded quarterly from the dates such amounts are due until they are paid or funds for the payment thereof are made available for payment.

(b)    On the Exchange Date, interest may be prepaid by the Company, such prepayment of interest to be applied to interest payable on the next occurring Interest Payment Date.

(c)    Interest and Additional Interest on any Security that is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, except that interest and any Additional Interest payable on the Stated Maturity (or any date of principal repayment upon early maturity) of the principal of a Security or on a Redemption Date shall be paid to the Person to whom principal is

paid.  The initial payment of interest on any Security that is issued between a Regular Record Date and the related Interest Payment Date shall be payable as provided in such Security.

(d)    Any interest on any Security that is due and payable, but is not timely paid or duly provided for, on any Interest Payment Date for Securities (herein called "*Defaulted Interest*") shall forthwith cease to be payable to the registered Holder on the relevant Regular Record Date by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in paragraph (i) or (ii) below:

(i)    The Company may elect to make payment of any Defaulted Interest to the Persons in whose names the Senior Notes (or their respective Predecessor Securities) are registered at the close of business on a Special Record Date for the payment of such Defaulted Interest (a "*Special Record Date*"), which shall be fixed in the following manner.  At least thirty (30) days prior to the date of the proposed payment, the Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Security and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest.  Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than fifteen (15) days and not less than ten (10) days prior to the date of the proposed payment and not less than ten (10) days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first class, postage prepaid, to each Holder of a Security at the address of such Holder as it appears in the Securities Register not less than ten (10) days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been so mailed, such Defaulted Interest shall be paid to the Persons in whose names the Senior Notes (or their respective Predecessor Securities) are registered on such Special Record Date; or

(ii)    The Company may make payment of any Defaulted Interest in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Senior Notes may be listed, traded, or quoted and, upon such notice as may be required by such exchange or automated quotation system (or by the Trustee if the Senior Notes are not listed), if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such payment shall be deemed practicable by the Trustee.

(e)    Payments of interest on the Senior Notes shall include interest accrued to but excluding the respective Interest Payment Dates.  Interest payments for the Senior Notes shall be computed and paid on the basis of a 360-day year and the actual number of days elapsed in the relevant interest period.

(f)     Payment of principal of, premium, if any, and interest on the Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  Payments of principal, premium, if any, and interest due at the Maturity of such Securities shall be made at the Place of Payment upon surrender of such Securities to the Paying Agent and payments of interest shall be made subject to such surrender where applicable, by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Paying Agent at least ten (10) Business Days prior to the date for payment by the Person entitled thereto unless proper written transfer instructions have not been received by the relevant record date, in which case such payments shall be made by check mailed to the address of such Person as such address shall appear in the Security Register.

(g)     The parties hereto acknowledge and agree that the Holders have certain rights to direct the Company to modify the Interest Payment Dates and corresponding Redemption Date and Stated Maturity of the Senior Notes or a portion of the Senior Notes pursuant to Section 6.10 of the Exchange Agreement.  In the event any such modifications are made to the Senior Notes or a portion of the Senior Notes, appropriate changes to the form of Security set forth in Article II hereof shall be made prior to the issuance and authentication of new or replacement Senior Notes.  Any such modification of the Interest Payment Dates and corresponding Redemption Date and Stated Maturity with respect to any Securities or tranche of Securities shall not require or be subject to the consent of the Trustee.  All reasonable expenses in connection with such modification shall be paid by the applicable Holder (or the successor to such Holder's interest in the Senior Notes).

(h)     Subject to the foregoing provisions of this Section 3.1, each Security delivered under this Indenture upon transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, that were carried by such other Security.

(i)     The Senior Notes will rank *pari passu* with each other and the Company's other senior unsecured obligations from time to time outstanding

SECTION 3.2.  *Denominations.*

The Senior Notes shall be in registered form without coupons and shall be issuable in minimum denominations of $100,000 and any integral multiple of $1,000 in excess thereof.

SECTION 3.3.  *Execution, Authentication, Delivery and Dating.*

(a)     At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities in an aggregate principal amount (including all then Outstanding Securities) not in excess of Thirty Million, Nine Hundred Thirty-Seven Thousand, Five Hundred Dollars ($30,937,500) executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Securities, and the Trustee in accordance with the Company Order shall authenticate and deliver such Securities.  In authenticating such Securities, and accepting the additional responsibilities

SECTION 5.2. *Acceleration of Maturity; Rescission and Annulment.*

(a)      If an Event of Default occurs and is continuing, then and in every such case the Trustee or the Holders of not less than twenty-five percent (25%) in aggregate principal amount of the Outstanding Securities may declare the principal amount of all the Senior Notes to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by Holders).

(b)      At any time after such a declaration of acceleration with respect to Securities has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this <u>Article V</u>, the Holders of a majority in aggregate principal amount of the Outstanding Securities, by written notice to the Trustee, the Company and the Trustee, may rescind and annul such declaration and its consequences if:

(i)      the Company has paid or deposited with the Trustee a sum sufficient to pay:

(A)      all overdue installments of interest on all Securities,

(B)      any accrued Additional Interest on all Securities,

(C)      the principal of and any premium on any Securities that have become due otherwise than by such declaration of acceleration and interest (including any Additional Interest) thereon at the rate borne by the Senior Notes, and

(D)      all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel; and

(ii)      all Events of Default with respect to Securities, other than the non-payment of the principal of Securities that has become due solely by such acceleration, have been cured or waived as provided in <u>Section 5.13</u>.

SECTION 5.3. *Collection of Indebtedness and Suits for Enforcement by Trustee.*

(a)      The Company covenants that if:

(i)      default is made in the payment of any installment of interest (including any Additional Interest) on any Security when such interest becomes due and payable and such default continues for a period of thirty (30) days, or

(ii)      default is made in the payment of the principal of and any premium on any Security at the Maturity thereof,

the Company will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of such Securities, the whole amount then due and payable on such Securities for principal and any premium and interest (including any Additional Interest) and, in addition thereto, all amounts owing the Trustee under <u>Section 6.6</u>.

# EXHIBIT C



# BNY MELLON

## NOTICE OF ACCELERATION

May 6, 2016

Novastar Financial, Inc.
Attn: Rodney Schwatken
2114 Central Street – Suite 600
Kansas City, MO 64108                    **VIA UPS Overnight Mail and First Class**

Re:   **NOVASTAR FINANCIAL, INC.**
      **SENIOR NOTES DUE 2033, SERIES 1 ("Series 1 Notes") (CUSIP 669947AA1)[1]**
      **SENIOR NOTES DUE 2033, SERIES 2 ("Series 2 Notes") (CUSIP 669947AB9)**

Dear Mr. Schwatken:

This notice is delivered by The Bank of New York Mellon Trust Company, N.A., as Trustee under three separate Indentures, each dated March 22, 2011, between NovaStar Financial, Inc. and the Trustee, relating to the Series 1 Senior Notes, Series 2 Senior Notes and Series 3 Senior Notes, respectively ("Series 1 Senior Notes", "Series 2 Senior Notes" and "Series 3 Senior Notes" collectively referred to as "Senior Notes").   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Indentures.

### Notice of Event of Default under Indentures

As the Trustee previously advised Holders, the Company did not make interest payments on March 30, 2016 for the each Series of Senior Notes, and that if such non-payment continued for a period of 30 days an Event of Default would occur.  Non-payment of interest has continued for more than 30 days.  Accordingly, notice is hereby given that an Event of Default has occurred and is continuing on each Series of Senior Notes, pursuant to Section 5.1(a) of each Indenture.

### Remedies for Holders

Pursuant to Section 5.2 of each Indenture, if an Event of Default occurs and is continuing, then and in every such case the Trustee or the Holders of not less than twenty-five percent (25%) in aggregate principal amount of the Outstanding Securities for each series may declare the principal amount of the respective series of Notes to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by Holders).

---

[1] CUSIP numbers appearing herein have been included solely for the convenience of the Holders.  The Bank of New York Mellon Trust Company, N.A. assumes no responsibility for the selection or use of such number and makes no representation as to the correctness of the CUSIP numbers listed herein.

**Notice of Acceleration Series 1 Senior Notes and Series 2 Senior Notes**

**THE TRUSTEE HAS RECEIVED A DIRECTION TO ACCELERATE FROM THE HOLDERS OF THE SERIES 1 SENIOR NOTES AND SERIES 2 SENIOR NOTES. THIS IS YOUR NOTICE THE TRUSTEE HEREBY DECLARES ALL PRINCIPAL, ACCRUED AND UNPAID INTEREST (INCLUDING ADDITIONAL INTEREST) TO BE IMMEDIATELY DUE AND PAYABLE ON SERIES 1 SENIOR NOTES AND SERIES 2 SENIOR NOTES.**

Please be advised that the Trustee reserves all of the rights, powers, claims and remedies available to it under the Indentures and applicable law. Except as may be limited by the terms of applicable law or any court order, no delay or forbearance by the Trustee to exercise any right or remedy accruing upon the occurrence of a Default, an Event of Default or similar event or otherwise under the terms of the Indentures, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or an acquiescence therein.

Should you have any questions regarding the contents of this notice or wish to direct the Trustee, you may contact J. Chris Matthews by e-mail at j.chris.matthews@bnymellon.com or by telephone at (713) 483-6267.

The Bank of New York Mellon Trust Company, N.A. as Trustee

cc:

Novastar Financial, Inc.
Attn: Barry Igdaloff, Chairman
2114 Central Street – Suite 600
Kansas City, MO 64108



# BNY MELLON

## NOTICE OF ACCELERATION

June 6, 2016

## VIA UPS OVERNIGHT MAIL AND FIRST CLASS

Novation Companies, Inc.
Attn: Rodney Schwatken
2114 Central Street – Suite 600
Kansas City, MO 64108

**Re:    SENIOR NOTES DUE 2033, SERIES 3 ("Series 3 Notes") (CUSIP 669947AC7)**

Dear Mr. Schwatken:

This notice is delivered by The Bank of New York Mellon Trust Company, N.A., as Trustee under the Indenture dated March 22, 2011, between Novation Companies, Inc. (formerly named NovaStar Financial, Inc.) and the Trustee, relating to the Series 3 Senior Notes the "Series 3 Senior Notes." Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Indenture.

## Notice of Event of Default under Indentures

The Company did not make interest payment due on March 30, 2016 for the Series 3 Senior Notes. Non-payment of interest has continued for more than 30 days. Accordingly, notice is hereby given that an Event of Default has occurred and is continuing on the Series 3 Senior Notes, pursuant to Section 5.1(a) of the Indenture.

## Notice of Acceleration Series 3 Senior Notes

**THE TRUSTEE HAS RECEIVED A DIRECTION TO ACCELERATE FROM THE HOLDERS OF THE SERIES 3 SENIOR NOTES. THIS IS YOUR NOTICE THE TRUSTEE HEREBY DECLARES ALL PRINCIPAL, ACCRUED AND UNPAID INTEREST (INCLUDING ADDITIONAL INTEREST) TO BE IMMEDIATELY DUE AND PAYABLE ON SERIES 3 SENIOR NOTES.**

Please be advised that the Trustee reserves all of the rights, powers, claims and remedies available to it under the Indenture and applicable law. Except as may be limited by the terms of applicable law or any court order, no delay or forbearance by the Trustee to exercise any right or remedy accruing upon the occurrence of a Default, an Event of Default or similar event or otherwise under the terms of the Indenture, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or an acquiescence therein.

7810623.1

Should you have any questions regarding the contents of this notice or wish to direct the Trustee, you may contact J. Chris Matthews by e-mail at j.chris.matthews@bnymellon.com or by telephone at (713) 483-6267.

**THE BANK OF NEW YORK MELLON**
**TRUST COMPANY, N.A**. as Trustee

cc:    Novation Companies, Inc.
       Attn: Barry Igdaloff, Chairman
       2114 Central Street – Suite 600
       Kansas City, MO 64108

7810623.1

# EXHIBIT D

# NOVATION COMPANIES, INC.

# FORM 10-K
### (Annual Report)

## Filed 02/16/16 for the Period Ending 12/31/15

| | |
|---|---|
| Address | 2114 CENTRAL |
| | STE 600 |
| | KANSAS CITY, MO 64108 |
| Telephone | 8162377000 |
| CIK | 0001025953 |
| Symbol | NOVCQ |
| SIC Code | 6531 - Real Estate Agents and Managers |
| Industry | Real Estate Development & Operations |
| Sector | Financials |
| Fiscal Year | 12/31 |



http://www.edgar-online.com
© Copyright 2016, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

### FORM 10-K

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year ended December 31, 2015**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From _____ to _____

---

### Commission File Number 001-13533
# NOVATION COMPANIES, INC.
(Exact Name of Registrant as Specified in its Charter)

| **Maryland** | **74-2830661** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

| **2114 Central Street, Suite 600, Kansas City, MO** | **64108** |
|---|---|
| (Address of Principal Executive Office) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: (816) 237-7000**

---

**Securities Registered Pursuant to Section 12(b) of the Act:**
**None**

**Securities Registered Pursuant to Section 12(g) of the Act:**
**Title of Each Class**
Common Stock, $0.01 par value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐   No ☒

The aggregate market value of voting and non-voting stock held by non-affiliates of the registrant as of June 30, 2015 was approximately $17,674,450 , based upon the closing sales price of the registrant's common stock on that date on the OTCQB market of the OTC Markets Group, Inc.

The number of shares of the Registrant's Common Stock outstanding on February 12, 2016 was 92,844,907 .

## Documents Incorporated by Reference
Portions of the registrant's definitive proxy statement relating to its 2016 annual meeting of shareholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A are incorporated by reference into Part III of this Annual Report on Form 10-K.

**NOVATION COMPANIES, INC.**
**FORM 10-K**
**For the Fiscal Year ended December 31, 2015**

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 2 |
| Item 1B. | Unresolved Staff Comments | 5 |
| Item 2. | Properties | 5 |
| Item 3. | Legal Proceedings | 5 |
| Item 4. | Mine Safety Disclosures | 6 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 7 |
| Item 6. | Selected Financial Data | 7 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 8 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 12 |
| Item 8. | Financial Statements and Supplementary Data | 13 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 38 |
| Item 9A. | Controls and Procedures | 38 |
| Item 9B. | Other Information | 38 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 39 |
| Item 11. | Executive Compensation | 39 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 39 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 39 |
| Item 14. | Principal Accountant Fees and Services | 39 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 40 |
| | Exhibit Index | 40 |
| | Signatures | 43 |

# PART I

Unless the context otherwise requires, references in this Annual Report on Form 10-K to "Novation," the "Company," "NOVC," "we," "us" and "our," refer to Novation Companies, Inc. and its consolidated subsidiaries and their respective predecessors.

**Forward-Looking Statements**

Statements in this report regarding Novation and its business, that are not historical facts are "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Forward-looking statements are those that predict or describe future events, do not relate solely to historical matters and include statements regarding management's beliefs, estimates, projections, and assumptions with respect to, among other things, our future operations, business plans and strategies, as well as industry and market conditions, all of which are subject to change at any time without notice. Words such as "believe," "expect," "anticipate," "promise," "plan," and other expressions or words of similar meanings, as well as future or conditional auxiliary verbs such as "would," "should," "could," or "may" are generally intended to identify forward-looking statements. Actual results and operations for any future period may vary materially from those discussed herein. Some important factors that could cause actual results to differ materially from those anticipated include: our ability to identify and acquire operating businesses or make other investments that generate taxable income; decreases in cash flows from our mortgage securities; our ability to remain in compliance with the agreements governing our indebtedness; the outcome of litigation actions pending against us or other legal contingencies; our compliance with applicable local, state and federal laws and regulations; compliance with new accounting pronouncements; the impact of general economic conditions; and the risks that are from time to time included in our filings with the Securities and Exchange Commission ("SEC"), including this report. Other factors not presently identified may also cause actual results to differ. This report speaks only as of its date and we expressly disclaim any duty to update the information herein except as required by federal securities laws.

**Item 1. Business**

**Our Business**

As of December 31, 2015, the Company owned 100% of Corvisa LLC ("Corvisa"), a developer and seller of cloud-based communication software under the CorvisaOne® brand, telecommunications services, and implementation consulting services. On December 21, 2015, the Company entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") with Corvisa Services LLC ("Corvisa Services"), a wholly owned subsidiary of the Company, and ShoreTel, Inc. ("ShoreTel"), pursuant to which ShoreTel agreed to purchase all of the membership interests of Corvisa, subject to the terms and conditions under the Purchase Agreement.

The sale of Corvisa was completed on January 6, 2016. The aggregate consideration for the transaction included approximately $8.4 million in cash, subject to a potential post-closing working capital adjustment, of which amount approximately $7.0 million was paid at the closing and the following was deposited in escrow: (i) $1.0 million for a period of twelve months to secure certain indemnification obligations of the Company; and (ii) $0.35 million to secure certain obligations of the Company in connection with the post-closing working capital adjustment. In connection with the closing of this transaction, the Company and ShoreTel also entered into a Transition Services Agreement and an Escrow Agreement.

At ShoreTel's request, the Company disposed of Corvisa's third-party software implementation consulting business in December 2015. The Company sold the assets related exclusively to this business, including but not limited to customer contracts, computer hardware and marketing materials, to Canpango LLC ("Canpango"), which agreed to hire certain employees of the business, to assume Corvisa's obligations under the customer contracts, and to pay to the Company a portion of the business's existing accounts receivable collected in the next nine months, less associated collection costs. Canpango is led by a former employee of Corvisa, and certain current and former employees of Corvisa have financial interests in Canpango. The sales price, assets and operations related exclusively to this business were not material to the Company's financial statements when taken as a whole.

With the sale of Corvisa complete, the Company intends to continue its strategy of seeking to acquire operating businesses or make other investments that generate taxable earnings. As of the date the financial statements included in this report are issued, the Company has not yet identified any specific acquisition targets.

On August 18, 2014, the Company sold certain intellectual property, software, and customer data of its subsidiary, Advent Financial Services LLC ("Advent"), to Santa Barbara Tax Products Group, LLC, and announced that it would be conducting an orderly winding-down of the remaining business and operations of Advent; a financial settlement services provider for professional tax preparers nationwide.

On April 16, 2014, the Company and the non-controlling members of StreetLinks LLC ("StreetLinks"), a national residential appraisal and mortgage real estate valuation management services company, entered into a purchase and sale agreement with Assurant Services, LLC, a subsidiary of Assurant, Inc. ("Assurant"), pursuant to which Assurant purchased 100% of the outstanding membership units of StreetLinks.

Prior to 2008, the Company originated, purchased, securitized, sold, invested in and serviced residential nonconforming mortgage loans and mortgage securities. Although those activities have been discontinued, as a result of those activities, the Company acquired and owns mortgage securities that continue to be a source of our cash flow.

**Employees**

As of December 31, 2015 , the Company employed, directly or through subsidiaries, an aggregate of 115 full-time employees. With the sale of Corvisa, this number declined to approximately 18 employees. The Company anticipates further reductions in headcount as the accounting and other administrative services are transitioned to ShoreTel pursuant to the transition services agreement. None of the Company's employees are represented by a union or covered by a collective bargaining agreement.

**Additional Information**

The Company is a Maryland corporation formed on September 13, 1996 as "CapStar Financial, Inc." The Company's name was changed to "NovaStar Financial, Inc." effective October 11, 1996, and to "Novation Companies, Inc." effective May 23, 2012. Our corporate executive offices are located at 2114 Central Street, Suite 600, Kansas City, MO 64108. Our telephone number is (816) 237-7000 .

Our website address is www.novationcompanies.com. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available, free of charge, on our website at www.novationcompanies.com as soon as reasonably practicable after we electronically file this material with, or furnish it to, the SEC. Reports and other information we file with the SEC may also be viewed at the SEC's website at www.sec.gov, or viewed or obtained at the SEC Public Reference Room at 100 F Street, NE, Washington, DC 20549. Our website is not intended to be a part of, nor are we incorporating it by reference into, this Annual Report on Form 10-K.

**Item 1A. Risk Factors**

**Risk Factors**

*Investing in our common stock involves a high degree of risk. You should carefully consider the following risk factors, as well as the other information contained in this Annual Report on Form 10-K, including our consolidated financial statements and notes thereto, before deciding whether to invest in our common stock. Any of these risks, as well as additional risks and uncertainties that we are unaware of, could negatively affect our results of operations, financial condition, liquidity and business prospects, and cause the trading price of our common stock to decline, and cause you to lose all or part of your investment.*

**Risks Related to our Business**

***Our success is dependent on our ability to identify and acquire operating businesses or make other investments that generate taxable earnings, which is subject to significant uncertainties and limitations.***

With the sale of Corvisa complete, we intend to continue our strategy of seeking to acquire operating businesses or make other investments that generate taxable earnings. There can be no assurances that we will be able to identify or successfully acquire new operating businesses. The process of identifying an acquisition target and negotiating an acquisition may take an extended period of time and could result in significant additional expenditures, such as legal and consulting fees. Our ability to acquire operating businesses is significantly constrained by our likely inability to obtain additional debt financing. Moreover, we may never realize the anticipated benefits of any acquisition, which could significantly harm our results of operations, financial condition and business prospects.

***Acquisitions, business combinations and other transactions present integration risk and may have negative consequences for our business and our stockholders.***

The process of integrating acquired businesses into the Company may result in unforeseen difficulties, liabilities and costs. Significant management attention and resources are required to integrate any acquired businesses. Difficulties that we encounter in integrating the operations of acquired businesses could significantly harm our results of operations, financial condition and business prospects .

2

***Our ability to use our net operating loss carryforwards and net unrealized built-in losses could be severely limited in the event of certain transfers of our voting securities.***

We currently have recorded a significant deferred tax asset, before valuation allowance, almost all of which relates to certain net operating loss carryforwards and net unrealized built-in-losses. While we believe that it is more likely than not that we will not be able to utilize such losses in the future, the net operating loss carryforwards and net unrealized built-in losses could provide significant future tax savings to us if we are able to fully utilize such losses. However, our ability to use these tax benefits may be impacted, restricted or eliminated due to a future "ownership change" within the meaning of Section 382 of the Code. An ownership change could occur that would severely limit our ability to use the tax benefits associated with the net operating loss carryforwards and net unrealized built-in losses, which may result in higher taxable income for us (and a significantly higher tax cost as compared to the situation where these tax benefits are preserved).

***We may become subject to the regulation under the Investment Company Act of 1940, which would impose significant responsibilities and restrictions on our ability to do business.***

We plan to continue to conduct our business and operations in such a manner as not to be deemed an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Investment companies are subject to extensive, restrictive and potentially adverse regulations relating to, among other things, operating methods, management, capital structure and transactions with affiliates. An entity may generally be deemed to be an investment company for purposes of the Investment Company Act if (a) it is or holds itself out as being engaged primarily in the business of investing, reinvesting or trading in securities; or (b) absent an applicable exemption, it owns investment securities having a value exceeding 40% of certain assets (the "40% Test"). We do not believe we are primarily engaged in an investment company type business, nor do we propose to primarily engage in such a business. However, as a result of the sale of Corvisa in January 2016, we can no longer definitively conclude that we pass the 40% Test.

We intend to rely on the exemption from investment company status under Rule 3a-2 under the Investment Company Act, which provides that a company is deemed not to be an investment company for up to one year provided that the company has a bona fide intent to be engaged primarily, as soon as is reasonably possible, in a business other than that of an investment company. Accordingly, we intend to continue our strategy of seeking to acquire operating businesses as soon as reasonably possible, or seek to rely on another exemption under the Investment Company Act. This may limit our ability to make certain investments other than the acquisition of operating businesses, or require us to take or forego certain actions, which could otherwise be beneficial to us.

If we are not able to acquire operating businesses during the one-year grace period under Rule 3a-2 or rely on another exemption under the Investment Company Act, we may be required to take certain other actions to comply with the Investment Company Act, which actions may include divesting certain desirable assets immediately or registering as an investment company.

***Covenant restrictions under our indebtedness may limit our ability to operate our business.***

The indentures governing the senior notes (the "Indentures") we issued on March 22, 2011 (the "Senior Notes") contain, among other things, covenants that may restrict our and our subsidiaries' ability to finance future operations, capital needs or to engage in other business activities. Without the prior consent of the holders of our Senior Notes, the terms of our Senior Notes and the related Indentures restrict, among other things, our ability and the ability of our subsidiaries to:

  •   incur indebtedness;
  •   create certain liens;
  •   make payments from our subsidiaries to us;
  •   make payments to our shareholders;
  •   acquire our outstanding shares, or the shares of our subsidiaries;
  •   make payments on debt securities *pari passu* or junior to the Senior Notes; and
  •   merge, consolidate, transfer and/or sell substantially all of our assets.

There can be no assurance that we will be able to receive the consent of the persons holding the Senior Notes should we have a need to take one of the restricted actions, which such limitation may hinder our ability to operate or grow our business in the future.

***Loss of key members of our management could disrupt our business.***

The loss of certain key members of management could have a material adverse effect on our business, financial condition and results of operations. We may not be able to retain our existing senior management, fill new positions or vacancies created by expansion or turnover or attract additional qualified senior management personnel.

***We may not have access to financing on reasonable terms or at all, which may be necessary for us to acquire and operate new businesses.***

We do not currently have in place any agreements or commitments for short-term financing nor any agreements or commitments for additional long-term financing. In light of these factors and current market conditions, we may not be able to secure additional financing for a potential acquisition.

***Differences in our actual experience compared to the assumptions that we use to determine the value of our residual mortgage securities and to estimate fair values could further adversely affect our financial position.***

The Company uses significant unobservable inputs (Level 3 inputs) to estimate the fair value of its residual mortgage securities. Material differences between actual experience and the assumptions used to determine the fair value of these securities may negatively impact our financial condition and results of operations. For example, one significant unobservable input used to determine the fair value of the Company's residual mortgage securities is the prepayment rate for the underlying mortgage loan collateral. If prepayment rates are faster (higher) than our estimates, the value of the securities may decline significantly.

***The cash flows from, and value of, our mortgage securities will further decline as the underlying mortgage loan collateral declines.***

There are many factors that affect the cash flows from, and value of, our mortgage securities, many of which are beyond our control. In general, the nature of mortgage securities is that as the underlying mortgage loan collateral is repaid or defaults, the cash flows from, and value of, our securities will decline.

## Risks Related to our Legacy Businesses

***We may be required to repurchase mortgage loans or indemnify mortgage loan purchasers as a result of breaches of representations and warranties, borrower fraud, or certain borrower defaults, which could further harm our liquidity.***

When we sold mortgage loans, whether as whole loans or pursuant to a securitization, we made customary representations and warranties to the purchaser about the mortgage loans and the manner in which they were originated. Our whole loan sale agreements require us to repurchase or substitute mortgage loans in the event we breach any of these representations or warranties. In addition, we may be required to repurchase mortgage loans as a result of borrower, broker, or employee fraud. Likewise, we are required to repurchase or substitute mortgage loans if we breach a representation or warranty in connection with our securitizations. We have received various repurchase demands as performance of subprime mortgage loans has deteriorated. A majority of repurchase requests have been denied, otherwise a negotiated purchase price adjustment was agreed upon with the purchaser. Enforcement of repurchase obligations against us would further harm our liquidity.

***There can be no assurance that the Company will earn any post-closing consideration under the terms of the StreetLinks sale.***

On April 16, 2014, the Company, and the minority owners of StreetLinks, sold StreetLinks LLC to Assurant Services, LLC and Assurant, Inc. A portion of the total sales price of StreetLinks was in the form of an earn-out of up to $12 million dependent on the total revenue of StreetLinks in fiscal 2015 and 2016 (the "Earn-Out"), and subject to adjustment for working capital and the other terms and conditions set forth in the definitive agreement.

Under the Earn-Out, if (a) the total revenue of StreetLinks is $184 million or more for calendar year 2015, then Assurant will pay to all the sellers of StreetLinks an aggregate of $12 million (subject to reduction for certain earned bonus payments to StreetLinks employees); but if not, then (b) if the total revenue of StreetLinks is greater than $167.5 million for the calendar year 2016, Assurant will pay to all the seller's up to an aggregate of $12 million (subject to reduction for certain earned bonus payments to StreetLinks employees), based on a linear scale where full payment of the $12 million would occur at total revenue of $184 million. At the time of the sale, the Company owned 88% of StreetLinks.

There can be no assurance that the Company will receive any payment under the Earn-Out. Assurant has agreed to act in good faith in conducting the business of StreetLinks and to keep separate records, but generally Novation does not control how Assurant may operate the business of StreetLinks. StreetLinks did not meet the revenue target set for calendar year 2015.

## Risks Related to our Capital Stock

***There can be no assurance that our common stock will continue to be traded in an active market.***

Our common stock currently trades on the OTCQB market of the OTC Markets Group, Inc. Trading of securities on this quotation service is generally limited and is effected on a less regular basis than on exchanges, such as the NYSE, and accordingly investors who own or purchase our stock will find that the liquidity or transferability of the stock may be limited. Additionally, a shareholder may find it more difficult to dispose of, or obtain accurate quotations as to the market value of, our stock. If an active public trading market cannot be sustained, the trading price of our common stock could be adversely affected and the ability of an investor to transfer their shares of our common stock may be limited.

***The market price and trading volume of our common stock may be volatile, which could result in substantial losses for our shareholders.***

The market price of our capital stock can be highly volatile and subject to wide fluctuations. In addition, the trading volume in our capital stock may fluctuate and cause significant price variations to occur. Investors may experience volatile returns and material losses. Some of the factors that could negatively affect our share price or result in fluctuations in the price or trading volume of our capital stock include:

- actual or perceived changes in our ability to continue as a going concern;
- actual or anticipated changes in our earnings and cash flow;
- general market and economic conditions, including the operations and stock performance of other industry participants;
- the impact of new state or federal legislation or adverse court decisions;
- actual or anticipated changes in the delinquency and default rates on mortgage loans, in general, and specifically on the loans we invest in through our mortgage securities;
- actual or anticipated changes in financial estimates by securities analysts;
- sales, or the perception that sales could occur, of a substantial number of shares of our common stock by insiders;
- additions or departures of senior management and key personnel; and
- actions by institutional shareholders.

***Some provisions of our charter, bylaws, Maryland law and our current shareholder rights plan may deter takeover attempts, which may limit the opportunity of our shareholders to sell their common stock at favorable prices.***

Certain provisions of our charter, bylaws, Maryland law, and our current shareholder rights plan could discourage, delay or prevent transactions that involve an actual or threatened change in control, and may make it more difficult for a third party to acquire us, even if doing so may be beneficial to our shareholders. For example, our board of directors is divided into three classes with three year staggered terms of office. This makes it more difficult for a third party to gain control of our board because a majority of directors cannot be elected at a single meeting. Further, under our charter, generally a director may only be removed for cause and only by the affirmative vote of the holders of at least a majority of all classes of shares entitled to vote in the election for directors together as a single class. Our bylaws make it difficult for any person other than management to introduce business at a duly called meeting requiring such other person to follow certain advance notice procedures. Maryland law provides protection for Maryland corporations against unsolicited takeover situations. Finally, we have a shareholder rights plan to protect our net operating loss carryforwards by preventing any shareholder from becoming a 5% shareholder, which may constitute a change in control of the Company.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

The executive and administrative offices for the Company are located in Kansas City, Missouri, and consist of approximately 12,000 square feet of leased office space. The Company is also a party to an operating lease for 30,000 square feet of office space in Tampa, Florida. The Company abandoned this operating lease during the fourth quarter of 2014. With the sale of Corvisa, the Company is currently in the process of re-evaluating its current office space needs and assessing its alternatives under its existing operating leases.

## Item 3. Legal Proceedings

The Company is a party to various legal proceedings. Except as set forth below, these proceedings are of an ordinary and routine nature.

On May 21, 2008, a purported class action case was filed in the Supreme Court of the State of New York, New York County, by the New Jersey Carpenters' Health Fund, on behalf of itself and all others similarly situated. Defendants in the case included NovaStar Mortgage Funding Corporation ("NMFC"), a wholly-owned subsidiary of the Company, and its individual directors, several securitization trusts sponsored by the Company ("affiliated defendants") and several unaffiliated investment banks and credit rating agencies. The case was removed to the United States District Court for the Southern District of New York. On June 16, 2009, the plaintiff filed an amended complaint. The plaintiff seeks monetary damages, alleging that the defendants violated sections 11, 12 and 15 of the Securities Act of 1933, as amended, by making allegedly false statements regarding mortgage loans that served as collateral for securities purchased by the plaintiff and the purported class members. On August 31, 2009, the Company filed a motion to dismiss the plaintiff's claims, which the court granted on March 31, 2011, with leave to amend. The plaintiff filed a second amended complaint on May 16, 2011, and the Company again filed a motion to dismiss. On March 29, 2012, the court dismissed the plaintiff's second amended complaint with prejudice and without leave to replead. The plaintiff filed an appeal. On March 1, 2013, the appellate court reversed the judgment of the lower court, which had dismissed the case.

Also, the appellate court vacated the judgment of the lower court which had held that the plaintiff lacked standing, even as a class representative, to sue on behalf of investors in securities in which plaintiff had not invested, and the appellate court remanded the case back to the lower court for further proceedings. On April 23, 2013 the plaintiff filed its memorandum with the lower court seeking a reconsideration of the earlier dismissal of plaintiff's claims as to five offerings in which plaintiff was not invested, and on February 5, 2015 the lower court granted plaintiff's motion for reconsideration and vacated its earlier dismissal. Given the stage of the litigation, the Company cannot provide an estimate of the range of any loss. The Company believes that the affiliated defendants have meritorious defenses to the case and expects them to defend the case vigorously.

On June 20, 2011, the National Credit Union Administration Board, as liquidating agent of U.S. Central Federal Credit Union, filed an action against NMFC and numerous other defendants in the United States District Court for the District of Kansas, claiming that the defendants issued or underwrote residential mortgage-backed securities pursuant to allegedly false or misleading registration statements, prospectuses, and/or prospectus supplements. On August 24, 2012, the plaintiff filed an amended complaint making essentially the same claims against NMFC. NMFC filed a motion to dismiss the amended complaint which was denied on September 12, 2013. The defendants had claimed that the case should be dismissed based upon a statute of limitations and sought an appeal of the court's denial of this defense. An interlocutory appeal of this issue was allowed, and on August 27, 2013, the Tenth Circuit affirmed the lower court's denial of defendants' motion to dismiss the plaintiff's claims as being time barred; the appellate court held that the Extender Statute, 12 U.S.C. §1787(b)(14) applied to plaintiff's claims. On June 16, 2014, the United States Supreme Court granted a petition of NMFC and its co-defendants for certiorari, vacated the ruling of the Tenth Circuit, and remanded the case back to that court for further consideration in light of the Supreme Court's decision in CTS Corp. v. Waldburger, 134 S. Ct. 2175 (2014). On August 19, 2014, the Tenth Circuit reaffirmed its prior decision, and on October 2, 2014 the defendants filed a petition for writ of certiorari with the Supreme Court, which was denied. Given the stage of the litigation, the Company cannot provide an estimate of the range of any loss. The Company believes that NMFC has meritorious defenses to the case and expects it to defend the case vigorously.

On February 28, 2013 the Federal Housing Finance Agency, as conservator for the Federal Home Loan Mortgage Corporation (Freddie Mac) and on behalf of the Trustee of the NovaStar Mortgage Funding Trust, Series 2007-1 (the "Trust"), a securitization trust in which the Company retains a residual interest, filed a summons with notice in the Supreme Court of the State of New York, County of New York against the Company and NovaStar Mortgage, Inc. ("NMI"), a wholly-owned subsidiary of the Company. The notice provides that this is a breach of contract action with respect to certain, unspecified mortgage loans and defendant's failure to repurchase such loans under the applicable agreements. Plaintiff alleges that defendants, from the closing date of the transaction that created the Trust, were aware of the breach of the representations and warranties made and failed to notice and cure such breaches, and due to the failure of defendants to cure any breach, notice to defendants would have been futile. The summons with notice was not served until June 24, 2013. By letter dated June 24, 2013, the Trustee of the Trust forwarded a notice from Freddie Mac alleging breaches of representations and warranties with respect to 43 loans, as more fully set forth in included documentation. The 43 loans had an aggregate, original principal balance of about $6.5 million. On August 19, 2013, Deutsche Bank National Trust Company, as Trustee, filed a complaint identifying alleged breaches of representations and warranties with respect to seven loans that were included in the earlier list of 43 loans. Plaintiff also generally alleged a trust-wide breach of representations and warranties by defendants with respect to loans sold and transferred to the trust. Plaintiff seeks specific performance of repurchase obligations; compensatory, consequential, recessionary and equitable damages for breach of contract; specific performance and damages for anticipatory breach of contract; and indemnification (indemnification against NMI only). On October 9, 2013, the Company and NMI filed a motion to dismiss plaintiff's complaint. This motion to dismiss was withdrawn after plaintiff filed an amended complaint on January 28, 2014, and on March 4, 2014 the Company and NMI filed a motion to dismiss the amended complaint. Given the stage of the litigation, the Company cannot provide an estimate of the range of any loss. The Company believes that it has meritorious defenses to the case and expects to defend the case vigorously.

## Item 4. Mine Safety Disclosures

None.

## PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

The Company's common stock currently trades on the OTCQB market of the OTC Markets Group, Inc. under the symbol "NOVC". The following table sets forth the high and low bid prices as reported by this quotation service, for the periods indicated.

|  | High | | Low | |
|---|---|---|---|---|
| **2015** | | | | |
| First Quarter | $ | 0.35 | $ | 0.24 |
| Second Quarter | | 0.42 | | 0.22 |
| Third Quarter | | 0.32 | | 0.22 |
| Fourth Quarter | | 0.31 | | 0.12 |
| | | | | |
| **2014** | | | | |
| First Quarter | $ | 0.37 | $ | 0.23 |
| Second Quarter | | 0.40 | | 0.24 |
| Third Quarter | | 0.31 | | 0.23 |
| Fourth Quarter | | 0.34 | | 0.19 |

As of February 12, 2016 , we had approximately 722 shareholders of record of the Company's common stock. This figure does not represent the actual number of beneficial owners of our common stock because such stock is frequently held in "street name" by securities dealers and others for the benefit of individual owners who may vote the shares.

No dividends were declared during 2015 or 2014, nor do we expect to declare any stock dividend distributions in the near future. The indentures governing the Senior Notes contain certain restrictive covenants which prohibit the Company and its subsidiaries, from among other things, making any cash dividend or distribution to Novation shareholders. Should the restrictions be relieved, dividend distributions will be made at the discretion of the Board of Directors and will depend on earnings, financial condition, cost of equity, investment opportunities and other factors as the Board of Directors may deem relevant.

**Item 6. Selected Financial Data**

Not applicable.

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following is a discussion and analysis of our financial condition and results of operations for the years ended December 31, 2015 and 2014. This discussion and analysis should be read in conjunction with our audited consolidated financial statements and Notes to the Consolidated Financial Statements set forth in Part II, Item 8, "Financial Statements and Supplementary Data" of this Form 10-K. This discussion contains forward-looking statements that involve risks and uncertainties and that are not historical facts, including statements about our beliefs and expectations. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those discussed below and particularly under the headings "Risk Factors," "Business" and "Forward-Looking Statements" contained in Item 1A, Item 1, and Part I of this Form 10-K, respectively.*

### Executive Overview

The Management's Discussion and Analysis of Financial Condition and Operating Results ("MD&A") includes the following sections:

- Corporate Overview, Background and Strategy **–** a brief overview of our business, current strategy, and significant recent events.
- Consolidated Results of Operations **–** an analysis of our results of operations for the years ended December 31, 2015 and 2014 as presented in our Consolidated Financial Statements.
- Operating Segment Results of Operations **–** an analysis of our results of operations for the years ended December 31, 2015 and 2014 as presented in our Consolidated Financial Statements for our reporting segments.
- Liquidity and Capital Resources **–** an analysis of our cash flows and financial commitments.
- Critical Accounting Estimates **–** a discussion of our critical accounting estimates, which involve a high degree of judgment or complexity. This section also includes the impact of new accounting standards.

### Corporate Overview, Background and Strategy

#### *Our Business*

A description of our business is included in Item 1 of this report and is incorporated herein by reference.

#### *Our Strategy*

The Company is continuing its strategy of seeking to acquire operating businesses or making other investments that generate taxable earnings. As of the date the financial statements included in this report are issued, the Company has not yet identified any specific acquisition targets.

The key performance measures for executive management are:

- maintaining and/or generating adequate liquidity to sustain us and allow us to take advantage of acquisition opportunities, and
- generating taxable income and long-term value for our shareholders.

The following key performance metrics are derived from our consolidated financial statements for the periods presented and should be read in conjunction with the more detailed information therein and with the disclosure included in this report under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Table 1 **–** Summary of Financial Highlights and Key Performance Metrics (dollars in thousands; except per share amounts)

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2015** | | **2014** | |
| Cash and cash equivalents | $ | 2,826 | $ | 3,235 |
| Marketable securities | $ | 18,897 | $ | 43,057 |
| Net (loss) income available to common shareholders, per diluted share | $ | (0.32) | $ | 0.34 |

**Consolidated Results of Operations**

*Year ended December 31, 2015 as Compared to the Year Ended December 31, 2014*

*Service Fee Income and Cost of Services – Transition Services*

In connection with the sale of StreetLinks, the Company and Assurant entered into a transition services agreement, pursuant to which the Company agreed to provide ongoing information technology, human resources management and accounting services to StreetLinks for a period of up to eighteen months. The majority of the professional services fees earned by the Company under the transition services agreement during 2014 were attributed to Corvisa Services and Corvisa and have been included in discontinued operations. The remaining $0.2 million of fees included in the service fee income – transition services line item on the consolidated statement of operations represent fees earned for accounting services performed under the transition services agreement. As these services were substantially complete as of December 31, 2014, there were no such fees earned during 2015.

*Interest Income – Mortgage Securities*

Interest income on mortgage securities decreased to approximately $6.1 million in 2015 from $7.2 million in 2014 . Fluctuations in the interest income received from our mortgage portfolio are typically due to factors beyond the Company's control, such as the
performance of the underlying loan collateral, prepayment speeds, interest rates, etc. The Company expects interest income
and cash flow from these securities to decline as the principal on the underlying loan collateral is paid, written down, or written
off.

*General and Administrative*

General and administrative expenses decreased to approximately $5.7 million in 2015 compared to $8.2 million in 2014 . The decrease in general and administrative expenses is due primarily to a decrease in compensation and benefits as a result of the new executive compensation structure enacted for 2015, the resignation of the Company's former Chief Executive Officer, Lance Anderson, during the third quarter of 2015, and the retirement of the Company's former Chief Operating Officer, Steve Haslam, during the third quarter of 2014. The decrease in general and administrative expenses is also due to a reduction in rent expense in 2015 due to the abandonment of an operating lease during the fourth quarter of 2014.

As a result of the Company's recent divestiture activity, the Company is eliminating a significant portion of its remaining employees subsequent to 2015. In addition, the Company is taking steps to reduce other operating and overhead costs, including the reduction in leased office space. Although the anticipated cost savings cannot be quantified at this time, the Company expects a significant reduction in operating costs beginning in the second quarter of 2016 as the accounting and other administrative services performed by the Company on behalf of Corvisa are transitioned to ShoreTel pursuant to the transition services agreement.

*Other (Expense) Income*

Other (expense) income was not material for any period presented.

*Interest Expense*

Interest expense is comprised primarily of interest on the Company's senior debt. During 2015, interest expense increased to $3.2 million from $2.9 million in 2014 . This increase was driven primarily by an increase in accretion expense associated with the senior debt, as the actual interest expense and related cash payments were materially consistent year over year. See Note 6 to the consolidated financial statements for additional information regarding the Company's borrowings.

*Income Tax Benefit*

The income tax benefit from continuing operations was not material during 2015. This is due primarily to continued losses from operations and the full valuation allowance against the Company's deferred tax assets. During 2014 , the Company recorded an income tax benefit from continuing operations of approximately $1.7 million , which relates primarily to current year operating losses from continuing operations and the utilization of a portion of the Company's deferred tax assets to offset the income tax expense from discontinued operations. See Note 10 to the consolidated financial statements for further details regarding the Company ' s income tax provision and deferred tax assets.

**Liquidity and Capital Resources**

As of December 31, 2015 , the Company had approximately $2.8 million in unrestricted cash and cash equivalents and $0.6 million of restricted cash, portions of which are included in the other current assets and other assets line items on the consolidated balance sheet. In addition, the Company held approximately $18.9 million in marketable securities, which consist of approximately $16.9 million in corporate notes and bonds with average remaining maturities between six months and 21 months as of December 31, 2015 , and approximately $2.0 million in mortgage securities, which contributed approximately $6.3 million in cash flows during 2015. The Company's marketable securities are classified as available-for-sale and are included in the current and non-current marketable securities line items on the consolidated balance sheet as of December 31, 2015. For additional

information regarding the Company's marketable securities, see Note 4 to the consolidated financial statements. Additional information regarding the Company's contractual obligations is included in the "Contractual Obligations" section below.

Based on current projections, the Company believes its existing liquid assets, as described above, and the ongoing cash flows from its mortgage securities portfolio will be sufficient to sustain the Company for a period of at least twelve months and enable the Company to effectively implement this strategy. While the Company acknowledges that cash flows from its mortgage securities portfolio can be volatile in nature, the recent performance of these securities suggests that these securities will continue to be a source of cash flows for the near future.

The Company's ongoing contractual obligations subsequent to the sale of Corvisa consist primarily of the Senior Notes and certain operating lease agreements. Additional information regarding these contractual obligations is included in the "Contractual Obligations" section below.

As discussed in Note 7 to the consolidated financial statements set forth in Item 8 of this report, we are also the subject of various legal proceedings, the outcomes of which are uncertain. We may also face demands in the future that are unknown to us today related to our legacy lending and servicing operations.

The Indentures contain restrictive covenants (the "Negative Covenants") subject to certain exceptions, including receipt of written consent of the holders of the Senior Notes. The Negative Covenants prohibit the Company and its subsidiaries, from among other things, incurring debt, permitting any lien upon any of its property or assets, making any cash dividend or distribution or liquidation payment, acquiring our shares or equity in our subsidiaries, making payment on our debt securities that rank *pari passu* or junior to the Senior Notes, or disposing of any equity interest in certain subsidiaries or all or substantially all of the assets of certain subsidiaries unless certain conditions are met. The Senior Notes accrue interest at a rate of 1.0% per annum until the earlier of (1) the completion of an equity offering by the Company or its subsidiaries that results in proceeds of $40 million or more or (2) January 1, 2016. Thereafter, the Senior Notes will accrue interest at a rate of three-month LIBOR plus 3.5% per annum (the "Full Rate"). Interest on the Senior Notes is paid on a quarterly basis and no principal payments are due until maturity on March 30, 2033. The Negative Covenants remain in effect until both of the following conditions are met: (i) the Senior Notes begin accruing interest at the Full Rate, and (ii) the Company satisfies certain financial covenants (the "Financial Covenants"). Satisfaction of the Financial Covenants requires the Company to demonstrate on a consolidated basis that (1) its Tangible Net Worth is equal to or greater than $40 million, and (2) either (a) the Interest Coverage Ratio is equal to or greater than 1.35x, or (b) the Leverage Ratio is not greater than 95% (each such term as defined in the Indentures). As the Senior Notes were not accruing interest at the Full Rate, the Negative Covenants were still in effect as of December 31, 2015 and 2014 . Compliance with the Financial Covenants is required only when the Company seeks to take action prohibited by the Negative Covenants that has not been approved by the holders of the Senior Notes.

With respect to the Company's recent divestiture activity, which is discussed further in Note 3 to the consolidated financial statements, the sale of a subsidiary is not prohibited by the Negative Covenants provided that the sale is at fair market value and the proceeds are reinvested in the Company. As such, the Company was in compliance with all Negative Covenants as of December 31, 2015 and 2014 .

***Overview of Cash Flow for the Year Ended December 31, 2015***

The following table provides a summary of our operating, investing and financing cash flows as taken from our consolidated statements of cash flows for 2015 and 2014 .

**Table 2 – Summary of Operating, Investing and Financing Cash Flows (dollars in thousands)**

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| **Consolidated Statements of Cash Flows:** | | | | |
| Cash flows (used in) provided by operating activities of continuing operations | $ | (1,742) | $ | 5,034 |
| Cash flows provided by investing activities of continuing operations | | 26,993 | | 15,269 |
| Cash flows used in financing activities of continuing operations | | (25,660) | | (22,460) |

*Operating Activities*

The decrease in net cash flows from operating activities to approximately $1.7 million used in operating activities during 2015 from approximately $5.0 million provided by operating activities during 2014 is driven primarily by a reduction in collections of amounts due from discontinued operations.

*Investing Activities*

The increase in the net cash flows provided by investing activities is due primarily to an increase in cash proceeds from the sales and maturities of marketable securities during 2015, coupled with a significant reduction in purchases of marketable securities period over period. This was partially offset by cash proceeds received from the sale of StreetLinks during 2014, as no such proceeds were received during 2015.

*Financing Activities*

The increase in net cash flows used in financing activities year over year is due primarily to an increase in cash payments for contributions of capital to discontinued operations, which was partially offset by a reduction in cash received from distributions of earnings of discontinued operations.

### Contractual Obligations

We have entered into certain long-term debt and lease agreements which obligate us to make future payments to satisfy the related contractual obligations. The following table summarizes the contractual obligations of our continuing operations as of December 31, 2015 .

**Table 3 – Contractual Obligations (dollars in thousands)**

| Contractual Obligations | Total | | Less than 1 Year | | 1-3 Years | | 3-5 Years | | After 5 Years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Payments Due by Period | | | | | |
| Senior notes (A) | $ | 167,787 | $ | 3,866 | $ | 8,271 | $ | 8,878 | $ | 146,772 |
| Operating leases | | 2,087 | | 700 | | 1,200 | | 187 | | — |
| Total obligations | $ | 169,874 | $ | 4,566 | $ | 9,471 | $ | 9,065 | $ | 146,772 |

(A)   In computing the future obligations relating to the Senior Notes, interest payments are calculated using an interest rate of 1.0% per annum until January 2016 and the estimated Full Rate thereafter, as based on current forward rate curves. The Senior Notes are assumed to mature in March 2033. The Senior Notes, including the actual interest rates, are described in detail in Note 6 to our consolidated financial statements.

The estimated liability associated with uncertain tax positions of $0.4 million which is included in the other liabilities line item of the noncurrent liabilities section of the consolidated balance sheet as of December 31, 2015 , are not included in the table above as the timing of payment cannot be reasonably or reliably estimated.

### Critical Accounting Estimates

We prepare our consolidated financial statements in conformity with GAAP and, therefore, are required to make estimates regarding the values of our assets and liabilities and in recording income and expenses. These estimates are based, in part, on our judgment and assumptions regarding various economic conditions that we believe are reasonable based on facts and circumstances existing at the time of financial reporting. These estimates affect reported amounts of assets, liabilities and accumulated other comprehensive income at the date of the consolidated financial statements and the reported amounts of income, expenses and other comprehensive income during the periods presented. The following summarizes the components of our consolidated financial statements where understanding accounting policies is critical to understanding and evaluating our reported financial results, especially given the significant estimates used in applying the policies. The discussion is intended to demonstrate the significance of estimates to our financial statements and the related accounting policies. Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of our Board of Directors and the Audit Committee has reviewed our disclosure.

*Mortgage Securities*

Our mortgage securities represent beneficial interests we retained in securitization transactions. The residual securities include interest-only mortgage securities, prepayment penalty bonds and over-collateralization bonds.

The residual securities we retained in securitization transactions structured as sales primarily consist of the right to receive the future cash flows from a pool of securitized mortgage loans which include:

• the interest spread between the coupon net of servicing fees on the underlying loans, the cost of financing, mortgage insurance, payments or receipts on or from derivative contracts and bond administrative costs;

• prepayment penalties received from borrowers who pay off their loans early in their term; and

• overcollateralization which is designed to protect the primary bondholder from credit loss on the underlying loans.

We believe the accounting estimates related to the valuation of our residual securities and establishing the rate of income recognition are "critical accounting estimates" because they can materially affect net income and shareholders' equity and require us to forecast interest rates, mortgage principal payments, prepayments and loan default assumptions which are highly uncertain and require a large degree of judgment. The rate used to discount the projected cash flows is also critical in the valuation of our residual securities. We use internal, historical collateral performance data and published forward yield curves when modeling future expected cash flows and establishing the rate of income recognized on mortgage securities. We believe the value of our residual securities is appropriate, but can provide no assurance that future changes in interest rates, prepayment and loss experience or changes in the market discount rate will not require write-downs of the residual assets.

At each reporting date, the fair value of the residual securities is estimated based on the present value of future expected cash flows to be received. Management's best estimate of key assumptions, including credit losses, prepayment speeds, expected call dates, market discount rates and forward yield curves commensurate with the risks involved, are used in estimating future cash flows. See Note 8 to the consolidated financial statements for the current fair value of our residual securities.

### Income Taxes

In determining the amount of deferred tax assets to recognize in the financial statements, the Company evaluates the likelihood of realizing such benefits in future periods. The income taxes guidance requires the recognition of a valuation allowance if it is more likely than not that all or some portion of the deferred tax asset will not be realized. Income tax guidance indicates the more likely than not threshold is a level of likelihood that is more than 50%.

Under the income tax guidance, companies are required to identify and consider all available evidence, both positive and negative, in determining whether it is more likely than not that all or some portion of its deferred tax assets will not be realized. Positive evidence includes, but is not limited to the following: cumulative earnings in recent years, earnings expected in future years, excess appreciated asset value over the tax basis and positive industry trends. Negative evidence includes, but is not limited to the following: cumulative losses in recent years, losses expected in future years, a history of operating losses or tax credit carryforwards expiring, and adverse industry trends.

The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists, the more positive evidence is required to counter to support a conclusion that a valuation allowance is not needed for all or some of the deferred tax assets. Cumulative losses in recent years are significant negative evidence that is difficult to overcome when determining the need for a valuation allowance. Similarly, cumulative earnings in recent years represent significant positive objective evidence. If the weight of the positive evidence is sufficient to support a conclusion that it is more likely than not that a deferred tax asset will be realized, a valuation allowance should not be recorded.

The Company examines and weighs all available evidence (both positive and negative and both historical and forecasted) in the process of determining whether it is more likely than not that a deferred tax asset will be realized. The Company considers the relevance of historical and forecasted evidence when there has been a significant change in circumstances. Additionally, the Company evaluates the realization of its recorded deferred tax assets on an interim and annual basis. The Company does not record a full valuation allowance if the weight of the positive evidence exceeds the negative evidence and is sufficient to support a conclusion that it is more likely than not that its deferred tax asset will be realized.

If a valuation allowance is necessary, the Company considers all sources of taxable income in determining the amount of valuation allowance to be recorded. Sources of taxable income identified in the income tax guidance include the following: 1) taxable income in prior carryback year, 2) future reversals of existing taxable temporary differences, 3) future taxable income exclusive of reversing temporary differences and carryforwards, and 4) tax planning strategies.

The Company currently evaluates estimates of uncertainty in income taxes based upon a framework established in the income tax accounting guidance. The guidance prescribes a recognition threshold and measurement standard for the recognition and measurement of tax positions taken or expected to be taken in a tax return. In accordance with the guidance, the Company evaluates whether a tax position will more likely than not be sustained upon examination by the appropriate taxing authority. The Company measures the amount to recognize in its financial statements as the largest amount that is greater than 50% likely of being realized upon ultimate settlement. The recognition and measurement of tax benefits is often judgmental, and determinations regarding the tax benefit can change as additional developments occur relative to the issue.

### Impact of Recently Issued Accounting Pronouncements

Information regarding the impact of recently issued accounting pronouncements is included in Note 2 to the consolidated financial statements set forth in Item 8 of this report, which is incorporated by reference.

### Item 7A. Quantitative and Qualitative Disclosures about Market Risk

Not applicable.

12

**Item 8. Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOVATION COMPANIES, INC. AND SUBSIDIARIES**

---

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 14 |
| Consolidated Balance Sheets | 15 |
| Consolidated Statements of Operations | 16 |
| Consolidated Statements of Comprehensive Income (Loss) | 17 |
| Consolidated Statements of Shareholders' Deficit | 18 |
| Consolidated Statements of Cash Flow | 19 |
| Notes to Consolidated Financial Statements | 21 |

13

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Novation Companies, Inc.

We have audited the accompanying consolidated balance sheets of Novation Companies, Inc. a Maryland corporation, and subsidiaries (the "Company") as of December 31, 2015 and 2014, and the related consolidated statements of operations, comprehensive income (loss), shareholders' deficit, and cash flows for each of the two years in the period ended December 31, 2015. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Novation Companies, Inc. and subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, the Company has changed its method of accounting for the presentation of deferred income taxes in 2015 and 2014 due to the adoption of FASB Accounting Standards Update No. 2015-17 – *Balance Sheet Classification of Deferred Taxes* .

/s/ GRANT THORNTON LLP

Kansas City, Missouri
February 16, 2016

14

**NOVATION COMPANIES, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(dollars in thousands, except share and per share amounts)**

|  | December 31, 2015 | December 31, 2014 |
|---|---:|---:|
| **Assets** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 2,826 | $ 3,235 |
| Marketable securities, current | 17,500 | 28,410 |
| Other current assets | 1,119 | 966 |
| Current assets of discontinued operations | 1,843 | 5,565 |
| Total current assets | 23,288 | 38,176 |
| Non-Current Assets | | |
| Marketable securities, non-current | 1,397 | 14,647 |
| Property and equipment, net of accumulated depreciation | 358 | 504 |
| Other assets | 481 | 611 |
| Non-current assets of discontinued operations | 6,415 | 7,273 |
| Total non-current assets | 8,651 | 23,035 |
| Total assets | $ 31,939 | $ 61,211 |
| **Liabilities and Shareholders' Deficit** | | |
| Liabilities: | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 1,453 | $ 2,314 |
| Other current liabilities | — | 628 |
| Current liabilities of discontinued operations | 2,470 | 3,263 |
| Total current liabilities | 3,923 | 6,205 |
| Non-Current Liabilities | | |
| Senior notes | 88,385 | 85,937 |
| Other liabilities | 391 | 494 |
| Non-current liabilities of discontinued operations | 1,833 | 1,925 |
| Total non-current liabilities | 90,609 | 88,356 |
| Total liabilities | 94,532 | 94,561 |
| Commitments and contingencies (Note 7) | | |
| Shareholders' deficit: | | |
| Capital stock, $0.01 par value per share, 120,000,000 shares authorized: | | |
| Common stock, 92,748,753 shares issued and outstanding | 928 | 915 |
| Additional paid-in capital | 744,575 | 743,919 |
| Accumulated deficit | (809,532) | (780,803) |
| Accumulated other comprehensive income | 1,436 | 2,619 |
| Total shareholders' deficit | (62,593) | (33,350) |
| Total liabilities and shareholders' deficit | $ 31,939 | $ 61,211 |

See notes to consolidated financial statements.

**NOVATION COMPANIES, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(dollars in thousands, except share and per share amounts)**

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| Income: | | |
|     Service fee income – transition services | $ — | $ 243 |
|     Interest income – mortgage securities | 6,131 | 7,192 |
| Total | 6,131 | 7,435 |
| | | |
| Operating Expenses: | | |
|     General and administrative | 5,704 | 8,206 |
| Total | 5,704 | 8,206 |
| | | |
|     Other (expense) income | (27) | 84 |
|     Interest expense | (3,193) | (2,941) |
| | | |
| Loss from continuing operations before income taxes | (2,793) | (3,628) |
| Income tax benefit | (28) | (1,722) |
| Net loss from continuing operations | (2,765) | (1,906) |
| (Loss) income from discontinued operations, net of income taxes | (25,964) | 32,845 |
| Net (loss) income | $ (28,729) | $ 30,939 |
| | | |
| (Loss) Earnings Per Common Share attributable to Novation: | | |
|     Basic | $ (0.32) | $ 0.34 |
|     Diluted | $ (0.32) | $ 0.34 |
| Weighted average basic common shares outstanding | 91,138,068 | 90,926,211 |
| Weighted average diluted common shares outstanding | 91,138,068 | 90,926,211 |

See notes to consolidated financial statements.

16

**NOVATION COMPANIES, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(dollars in thousands)**

| | For the Year Ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| Net (loss) income | $ (28,729) | $ 30,939 |
| Other comprehensive income (loss): | | |
| Change in unrealized gain on marketable securities – available-for-sale | (1,183) | (484) |
| Total comprehensive income (loss) | $ (29,912) | $ 30,455 |

See notes to consolidated financial statements.

**NOVATION COMPANIES, INC.**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' DEFICIT**
**(dollars in thousands, except share amounts)**

| | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Noncontrolling Interest | Total Shareholders' Deficit |
|---|---|---|---|---|---|---|
| | | | Total NCI Shareholders' Deficit | | | |
| Balance, December 31, 2014 | $ 915 | $ 743,919 | $ (780,803) | $ 2,619 | $ — | $ (33,350) |
| Issuance of nonvested shares | 13 | (13) | — | — | — | — |
| Compensation recognized under stock compensation plans | — | 669 | — | — | — | 669 |
| Net loss | — | — | (28,729) | — | — | (28,729) |
| Other comprehensive loss | — | — | — | (1,183) | — | (1,183) |
| Balance, December 31, 2015 | $ 928 | $ 744,575 | $ (809,532) | $ 1,436 | $ — | $ (62,593) |

Continued

| | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Noncontrolling Interest | Total Shareholders' Deficit |
|---|---|---|---|---|---|---|
| | | | Total NCI Shareholders' Deficit | | | |
| Balance, December 31, 2013 | $ 915 | $ 739,468 | $ (811,742) | $ 3,103 | $ 36 | $ (68,220) |
| Compensation recognized under stock compensation plans | — | 637 | — | — | — | 637 |
| Distributions to noncontrolling interests | — | — | — | — | (5) | (5) |
| Exchange of membership interests for forgiveness of note payable | — | 3,814 | — | — | 107 | 3,921 |
| Other changes in noncontrolling interests | — | — | — | — | (138) | (138) |
| Net income | — | — | 30,939 | — | — | 30,939 |
| Other comprehensive loss | — | — | — | (484) | — | (484) |
| Balance, December 31, 2014 | $ 915 | $ 743,919 | $ (780,803) | $ 2,619 | $ — | $ (33,350) |

See notes to consolidated financial statements.

Concluded

18

**NOVATION COMPANIES, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(dollars in thousands)**

| | For the Year Ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| **Cash flows from operating activities:** | | |
| Net (loss) income | $ (28,729) | $ 30,939 |
| (Loss) income from discontinued operations, net of income taxes | (25,964) | 32,845 |
| Net loss from continuing operations | (2,765) | (1,906) |
| Adjustments to reconcile net (loss) income to net cash (used in) provided by operating activities: | | |
| Accretion of marketable securities, net | (235) | (512) |
| Amortization of deferred debt issuance costs and senior debt discount | 2,448 | 2,070 |
| Other non-cash losses, net | 203 | 277 |
| Compensation recognized under stock compensation plans | 669 | 637 |
| Depreciation expense | 148 | 249 |
| Deferred taxes | — | (1,498) |
| Changes in: | | |
| Due from discontinued operations | 89 | 6,609 |
| Other current assets and liabilities, net | (1,346) | 500 |
| Other noncurrent assets and liabilities, net | (91) | (603) |
| Accounts payable and accrued expenses | (862) | (789) |
| Net cash (used in) provided by operating activities of continuing operations | (1,742) | 5,034 |
| Net cash used in operating activities of discontinued operations | (23,005) | (17,332) |
| Net cash used in operating activities | (24,747) | (12,298) |
| **Cash flows from investing activities:** | | |
| Proceeds from sales and maturities of marketable securities | 26,995 | 12,085 |
| Proceeds from other investing activities, net | 2 | — |
| Proceeds from sale of subsidiary | — | 54,748 |
| Purchases of marketable securities | — | (51,379) |
| Purchases of property and equipment | (4) | (185) |
| Net cash provided by investing activities of continuing operations | 26,993 | 15,269 |
| Net cash used in investing activities of discontinued operations | (4,490) | (6,253) |
| Net cash provided by investing activities | 22,503 | 9,016 |
| **Cash flows from financing activities:** | | |
| Cash payments for contributions of capital to discontinued operations | (25,660) | (23,229) |
| Cash receipts from distributions of earnings from discontinued operations | — | 774 |
| Principal payments under capital leases | — | (5) |
| Net cash used in financing activities of continuing operations | (25,660) | (22,460) |
| Net cash provided by financing activities of discontinued operations | 25,428 | 22,129 |
| Net cash used in financing activities | (232) | (331) |

Continued

**NOVATION COMPANIES, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(dollars in thousands)**

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Net decrease in cash and cash equivalents of continuing operations | $ (409) | $ (2,157) |
| Cash and cash equivalents of continuing operations, beginning of period | 3,235 | 5,392 |
| Cash and cash equivalents of continuing operations, end of period | $ 2,826 | $ 3,235 |
| | | |
| Net decrease in cash and cash equivalents of discontinued operations | $ (2,067) | $ (1,456) |
| Cash and cash equivalents of discontinued operations, beginning of period | 2,419 | 3,875 |
| Cash and cash equivalents of discontinued operations, end of period | $ 352 | $ 2,419 |

**Supplemental Disclosure of Cash Flow Information**
**(dollars in thousands)**

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Cash paid for interest | $ 871 | $ 910 |
| Cash (paid) received from income taxes, net | (708) | 48 |
| Cash received on mortgage securities - available-for-sale with no cost basis | 5,603 | 6,479 |
| Non-cash investing and financing activities: | | |
|     Exchange of membership interests for forgiveness of note payable | — | 3,921 |

See notes to consolidated financial statements.                                                                                                                 Concluded

**NOVATION COMPANIES, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

---

**Note 1. Basis of Presentation, Business Plan and Liquidity**

***Description of Operations.*** As of December 31, 2015, Novation Companies, Inc. (the "Company" or "Novation" or "we" or "us") owned 100% of Corvisa LLC ("Corvisa"), a developer and seller of cloud-based communication software under the CorvisaOne® brand, telecommunications services, and implementation consulting services. On December 21, 2015, the Company entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") with Corvisa Services LLC ("Corvisa Services"), a wholly owned subsidiary of the Company, and ShoreTel, Inc. ("ShoreTel"). Subject to the terms and conditions under the Purchase Agreement, ShoreTel agreed to purchase all of the membership interests of Corvisa. This transaction closed on January 6, 2016. The operations of Corvisa have been classified as discontinued operations for all periods presented.

With the sale of Corvisa, the Company intends to continue its strategy of seeking to acquire operating businesses or making other investments that generate taxable earnings. As of the date the financial statements included in this report are issued, the Company has not yet identified any specific acquisition targets.

With the Company's divestiture of StreetLinks LLC ("StreetLinks") and Advent Financial Services LLC ("Advent") in 2014, both of which are discussed further below, the Company transferred the employees of Corvisa Services and approximately $1.0 million of Corvisa Services' assets to Corvisa during the fourth quarter of 2014. Prior to the transfer, Corvisa Services provided certain IT, procurement, human resources, and other shared services to the Company's portfolio of operating subsidiaries. As a result of these transfers, and in accordance with the relevant accounting guidance on transactions between entities under common control, the operating results of Corvisa Services have been consolidated with the operating results of Corvisa and included in discontinued operations for all periods presented.

On August 18, 2014, the Company sold certain intellectual property, software, and customer data of its subsidiary, Advent Financial Services LLC ("Advent"), to Santa Barbara Tax Products Group, LLC, and announced that it would be conducting an orderly winding-down of the remaining business and operations of Advent; a financial settlement services provider for professional tax preparers nationwide. The operations of Advent have been classified as discontinued operations for all periods presented.

On April 16, 2014, the Company and the non-controlling members of StreetLinks LLC ("StreetLinks"), a national residential appraisal and mortgage real estate valuation management services company, entered into a purchase and sale agreement with Assurant Services, LLC, a subsidiary of Assurant, Inc. ("Assurant"), pursuant to which Assurant purchased 100% of the outstanding membership units of StreetLinks. The operations of StreetLinks have been classified as discontinued operations for all periods presented.

Prior to 2008, we originated, purchased, securitized, sold, invested in and serviced residential nonconforming mortgage loans and mortgage securities. Although those activities have been discontinued, as a result of those activities, we acquired and own mortgage securities that continue to be a source of our cash flow.

See Note 3 to the consolidated financial statements for additional information regarding the Company's divestiture activity.

***Liquidity.*** As of December 31, 2015 , the Company had approximately $2.8 million in unrestricted cash and cash equivalents and $0.6 million of restricted cash, portions of which are included in the other current assets and other assets line items on the consolidated balance sheet. In addition, the Company held approximately $18.9 million in marketable securities, which consist of approximately $16.9 million in corporate notes and bonds with average remaining maturities between six months and 21 months as of December 31, 2015 , and approximately $2.0 million in mortgage securities, which contributed approximately $6.3 million in cash flows during 2015. The Company's marketable securities are classified as available-for-sale as of December 31, 2015 and are included in the current and non-current marketable securities line items on the consolidated balance sheet as of December 31, 2015 . For additional information regarding the Company's marketable securities, see Note 4 to the consolidated financial statements.

Based on current projections, the Company believes its existing liquid assets, as described above, and the ongoing cash flows from its mortgage securities portfolio will be sufficient to sustain the Company for a period of at least twelve months and enable the Company to effectively implement its strategy of seeking to acquire operating businesses or making other investments that generate taxable income. While the Company acknowledges that cash flows from its mortgage securities portfolio can be volatile in nature, the recent performance of these securities would suggest that these securities will continue to be a source of cash flows for the near future.

The Company's ongoing contractual obligations subsequent to the sale of Corvisa consist primarily of its Senior Notes, which are detailed further in Note 6 to the consolidated financial statements, and certain operating lease agreements, which are detailed in Note 7.

*Financial Statement Presentation.* The Company's consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP"). The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of income and expense during the period. The Company uses estimates and judgments in establishing the fair value of its mortgage securities and accounting for income taxes, including the determination of the timing of the establishment or release of the valuation allowance related to the deferred tax asset balances and reserves for uncertain tax positions. While the consolidated financial statements and footnotes reflect the best estimates and judgments of management at the time, actual results could differ significantly from those estimates.

The consolidated financial statements of the Company include the accounts of all wholly-owned and majority-owned subsidiaries. Intercompany accounts and transactions have been eliminated in consolidation.

## Note 2. Summary of Significant Accounting and Reporting Policies

*Cash and Cash Equivalents and Restricted Cash.* Cash equivalents consist of liquid investments with an original maturity of three months or less. Cash equivalents are stated at cost, which approximates fair value. Restricted cash includes funds the Company is required to post as cash collateral or transfer to escrow accounts and its release is subject to contractual requirements and time restrictions. The cash may not be released to the Company without the consent of the counterparties, which is generally at their discretion. The cash could also be subject to the indemnification of losses incurred by the counterparties. The Company had approximately $0.6 million of restricted cash as of both December 31, 2015 and 2014 , portions of which are included in the other current assets and other assets line items of the consolidated balance sheets. Restricted cash is held primarily in money market funds and time deposits and relates to our legacy mortgage lending activities and lease arrangements. Amounts related to our legacy mortgage lending activities will be released from restriction upon the expiration of the related underlying statute of obligations for surety claims. Amounts related to our lease arrangements will be released from restriction periodically over the term of the lease.

The Company maintains cash balances at several major financial institutions in the United States. Accounts at each institution are secured by the Federal Deposit Insurance Corporation up to $250,000. At December 31, 2015 , approximately 55% of the Company's cash and cash equivalents, including restricted cash and other short-term depository accounts, were with any one institution. The uninsured balances of the Company's unrestricted cash and cash equivalents, restricted cash and other short-term depository accounts aggregated $2.9 million as of December 31, 2015 .

*Marketable Securities – Available-for-Sale.* Marketable securities are stated at fair value in accordance with the relevant accounting guidance. The Company determines the fair value of its marketable securities based on pricing from our third party service provider and market prices from industry-standard independent data providers. Such market prices may be quoted prices in active markets for identical assets (Level 1 inputs) or pricing determined using inputs other than quoted prices that are observable either directly or indirectly (Level 2 inputs), such as yield curve, volatility factors, credit spreads, default rates, loss severity, current market and contractual prices for the underlying instruments or debt, broker and dealer quotes, as well as other relevant economic measures. To the extent observable inputs are not available, as is the case with the Company's mortgage securities – available-for-sale, the Company estimates fair value using significant unobservable inputs (Level 3 inputs). The methods and processes used to estimate the fair value of the Company's mortgage securities are discussed further below.

Mortgage securities – available-for-sale represent beneficial interests the Company retains in securitization transactions which consist of residual interests (the "residual securities") in certain components of the cash flows of the underlying mortgage loans to the securitization trusts. As payments are received on the residual securities, the payments are applied to the cost basis of the related mortgage securities. Each period, the accretable yield for each mortgage security is evaluated and, to the extent there has been a change in the estimated cash flows, it is adjusted and applied prospectively. The accretable yield is recorded as interest income with a corresponding increase to the carrying basis of the mortgage security.

The Company estimates the fair value of its residual securities retained based on the present value of future expected cash flows to be received. Management's best estimate of key assumptions, including credit losses, prepayment speeds, market discount rates and forward yield curves commensurate with the risks involved, are used in estimating future cash flows.

All of the Company's available-for-sale securities are reported at their estimated fair value with unrealized gains and losses reported in accumulated other comprehensive income. To the extent the cost basis of these securities exceeds the estimated fair value and the unrealized loss is considered to be other than temporary, an impairment charge is recognized and the amount recorded in accumulated other comprehensive income or loss is reclassified to earnings as a realized loss. The Company uses the specific identification method in computing realized gains or losses.

*Earnings Per Share ("EPS").* Basic EPS excludes dilution and is computed by dividing net income available to common shareholders by the weighted-average number of common shares outstanding for the period. Diluted EPS reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in the earnings of the entity. Diluted EPS is calculated assuming all options, nonvested shares and performance-based awards of the Company's common stock have been exercised, unless the

exercise would be antidilutive. See Note 9 to the consolidated financial statements for additional details on earnings per share calculation.

*Leases.* The Company categorizes leases as either operating or capital at the inception of the lease. Certain of the Company's lease agreements provide for scheduled rent increases during the lease term, rent holidays, or other incentives. Rent expense is recognized on a straight-line basis over the term of the lease from the time at which the Company takes possession of the property without regard to deferred payment terms, such as rent holidays. Additionally, incentives received are treated as a reduction of costs over the term of the lease.

*Income Taxes.* The Company had a gross deferred tax asset of $282.1 million and $269.6 million as of December 31, 2015 and 2014 , respectively. In determining the amount of deferred tax assets to recognize in the financial statements, the Company evaluates the likelihood of realizing such benefits in future periods. The income tax guidance requires the recognition of a valuation allowance if it is more likely than not that all or some portion of the deferred tax asset will not be realized. Income tax guidance indicates the more likely than not threshold is a level of likelihood that is more than 50%.

Under the income tax guidance, companies are required to identify and consider all available evidence, both positive and negative, in determining whether it is more likely than not that all or some portion of its deferred tax assets will not be realized. Positive evidence includes, but is not limited to the following: cumulative earnings in recent years, earnings expected in future years, excess appreciated asset value over the tax basis and positive industry trends. Negative evidence includes, but is not limited to the following: cumulative losses in recent years, losses expected in future years, a history of operating losses or tax credit carryforwards expiring, and adverse industry trends.

The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists, the more positive evidence is required to counter to support a conclusion that a valuation allowance is not needed for all or some of the deferred tax assets. Cumulative losses in recent years are significant negative evidence that is difficult to overcome when determining the need for a valuation allowance. Similarly, cumulative earnings in recent years represent significant positive objective evidence. If the weight of the positive evidence is sufficient to support a conclusion that it is more likely than not that a deferred tax asset will be realized, a valuation allowance should not be recorded.

The Company examines and weighs all available evidence (both positive and negative and both historical and forecasted) in the process of determining whether it is more likely than not that a deferred tax asset will be realized. The Company considers the relevance of historical and forecasted evidence when there has been a significant change in circumstances. Additionally, the Company evaluates the realization of its recorded deferred tax assets on an interim and annual basis. The Company does not record a full valuation allowance if the weight of the positive evidence exceeds the negative evidence and is sufficient to support a conclusion that it is more likely than not that its deferred tax asset will be realized.

If a valuation allowance is necessary, the Company considers all sources of taxable income in determining the amount of valuation allowance to be recorded. Sources of taxable income identified in the income tax guidance include the following: 1) taxable income in prior carryback year, 2) future reversals of existing taxable temporary differences, 3) future taxable income exclusive of reversing temporary differences and carryforwards, and 4) tax planning strategies.

The Company currently evaluates estimates of uncertainty in income taxes based upon a framework established in the income tax accounting guidance. The guidance prescribes a recognition threshold and measurement standard for the recognition and measurement of tax positions taken or expected to be taken in a tax return. In accordance with the guidance, the Company evaluates whether a tax position will more likely than not be sustained upon examination by the appropriate taxing authority. The Company measures the amount to recognize in its financial statements as the largest amount that is greater than 50% likely of being realized upon ultimate settlement. The recognition and measurement of tax benefits is often judgmental, and determinations regarding the tax benefit can change as additional developments occur relative to the issue.

### New Accounting Pronouncements

In November 2015, the Financial Accounting Standards Board (the "FASB") issued Accounting Standards Update ("ASU") 2015-17, Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes, as part of its simplification initiative (i.e., the Board's effort to reduce the cost and complexity of certain aspects of U.S. GAAP). The ASU requires entities to present deferred tax assets (DTAs) and deferred tax liabilities (DTLs) as noncurrent in a classified balance sheet. It thus simplifies the current guidance, which requires entities to separately present DTAs and DTLs as current or noncurrent in a classified balance sheet. Netting of DTAs and DTLs by tax jurisdiction is still required under the new guidance. For public business entities, the ASU is effective for annual periods beginning after December 15, 2016, and interim periods within those annual periods. For all other entities, the ASU is effective for annual periods beginning after December 15, 2017, and interim periods within annual periods beginning after December 15, 2018. Early adoption is permitted for all entities. The Company has elected to early adopt this guidance during the fourth quarter of 2015 and has elected to apply the new presentation retrospectively. The impact to the prior period balance sheet as a result of the retrospective application of this guidance was a decrease in both noncurrent assets and current liabilities of approximately $1.0 million . For additional information regarding the Company's deferred tax assets and liabilities, see Note 10 to the consolidated financial statements.

23

In January 2015, the FASB issued ASU 2015-1, Income Statement—Extraordinary and Unusual Items (Subtopic 225-20): Simplifying Income Statement Presentation by Eliminating the Concept of Extraordinary Items, which eliminates from GAAP the concept of an extraordinary item, which is an event or transaction that is both (1) unusual in nature and (2) infrequently occurring. Under this ASU, an entity will no longer (1) segregate an extraordinary item from the results of ordinary operations; (2) separately present an extraordinary item on its income statement, net of tax, after income from continuing operations; or (3) disclose income taxes and earnings-per-share data applicable to an extraordinary item. The ASU is effective for annual periods beginning after December 15, 2015, and interim periods within those annual periods. Entities may apply the guidance prospectively or retrospectively to all prior periods presented in the financial statements. Early adoption is permitted if the guidance is applied as of the beginning of the annual period of adoption. The Company does not expect this guidance to have a significant impact on the Company's financial statements.

In August 2014, the FASB issued ASU 2014-15, Presentation of Financial Statements-Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern, which provides guidance on determining when and how reporting entities must disclose going-concern uncertainties in their financial statements. This new standard requires management to perform interim and annual assessments of an entity's ability to continue as a going concern within one year of the date of issuance of the entity's financial statements. Further, an entity must provide certain disclosures if there is "substantial doubt about the entity's ability to continue as a going concern." This ASU is effective for annual periods ending after December 15, 2016, and interim periods thereafter. Early adoption is permitted. The Company elected to early adopt this guidance during the fourth quarter of 2015. The adoption of this guidance did not have a significant impact on the Company's financial statements for the years ended December 31, 2015 and 2014.

In May 2014, the FASB issued ASU 2014-09, Revenue from Contracts with Customers (Topic 606), which outlines a single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. This ASU applies to all contracts with customers except those that are within the scope of other topics in the FASB Accounting Standards Codification. Compared with current GAAP, this ASU also requires significantly expanded disclosures about revenue recognition. On July 9, 2015 the FASB voted to defer the effective date of this ASU by one year. Early adoption is permitted. However, entities are not allowed to adopt this ASU before the original effective date (that is, annual periods beginning after December 15, 2016). The Company is evaluating the impact of ASU 2014-09 on its consolidated financial statements and related disclosures. Upon completion of the sale of Corvisa, the Company no longer enters into contracts with customers to transfer goods or services or enters into contracts for the transfer of nonfinancial assets. As such, the Company does not currently expect this guidance to have a significant impact on the Company's financial statements.

In April 2014, the FASB issued ASU 2014-08, Presentation of Financial Statements (Topic 205) and Property, Plant, and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity, which amends the definition of a discontinued operation in ASC 205-20 and requires entities to provide additional disclosures about discontinued operations as well as disposal transactions that do not meet the discontinued-operations criteria. The FASB issued this ASU to provide more decision-useful information and to make it more difficult for a disposal transaction to qualify as a discontinued operation. This ASU is effective prospectively for all disposals (except disposals classified as held for sale before the adoption date) or components initially classified as held for sale in periods beginning on or after December 15, 2014. The Company adopted the provisions of ASU 2014-08 beginning with the sale of Corvisa.


**Note 3 . Divestitures**

*Corvisa LLC (Cloud SaaS Segment)*

On December 21, 2015, the Company entered into the Purchase Agreement with Corvisa Services and ShoreTel. Subject to the terms and conditions under the Purchase Agreement, ShoreTel agreed to purchase 100% of the membership interests of Corvisa. The transaction closed on January 6, 2016. The aggregate consideration for the transaction included approximately $8.4 million in cash, subject to a potential post-closing working capital adjustment, of which amount approximately $7.0 million was paid at the closing and the following was deposited in escrow: (i) approximately $1.0 million for a period of twelve months to secure certain indemnification obligations of the Company; and (ii) $0.35 million to secure certain obligations of the Company in connection with the post-closing working capital adjustment.

In connection with the transaction, the Company and ShoreTel also agreed to enter into a Transition Services Agreement pursuant to which each of the Company and ShoreTel would provide the other with specified services for a transition period following the closing. The Company does not expect the cash flows associated with these services to be significant to Corvisa, and the Company will have no significant continuing involvement with Corvisa beyond these services.

During the fourth quarter, the Company incurred approximately $0.8 million in severance and related one-time termination benefits associated with this transaction. Approximately $0.1 million of this expense was included in current liabilities of discontinued operations as of December 31, 2015. Also during the fourth quarter, the Company incurred approximately $0.5

24

million of legal and audit fees related to this transaction. These costs are included in the loss from discontinued operations line item in the consolidated statement of operations.

The Company anticipates an initial gain on the transaction of approximately $0.8 million , which will be reflected in discontinued operations during the first quarter of 2016. As the release of the amounts deposited in escrow is contingent upon future events and circumstances, such as indemnification claims, the Company will treat these amounts as a gain contingency. As such, no post-closing consideration will be recognized in earnings until the amounts have been released to the Company. Also included in discontinued operations during the first quarter of 2016 will be certain transaction-related costs that were contingent upon the closing of the sale. These costs include approximately $0.3 million of earned bonus payments to a Corvisa executive and approximately $1.0 million of advisory fees. In addition, the closing of this transaction triggered the acceleration of approximately $0.1 million in stock-based compensation expense.

At ShoreTel's request, the Company disposed of Corvisa's third-party software implementation consulting business in December 2015. The Company sold the assets related exclusively to this business, including but not limited to customer contracts, computer hardware and marketing materials, to Canpango LLC ("Canpango"), which agreed to hire certain employees of the business, to assume Corvisa's obligations under the customer contracts, and to pay to the Company a portion of the business's existing accounts receivable collected in the next nine months, less associated collection costs. Canpango is led by a former employee of Corvisa, and certain current and former employees of Corvisa have financial interests in Canpango. The sales price, assets and operations related exclusively to this business were not material to the Company's financial statements when taken as a whole.

*Advent Financial Services LLC (Financial Intermediary Segment)*

On August 18, 2014, Advent sold certain intellectual property, software, and customer data to Santa Barbara Tax Products Group, LLC, for cash consideration of $1.0 million paid at closing. The transaction resulted in a gain of approximately $0.8 million , which is included in net income from discontinued operations on the consolidated statement of operations.

Also on August 18, 2014, the Company announced that it was conducting an orderly winding-down of Advent's remaining business and operations. As the run-off operations are substantially complete, and as the Company will not have any significant continuing involvement in Advent, the operations of Advent have been classified as discontinued operations for all periods presented.

*StreetLinks LLC (Appraisal Management Segment)*

Prior to 2013, the Company entered into a Membership Interest Purchase Agreement (the "Unit Purchase Agreement") with its Chief Operating Officer, Mr. Steve Haslam, pursuant to which Mr. Haslam sold 1,927 units in StreetLinks to the Company in exchange for a total purchase price of $6.1 million , payable in quarterly installments. At the time of the original transaction, Mr. Haslam's units represented approximately 5% of the outstanding StreetLinks membership units. On April 16, 2014, the Company and Mr. Haslam agreed to terminate the Unit Purchase Agreement. In full satisfaction of the Company's outstanding obligations under the Unit Purchase Agreement, the Company transferred back to Mr. Haslam 1,218 StreetLinks membership units (approximately 3% of StreetLinks), which represents the portion of the membership units attributable to the $3.9 million in unpaid installment payments and $0.2 million in interest remaining under the Unit Purchase Agreement. The termination of the Unit Purchase Agreement and simultaneous transfer of 1,218 StreetLinks membership units to Mr. Haslam reduced the Company's ownership interest to approximately 88% as of April 16, 2014. In accordance with the relevant accounting guidance, the termination of the Unit Purchase Agreement and simultaneous transfer of ownership interests was treated as an equity transaction, increasing additional paid-in capital and StreetLinks' noncontrolling interest by approximately $3.8 million and $0.1 million , respectively, with no corresponding gain or loss recognized in the consolidated statement of operations.

On April 16, 2014, the Company and non-controlling members of StreetLinks (the "Sellers") entered into a purchase and sale agreement with Assurant, pursuant to which Assurant purchased 100% of the outstanding membership units of StreetLinks in exchange for $60.0 million paid in cash at closing and up to $12.0 million in post-closing consideration contingent upon the total revenue of StreetLinks in fiscal years 2015 and 2016. The Company received approximately $53.9 million in cash proceeds at closing, of which $1.0 million was used to make certain earned bonus payments to three StreetLinks executives. Subsequent to closing, the Company received an additional $0.8 million relating to adjustments for working capital. The transaction resulted in a gain of approximately $48.2 million during 2014, which is included in the income (loss) from discontinued operations, net of income taxes line item on the consolidated statement of operations. Also included in the income (loss) from discontinued operations, net of income taxes line for 2014 are approximately $1.8 million of transaction-related expenses, such as legal and consulting fees.

The post-closing consideration provides for payment if (1) the total revenue of StreetLinks is $184 million or more for calendar year 2015, Assurant shall pay to the Sellers an aggregate of $12.0 million ; but if not, then (2) if the total revenue of StreetLinks is greater than $167.5 million for the calendar year 2016, Assurant shall pay to Sellers up to an aggregate of $12.0 million , based on a linear scale where full payment of the $12.0 million would occur at total revenue of $184 million . The post-closing consideration will be reduced for certain earned bonus payments to three StreetLinks executives of $2.0 million if the maximum post-closing consideration is earned and otherwise prorated based on the same linear scale. There can be no assurance that

the Company will receive any post-closing consideration. Assurant has agreed to act in good faith in conducting the business of StreetLinks and to keep separate records, but generally the Company does not control how Assurant may operate the business of StreetLinks. In accordance with the relevant accounting guidance, the post-closing consideration will be treated as a gain contingency. As such, no post-closing consideration will be recognized in earnings until the contingency is resolved. StreetLinks did not meet the revenue target set for calendar year 2015.

In connection with the sale, the Company and Assurant also entered into a transition services agreement, pursuant to which the Company provided ongoing information technology, human resources management and accounting services to StreetLinks. The cash flows related to these services were not significant to StreetLinks. The Company has had no significant continuing involvement with StreetLinks beyond these services. The agreed-upon professional services were substantially complete as of December 31, 2014. The majority of the professional services fees earned by the Company under the transition services agreement during 2014 were attributed to Corvisa Services and Corvisa and have been included in discontinued operations. The fees remaining in the service fee income – transition services line item on the consolidated statement of operations represent fees earned for accounting services performed under the transition services agreement.

The Company has also executed a Non-Competition, Non-Solicitation and Non-Disclosure Agreement with StreetLinks providing that Novation is prohibited from competing in the real estate appraisal management or valuation services business through April 2018.

*Results of Discontinued Operations*

For 2015, net income from discontinued operations consists of the net operating income and losses of the disposed entities and any necessary eliminations and income tax expense. For 2014, net income from discontinued operations consists of the net operating income and losses of the disposed entities and any necessary eliminations through the date of sale or disposal, the gain on the sale of StreetLinks and any transaction-related expenses, income tax expense, and the gain on the sale of Advent intellectual property.

The results of the Company's discontinued operations are summarized below (dollars in thousands):

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2015 | | 2014 |
| Service fee income | $ | 3,254 | $ | 42,651 |
| Income from discontinued operations before income taxes | $ | (25,964) | $ | 34,894 |
| Income tax expense | | — | | 2,049 |
| Income from discontinued operations, net of income taxes | $ | (25,964) | $ | 32,845 |

26

The assets and liabilities of discontinued operations as of December 31, 2015 and 2014 are comprised of the assets and liabilities of Advent and Corvisa. The major classes of assets and liabilities of discontinued operations as of December 31, 2015 and 2014 are detailed below (dollars in thousands).

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| **Assets** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 352 | $ 2,419 |
| Service fee receivable, net | 282 | 729 |
| Marketable securities, current | — | 1,405 |
| Other current assets | 1,209 | 1,012 |
| Total current assets | 1,843 | 5,565 |
| Non-Current Assets | | |
| Property and equipment, net of accumulated depreciation | 5,708 | 5,128 |
| Marketable securities, noncurrent | — | 1,365 |
| Other assets | 707 | 780 |
| Total non-current assets | 6,415 | 7,273 |
| Total assets | $ 8,258 | $ 12,838 |
| | | |
| **Liabilities** | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 2,159 | $ 2,949 |
| Other current liabilities | 311 | 314 |
| Total current liabilities | 2,470 | 3,263 |
| Non-Current Liabilities | | |
| Other liabilities | 1,833 | 1,925 |
| Total non-current liabilities | 1,833 | 1,925 |
| Total liabilities | $ 4,303 | $ 5,188 |

**Note 4 . Marketable Securities**

The following table presents certain information on the Company's portfolio of available-for-sale securities as of December 31, 2015 and 2014 (dollars in thousands):

27

|  | As of December 31, 2015 | | | |
|---|---|---|---|---|
| Description of Securities | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Marketable securities, current | | | | |
| Corporate notes and bonds | $ 15,517 | $ — | $ (28) | $ 15,489 |
| Mortgage securities | 525 | 1,486 | — | 2,011 |
| Total | 16,042 | 1,486 | (28) | 17,500 |
| | | | | |
| Marketable securities, non-current | | | | |
| Corporate notes and bonds | 1,419 | — | (22) | 1,397 |
| Total | $ 1,419 | $ — | $ (22) | $ 1,397 |

|  | As of December 31, 2014 | | | |
|---|---|---|---|---|
| Description of Securities | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Marketable securities, current | | | | |
| Corporate notes and bonds | $ 23,056 | $ — | $ (25) | $ 23,031 |
| Commercial paper | 1,998 | — | — | 1,998 |
| Mortgage securities | 682 | 2,699 | — | 3,381 |
| Total | 25,736 | 2,699 | (25) | 28,410 |
| | | | | |
| Marketable securities, non-current | | | | |
| Corporate notes and bonds | 13,694 | — | (45) | 13,649 |
| Agency securities | 1,000 | — | (2) | 998 |
| Total | $ 14,694 | $ — | $ (47) | $ 14,647 |

Prior to 2008, the Company originated, purchased, securitized, sold, invested in and serviced residential nonconforming mortgage loans and mortgage securities. As a result of those activities, we acquired mortgage securities that continue to be a source of our earnings and cash flow. As of December 31, 2015 and 2014 , these mortgage securities consisted entirely of the Company's investment in the residual securities issued by securitization trusts sponsored by the Company. Residual securities consist of interest-only, prepayment penalty and overcollateralization bonds.

There were no other-than-temporary impairments relating to available-for-sale securities for 2015 and 2014. The average remaining maturities of the Company's short-term and long-term available-for-sale investments as of December 31, 2015 were approximately six and 21 months, respectively. Maturities of mortgage securities owned by the Company depend on repayment characteristics and experience of the underlying financial instruments. See Note 8 to the consolidated financial statements for details on the Company's fair value methodology.

The following table relates to the securitizations where the Company retained an interest in the assets issued by the securitization trust (dollars in thousands):

|  | Size/Principal Outstanding (A) | Assets on Balance Sheet (B) | Liabilities on Balance Sheet | Maximum Exposure to Loss(C) | Year to Date Loss on Sale | Year to Date Cash Flows |
|---|---|---|---|---|---|---|
| December 31, 2015 | $ 3,601,468 | $ 2,011 | $ — | $ 2,011 | $ — | $ 6,287 |
| December 31, 2014 | $ 4,062,068 | $ 3,381 | $ — | $ 3,381 | $ — | $ 7,136 |

(A)  Size/Principal Outstanding reflects the estimated principal of the underlying assets held by the securitization trust.
(B)  Assets on balance sheet are securities issued by the entity and are recorded in the current marketable securities line item of the consolidated balance sheets.
(C)  The maximum exposure to loss includes the assets held by the Company. The maximum exposure to loss assumes a total loss on the referenced assets held by the securitization trust.

**Note 5. Property and Equipment, Net**

All of the Company's property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the related assets. The estimated useful lives of the Company's property and equipment are the lesser of 5 years or remaining lease term for leasehold improvements, 5 years for furniture and fixtures, 3 to 5 years for office and computer equipment, and 1 to 3 years for software.

Maintenance and repairs are charged to expense. Major renewals and improvements are capitalized. Gains and losses on dispositions are credited or charged to earnings as incurred. Depreciation and amortization expense relating to property and equipment was $0.1 million and $0.2 million for 2015 and 2014, respectively.

The following table shows the Company's property and equipment, net as of December 31, 2015 and 2014 (dollars in thousands):

|  | December 31, 2015 | | December 31, 2014 | |
|---|---|---|---|---|
| Furniture, fixtures and office equipment | $ | 314 | $ | 318 |
| Hardware and computer equipment |  | 157 |  | 519 |
| Software |  | 547 |  | 580 |
| Leasehold improvements |  | 402 |  | 402 |
| Total Cost |  | 1,420 |  | 1,819 |
| Less: Accumulated depreciation and amortization |  | (1,062) |  | (1,315) |
| Property and equipment, net | $ | 358 | $ | 504 |

**Note 6 . Borrowings**

***Senior Notes*** *.* The Company has outstanding unsecured senior notes (collectively, the "Senior Notes") pursuant to three indentures (collectively, the "Indentures") with an aggregate principal balance of $85.9 million . The Senior Notes were created through an exchange of the Company's previously outstanding junior subordinated notes that occurred prior to 2012. This exchange was considered a modification of a debt instrument for accounting purposes, and therefore the Company uses the effective interest method to accrete from the existing balance as of the modification date to $88.4 million and $85.9 million as of December 31, 2015 and 2014, respectively. Under the effective interest method, significant changes in the rate at which a debt instrument accrues interest over its term can result in a recorded balance in excess of the aggregate principal balance of the debt instrument.

The Senior Notes accrue interest at a rate of 1.0% per annum until the earlier of (1) the completion of an equity offering by the Company or its subsidiaries that results in proceeds of $40 million or more or (2) January 1, 2016. Thereafter, the Senior Notes will accrue interest at a rate of three-month LIBOR plus  3.5% per annum (the "Full Rate"). Interest on the Senior Notes is paid on a quarterly basis and no principal payments are due until maturity on March 30, 2033.

The Indentures governing the Senior Notes contain certain restrictive covenants (the "Negative Covenants") subject to certain exceptions in the Indentures, including written consent of the holders of the Senior Notes. The Negative Covenants prohibit the Company and its subsidiaries, from among other things, incurring debt, permitting any lien upon any of its property or assets, making any cash dividend or distribution or liquidation payment, acquiring shares of the Company or its subsidiaries, making payment on debt securities of the Company that rank *pari passu* or junior to the Senior Notes, or disposing of any equity interest in certain subsidiaries or all or substantially all of the assets of certain subsidiaries unless certain conditions are met. The Negative Covenants remain in effect until both of the following conditions are met: (i) the Senior Notes begin accruing interest at the Full Rate, and (ii) the Company satisfies certain financial covenants (the "Financial Covenants"). Satisfaction of the Financial Covenants requires the Company to demonstrate on a consolidated basis that (1) its Tangible Net Worth is equal to or greater than $40 million , and (2) either (a) the Interest Coverage Ratio is equal to or greater than 1.35 x, or (b) the Leverage Ratio is not greater than 95% (each such term as defined in the Indentures). As the Senior Notes were not accruing interest at the Full Rate, the Negative Covenants, as defined above, were still in effect as of December 31, 2015 and 2014. Compliance with the Financial Covenants is required only when the Company seeks to take action prohibited by the Negative Covenants that has not been approved by the holders of the Senior Notes.

With respect to the Company's recent divestiture activity, which is discussed further in Note 3 to the consolidated financial statements, the sale of a subsidiary is not prohibited by the Negative Covenants provided that the sale is at fair market value and the proceeds are reinvested in the Company. As such, the Company was in compliance with the Negative Covenants as of December 31, 2015 and 2014.

**Note 7 . Commitments and Contingencies**

*Commitments .* In September 2014, Steve Haslam, who was then Senior Vice President and Chief Operating Officer of the Company, announced that, in lieu of accepting a new role with the Company and relocating, he was retiring from the Company effective October 1, 2014. Pursuant to the terms of his Employment Agreement dated March 8, 2012, Mr. Haslam elected to terminate his employment for "Good Reason" in connection with the new position and relocation offered to him. In addition to accrued but unpaid salary and other benefits, Mr. Haslam was paid $0.4 million in severance from the date of termination through October 1, 2015. The full amount of Mr. Haslam's severance was charged to income from continuing operations during the third quarter of 2014 in accordance with the relevant accounting guidance. As of December 31, 2014, the remaining severance obligation of approximately $0.3 million was included in accounts payable and accrued expenses. There was no such accrual as of December 31, 2015, as the obligation had been paid in its entirety.

The Company leases office space under various operating lease agreements, most of which contain renewal options and include escalating rents over the lease term. Rent expense for 2015 and 2014 aggregated $0.3 million and $1.1 million , respectively. The decrease in rent expense from 2014 to 2015 is due primarily to the abandonment of an operating lease during the fourth quarter of 2014. At December 31, 2015 , future minimum lease commitments under those leases for the next five years are as follows (dollars in thousands):

|  | Lease Obligations |
|---|---|
| 2015 | $ 700 |
| 2016 | 722 |
| 2017 | 478 |
| 2018 | 187 |
| 2019 | — |
|  | $ 2,087 |

*Contingencies .* Prior to 2008, the Company originated, purchased, securitized, sold, invested in and serviced residential nonconforming mortgage loans and mortgage securities. The Company has received indemnification and loan repurchase demands with respect to alleged violations of representations and warranties ("defects") and with respect to other alleged misrepresentations and contractual commitments made in loan sale and securitization agreements. These demands have been received substantially beginning in 2006 and have continued into recent years. Prior to the Company ceasing the origination of loans in its mortgage lending business, it sold loans to securitization trusts and other third parties and agreed to repurchase loans with material defects and to otherwise indemnify parties to these transactions. Beginning in 1997 and ending in 2007, affiliates of the Company sold loans to securitization trusts and third parties with the potential of such obligations. The aggregate original principal balance of these loans was $43.1 billion at the time of sale or securitization. The remaining principal balance of these loans is not available as these loans are serviced by third parties and may have been refinanced, sold or liquidated. Claims to repurchase loans or to indemnify under securitization documents have not been acknowledged as valid by the Company. In some cases, claims were made against affiliates of the Company that have ceased operations and have no or limited assets. The Company has not repurchased any loans or made any such indemnification payments since 2010.

Historically, repurchases of loans or indemnification of losses where a loan defect has been alleged have been insignificant and any future losses for alleged loan defects have not been deemed to be probable or reasonably estimable; therefore, the Company has recorded no reserves related to these claims. The Company does not use internal groupings for purposes of determining the status of these loans. The Company is unable to develop an estimate of the maximum potential amount of future payments related to repurchase demands because the Company does not have access to information relating to loans sold and securitized and the number or amount of claims deemed probable of assertion is not known nor is it reasonably estimated. Further, the validity of claims received remains questionable. Also, considering that the Company completed its last sale or securitization of loans during 2007, the Company believes that it will be difficult for a claimant to successfully validate any additional repurchase demands. Management does not expect that the potential impact of claims will be material to the Company's financial statements.

*Pending Litigation .* The Company is a party to various legal proceedings. Except as set forth below, these proceedings are of an ordinary and routine nature. Any legal fees associated with these proceedings are expensed as incurred.

Although it is not possible to predict the outcome of any legal proceeding, in the opinion of management, other than the active proceedings described in detail below, proceedings and actions against the Company should not, individually, or in the aggregate, have a material effect on the Company's financial condition, operations and liquidity. Furthermore, due to the uncertainty of any potential loss as a result of pending litigation and due to the Company's belief that an adverse ruling is not probable, the Company has not accrued a loss contingency related to the following matters in its consolidated financial

statements. However, a material outcome in one or more of the active proceedings described below could have a material impact on the results of operations in a particular quarter or fiscal year.

On May 21, 2008, a purported class action case was filed in the Supreme Court of the State of New York, New York County, by the New Jersey Carpenters' Health Fund, on behalf of itself and all others similarly situated. Defendants in the case included NovaStar Mortgage Funding Corporation ("NMFC"), a wholly-owned subsidiary of the Company, and its individual directors, several securitization trusts sponsored by the Company ("affiliated defendants") and several unaffiliated investment banks and credit rating agencies. The case was removed to the United States District Court for the Southern District of New York. On June 16, 2009, the plaintiff filed an amended complaint. The plaintiff seeks monetary damages, alleging that the defendants violated sections 11, 12 and 15 of the Securities Act of 1933, as amended, by making allegedly false statements regarding mortgage loans that served as collateral for securities purchased by the plaintiff and the purported class members. On August 31, 2009, the Company filed a motion to dismiss the plaintiff's claims, which the court granted on March 31, 2011, with leave to amend. The plaintiff filed a second amended complaint on May 16, 2011, and the Company again filed a motion to dismiss. On March 29, 2012, the court dismissed the plaintiff's second amended complaint with prejudice and without leave to replead. The plaintiff filed an appeal. On March 1, 2013, the appellate court reversed the judgment of the lower court, which had dismissed the case. Also, the appellate court vacated the judgment of the lower court which had held that the plaintiff lacked standing, even as a class representative, to sue on behalf of investors in securities in which plaintiff had not invested, and the appellate court remanded the case back to the lower court for further proceedings. On April 23, 2013 the plaintiff filed its memorandum with the lower court seeking a reconsideration of the earlier dismissal of plaintiff's claims as to five offerings in which plaintiff was not invested, and on February 5, 2015 the lower court granted plaintiff's motion for reconsideration and vacated its earlier dismissal. Given the stage of the litigation, the Company cannot provide an estimate of the range of any loss. The Company believes that the affiliated defendants have meritorious defenses to the case and expects them to defend the case vigorously.

On June 20, 2011, the National Credit Union Administration Board, as liquidating agent of U.S. Central Federal Credit Union, filed an action against NMFC and numerous other defendants in the United States District Court for the District of Kansas, claiming that the defendants issued or underwrote residential mortgage-backed securities pursuant to allegedly false or misleading registration statements, prospectuses, and/or prospectus supplements. On August 24, 2012, the plaintiff filed an amended complaint making essentially the same claims against NMFC. NMFC filed a motion to dismiss the amended complaint which was denied on September 12, 2013. The defendants had claimed that the case should be dismissed based upon a statute of limitations and sought an appeal of the court's denial of this defense. An interlocutory appeal of this issue was allowed, and on August 27, 2013, the Tenth Circuit affirmed the lower court's denial of defendants' motion to dismiss the plaintiff's claims as being time barred; the appellate court held that the Extender Statute, 12 U.S.C. §1787(b)(14) applied to plaintiff's claims. On June 16, 2014, the United States Supreme Court granted a petition of NMFC and its co-defendants for certiorari, vacated the ruling of the Tenth Circuit, and remanded the case back to that court for further consideration in light of the Supreme Court's decision in CTS Corp. v. Waldburger, 134 S. Ct. 2175 (2014). On August 19, 2014, the Tenth Circuit reaffirmed its prior decision, and on October 2, 2014 the defendants filed a petition for writ of certiorari with the Supreme Court, which was denied. Given the stage of the litigation, the Company cannot provide an estimate of the range of any loss. The Company believes that NMFC has meritorious defenses to the case and expects it to defend the case vigorously.

On February 28, 2013 the Federal Housing Finance Agency, as conservator for the Federal Home Loan Mortgage Corporation (Freddie Mac) and on behalf of the Trustee of the NovaStar Mortgage Funding Trust, Series 2007-1 (the "Trust"), a securitization trust in which the Company retains a residual interest, filed a summons with notice in the Supreme Court of the State of New York, County of New York against the Company and NovaStar Mortgage, Inc. ("NMI"), a wholly-owned subsidiary of the Company. The notice provides that this is a breach of contract action with respect to certain, unspecified mortgage loans and defendant's failure to repurchase such loans under the applicable agreements. Plaintiff alleges that defendants, from the closing date of the transaction that created the Trust, were aware of the breach of the representations and warranties made and failed to notice and cure such breaches, and due to the failure of defendants to cure any breach, notice to defendants would have been futile. The summons with notice was not served until June 28, 2013. By letter dated June 24, 2013, the Trustee of the Trust forwarded a notice from Freddie Mac alleging breaches of representations and warranties with respect to 43 loans, as more fully set forth in included documentation. The 43 loans had an aggregate, original principal balance of $6.5 million. On August 19, 2013, Deutsche Bank National Trust Company, as Trustee, filed a complaint identifying alleged breaches of representations and warranties with respect to seven loans that were included in the earlier list of 43 loans. Plaintiff also generally alleged a trust-wide breach of representations and warranties by defendants with respect to loans sold and transferred to the trust. Plaintiff seeks specific performance of repurchase obligations; compensatory, consequential, recessionary and equitable damages for breach of contract; specific performance and damages for anticipatory breach of contract; and indemnification (indemnification against NMI only). On October 9, 2013, the Company and NMI filed a motion to dismiss plaintiff's complaint. This motion to dismiss was withdrawn after plaintiff filed an amended complaint on January 28, 2014, and on March 4, 2014 the Company and NMI filed a motion to dismiss the amended complaint. Given the stage of the litigation, the Company cannot provide an estimate of the range of any loss. The Company believes that it has meritorious defenses to the case and expects to defend the case vigorously.

31

**Note 8 . Fair Value Accounting**

*Fair Value Measurements*

The Company's valuation techniques are based upon observable and unobservable inputs. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect the Company's market assumptions. These two types of inputs create the following fair value hierarchy:

- Level 1 – Valuations based on quoted prices in active markets for *identical* assets and liabilities.

- Level 2 – Valuations based on observable inputs in active markets for *similar* assets and liabilities, other than Level 1 prices, such as quoted interest or currency exchange rates.

- Level 3 – Valuations based on significant unobservable inputs that are supported by little or no market activity, such as discounted cash flow methodologies based on internal cash flow forecasts.

The following tables present for each of the fair value hierarchy levels, the Company's assets and liabilities which are measured at fair value on a recurring basis as of December 31, 2015 and 2014 (dollars in thousands):

| | | Fair Value Measurements at Reporting Date Using | | |
| Description | Fair Value at December 31, 2015 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash and cash equivalents: | | | | |
| Cash | $ 1,674 | $ 1,674 | $ — | $ — |
| Money market funds | 1,152 | 1,152 | — | — |
| Marketable securities, current: | | | | |
| Corporate notes and bonds | 15,489 | — | 15,489 | — |
| Mortgage securities | 2,011 | — | — | 2,011 |
| Marketable securities, non-current: | | | | |
| Corporate notes and bonds | 1,397 | — | 1,397 | — |
| Total | $ 21,723 | $ 2,826 | $ 16,886 | $ 2,011 |

| | | Fair Value Measurements at Reporting Date Using | | |
| Description | Fair Value at December 31, 2014 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash and cash equivalents: | | | | |
| Cash | $ 2,354 | $ 2,354 | $ — | $ — |
| Money market funds | 881 | 881 | — | — |
| Marketable securities, current: | | | | |
| Corporate notes and bonds | 23,031 | — | 23,031 | — |
| Commercial paper | 1,998 | — | 1,998 | — |
| Mortgage securities | 3,381 | — | — | 3,381 |
| Marketable securities, non-current: | | | | |
| Corporate notes and bonds | 13,649 | — | 13,649 | — |
| Agency securities | 998 | — | 998 | — |
| Total | $ 46,292 | $ 3,235 | $ 39,676 | $ 3,381 |

*Valuation Methods and Processes*

The Company determines the fair value of its cash equivalents and marketable securities based on pricing from our service provider and market prices from industry-standard independent data providers. Such market prices may be quoted prices in active markets for identical assets (Level 1 inputs) or pricing determined using inputs other than quoted prices that are observable either directly or indirectly (Level 2 inputs), such as yield curve, volatility factors, credit spreads, default rates, loss severity, current market and contractual prices for the underlying instruments or debt, broker and dealer quotes, as well as other relevant economic measures.

To the extent observable inputs are not available, as is the case with the Company's mortgage securities, the Company estimates fair value using present value techniques and generally does not have the option to choose other valuation methods for these securities. The methods and processes used to estimate the fair value of the Company's mortgage securities are discussed further below. There have been no significant changes to the Company's valuation techniques during 2014. Accordingly, there have been no material changes to the financial statements resulting from changes to our valuation techniques.

The Company's marketable securities are classified as available-for-sale and are reported at their estimated fair value with unrealized gains and losses reported in accumulated other comprehensive income. To the extent that the cost basis of the Company's marketable securities exceeds the fair value and the unrealized loss is considered to be other than temporary, an impairment charge is recognized and the amount recorded in accumulated other comprehensive income or loss is reclassified to earnings as a realized loss. The specific identification method is used in computing realized gains or losses.

***Mortgage securities - available-for-sale*** . As discussed above and in Note 4 to the consolidated financial statements, the Company's mortgage securities – available-for-sale, are measured at fair value. These securities are valued at each reporting date using significant unobservable inputs (Level 3) by discounting the expected cash flows using market interest rates commensurate with the credit quality and duration of the investment.

The Company uses the discount rate methodology for determining the fair value of its residual securities. The fair value of the residual securities is estimated based on the present value of future expected cash flows to be received. Management's best estimate of key assumptions, including credit losses, prepayment speeds, forward yield curves and discount rates commensurate with the risks involved, are used in estimating future cash flows.

An independent entity has been engaged to prepare projected future cash flows of the Company's mortgage securities for each reporting period (quarterly) used by management to estimate fair value. The Company's internal finance and accounting staff reviews and monitors the work of the independent entity, including an analysis of the assumptions used, retrospective review of prior period assumptions, and preparation of an overall conclusion regarding the value and valuation process. All other fair value analysis, consisting of simple cash flow estimates and discounting techniques, is conducted internally by the Company's internal financial staff. The Company's fair value process is conducted under the supervision of the Chief Financial Officer.

The following table presents certain quantitative information about the significant unobservable inputs used in the fair value measurement for items measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

| Description | Valuation Techniques | Significant Unobservable Inputs | Range |
|---|---|---|---|
| **Assets:** | | | |
| Mortgage securities – available-for-sale | Present value analysis | Prepayment rates | 8.0% – 11.5% |
| | | Weighted average life (years) | 2.0 |

The significant unobservable inputs used in the fair value measurement of mortgage securities – available-for-sale are prepayment rates and the weighted average life for the underlying mortgage loan collateral. Using a faster (higher) estimated prepayment rate would decrease the value of the securities. The Company uses a weighted average life of 2 years from the reporting date for the expected future estimated cash flows. The future cash flows are highly-dependent upon the performance of the underlying collateral of mortgage loans. The nonperformance risk associated with the collateral is the key reason the Company utilizes such a short weighted average life in its calculation. Assuming a shorter weighted average life would decrease the estimated value of the mortgage securities. Alternatively, assuming a longer weighted average life would increase the estimated value of the mortgage securities.

The following table provides a reconciliation of the beginning and ending balances for the Company's mortgage securities – available-for-sale which are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for 2015 and 2014 (dollars in thousands):

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Balance, beginning of period | $ 3,381 | $ 3,728 |
| Increases (decreases) to mortgage securities – available-for-sale: | | |
| Accretion of income (A) | 528 | 713 |
| Proceeds from paydowns of securities (A) | (685) | (656) |
| Mark-to-market value adjustment | (1,213) | (404) |
| Net increases (decreases) to mortgage securities – available-for-sale | (1,370) | (347) |
| Balance, end of period | $ 2,011 | $ 3,381 |

(A)   Cash received on mortgage securities with no cost basis was $5.6 million and $6.5 million for 2015 and 2014 , respectively.

Adjustments to assets and liabilities measured at fair value on a recurring and nonrecurring basis did not have a material impact on the earnings of continuing operations for any period presented.

The following disclosure of the estimated fair value of financial instruments presents amounts that have been determined using available market information and appropriate valuation methodologies. However, considerable judgment is required to interpret market data to develop the estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that could be realized in a current market exchange. The use of different market assumptions or estimation methodologies could have a material impact on the estimated fair value amounts. The fair value of short-term financial assets and liabilities, such as service fees receivable, notes receivable, and accounts payable and accrued expenses are not included in the following table as their fair value approximates their carrying value.

The estimated fair values of the Company's financial instruments are as follows as of December 31, 2015 and 2014 (dollars in thousands):

| | As of December 31, 2015 | | As of December 31, 2014 | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Financial assets: | | | | |
| Restricted cash | $ 598 | $ 435 | $ 597 | $ 450 |
| Marketable securities | 18,897 | 18,897 | 43,057 | 43,057 |
| Financial liabilities: | | | | |
| Senior notes | $ 88,385 | $ 18,331 | $ 85,937 | $ 15,189 |

For the items in the table above not measured at fair value in the statement of financial position but for which the fair value is disclosed, the fair value has been estimated using Level 3 methodologies, based on significant unobservable inputs that are supported by little or no market activity, such as discounted cash flow calculations based on internal cash flow forecasts. No assets or liabilities have been transferred between levels during any period presented.

*Restricted cash.* The fair value of restricted cash was estimated by discounting estimated future releases of the cash from restriction.

*Senior notes.* The fair value is estimated by discounting future projected cash flows using a discount rate commensurate with the risks involved. The value of the Senior Notes was calculated assuming that the Company would be required to pay interest at a rate of 1.0% per annum until January 2016, at which time the Company would be required to start paying the Full Rate of three-month LIBOR plus  3.5% until maturity in March 2033. The three-month LIBOR used in the analysis was projected using a forward interest rate curve.

**Note 9 . Earnings Per Share**

Basic earnings per share is computed by dividing net earnings available to common shareholders by the weighted average number of shares of common stock outstanding during the period. Diluted earnings per share include the effect of conversions of stock options and nonvested shares. The computations of basic and diluted earnings per share for 2015 and 2014 (dollars in thousands, except share and per share amounts) are as follows:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Numerator:** | | |
| Net loss from continuing operations | $ (2,765) | $ (1,906) |
| (Loss) Income from discontinued operations | (25,964) | 32,845 |
| Net (loss) income | $ (28,729) | $ 30,939 |
| | | |
| **Denominator:** | | |
| Weighted average common shares outstanding – basic | 91,138,068 | 90,926,211 |
| | | |
| Weighted average common shares outstanding – diluted: | | |
| Weighted average common shares outstanding – basic | 91,138,068 | 90,926,211 |
| Stock options | — | — |
| Nonvested shares | — | — |
| Weighted average common shares outstanding – diluted | 91,138,068 | 90,926,211 |
| | | |
| **Basic earnings per share:** | | |
| Net loss from continuing operations | $ (0.03) | $ (0.02) |
| (Loss) Income from discontinued operations | (0.29) | 0.36 |
| Net (loss) income | $ (0.32) | $ 0.34 |
| | | |
| **Diluted earnings per share:** | | |
| Net loss from continuing operations | $ (0.03) | $ (0.02) |
| (Loss) Income from discontinued operations | (0.29) | 0.36 |
| Net (loss) income | $ (0.32) | $ 0.34 |

The following weighted-average stock options to purchase shares of Common Stock were outstanding during each period presented, but were not included in the computation of diluted earnings (loss) per share because the number of shares assumed to be repurchased, as calculated was greater than the number of shares to be obtained upon exercise, therefore, the effect would be antidilutive (in thousands, except exercise prices):

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Number of stock options | 10,549 | 9,859 |
| Weighted average exercise price of stock options | $ 0.62 | $ 0.66 |

During 2015, the Company granted approximately 1.4 million options to purchase shares of common stock at a weighted average exercise price of $0.51 . The weighted average impact of approximately 0.7 million of the options granted during 2015 is included in the table above for 2015.

During 2014, the Company granted 3.7 million options to purchase shares of common stock at a weighted average exercise price of $0.51 . The weighted average impact of approximately 1.6 million of the options granted during 2014 is included in the table above for 2014.

During 2015 the Company granted approximately 1.3 million nonvested shares to its non-employee directors. These shares vest one year from the date of grant. The weighted average impact of approximately 0.5 million of the nonvested shares granted during the current year were not included in the calculation of earnings per share for 2015, because they were anti-dilutive.

As of December 31, 2015 and 2014, respectively, the Company had approximately 1.4 million and 0.5 million nonvested shares outstanding. While the nonvested shares granted during 2015 vest one year from the date of grant, the nonvested shares granted in prior years vest ratably over their original term of six years. The weighted average impact of approximately 0.8 million and 0.6 million nonvested shares were not included in the calculation of earnings per share for 2015 and 2014, respectively, because they were anti-dilutive.

**Note 10 . Income Taxes**

The Income tax benefit from both continuing and discontinued operations was not material during the 2015. This is due primarily to continued losses from operations and the full valuation allowance against the Company's deferred tax assets, which is discussed further below. During 2014, the Company recorded an income tax benefit from continuing operations of approximately $1.7 million . The majority of this benefit relates to operating losses from continuing operations and the utilization of a portion of the Company's deferred tax assets to offset the income tax expense from discontinued operations. For 2014, the income tax expense from discontinued operations totaled approximately $2.0 million , arising primarily from the gain on the sale of StreetLinks, offset by the operating losses of Corvisa. The components of income tax benefit from continuing operations for 2015 and 2014 were as follows (dollars in thousands):

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| **Current:** | | |
| Federal | $ (13) | $ (227) |
| State and local | (15) | 3 |
| Total current | (28) | (224) |
| | | |
| **Deferred:** | | |
| Federal | — | (1,306) |
| State and local | — | (192) |
| Total deferred | — | (1,498) |
| Total income tax benefit | $ (28) | $ (1,722) |

A reconciliation of the expected federal income tax expense using the federal statutory tax rate of 35% to the Company's actual income tax benefit and resulting effective tax rate for 2015 and 2014 were as follows (dollars in thousands):

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| Income tax at statutory rate | $ (977) | $ (1,270) |
| State income taxes, net of federal tax benefit | (96) | (226) |
| Valuation allowance | 2,519 | (2,740) |
| Change in state tax rate | — | (85) |
| State tax credits | 488 | — |
| Adjustment to deferred tax asset | (1,965) | 162 |
| Expiration of loss carryforward | — | 3,007 |
| Uncertain tax positions | (87) | (504) |
| Other | 90 | (66) |
| Total income tax benefit | $ (28) | $ (1,722) |

Prior to 2014, the Company concluded that it was no longer more likely than not that it would realize a portion of its deferred tax assets. As such, the Company maintained a full valuation allowance against its deferred tax assets as of both December 31, 2015 and 2014.

The Company's determination of the realizable deferred tax assets requires the exercise of significant judgment, based in part on business plans and expectations about future outcomes. In the event the actual results differ from these estimates in future periods, the Company may need to adjust the valuation allowance, which could materially impact our financial position and results of operations. The Company will continue to assess the need for a valuation allowance in future periods. As of December 31, 2015 and 2014 , the Company maintained a valuation allowance of $281.5 million and $268.6 million , respectively, for its deferred tax assets. During 2015, there was an increase in the valuation allowance of approximately $12.9 million , of which $2.5 million was attributable to continuing operations, while $10.4 million was attributable to discontinued operations.

Significant components of the Company's deferred tax assets and liabilities as of December 31, 2015 and 2014 were as follows (dollars in thousands):

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| **Deferred tax assets:** | | |
| Basis difference – investments | $ 18,043 | $ 20,049 |
| Federal net operating loss carryforwards | 239,003 | 227,519 |
| State net operating loss carryforwards | 20,168 | 16,922 |
| Other | 4,882 | 5,102 |
| Gross deferred tax asset | 282,096 | 269,592 |
| Valuation allowance | (281,548) | (268,592) |
| Deferred tax asset | 548 | 1,000 |
| **Deferred tax liabilities:** | | |
| Other | 548 | 1,000 |
| Deferred tax liability | 548 | 1,000 |
| Net deferred tax asset | $ — | $ — |

As of December 31, 2015 , the Company had a federal net operating loss of approximately $682.9 million . The federal net operating loss may be carried forward to offset future taxable income, subject to applicable provisions of the Internal Revenue Code (the "Code"). If not used, this net operating loss will expire in years 2025 through 2035 . The Company has state net operating loss carryovers arising from both combined and separate filings from as early as 2004. The state net operating loss carryovers may expire as early as 2017 and as late as 2035 .

The activity in the accrued liability for unrecognized tax benefits for the years ended December 31, 2015 and 2014 was as follows (dollars in thousands):

| | For the Year Ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| Beginning balance | $ 475 | $ 731 |
| Gross increases – tax positions in current period | 19 | 300 |
| Lapse of statute of limitations | (126) | (556) |
| Ending balance | $ 368 | $ 475 |

As of December 31, 2015 and 2014 , the total gross amount of unrecognized tax benefits was $0.4 million and $0.5 million , respectively, which also represents the total amount of unrecognized tax benefits that would impact the effective tax rate. The Company anticipates a reduction of unrecognized tax benefits of less than $0.1 million due the lapse of statute of limitations in the next twelve months. The Company does not expect any other significant change in the liability for unrecognized tax benefits in the next twelve months.

It is the Company's policy to recognize interest and penalties related to income tax matters in income tax expense. The benefit for interest and penalties recorded in income tax expense was not significant for 2015 and 2014 . There were accrued interest and penalties of less than $0.1 million as of both December 31, 2015 and 2014 .

The Company and its subsidiaries are subject to U.S. federal income tax as well as income tax of multiple state and local jurisdictions. Tax years 2011 to 2015 remain open to examination for both U.S. federal income tax and major state tax jurisdictions.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

The Company maintains a system of disclosure controls and procedures that are designed to ensure that information required to be disclosed by the Company in reports that it files or submits under the federal securities laws, including this report, is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

The Company's principal executive officer and principal financial officer evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(d)) as of the end of the period covered by this report and, based on such evaluation, concluded that the Company's disclosure controls and procedures were effective as of such date.

**Internal Control over Financial Reporting**

*Management's Annual Report on Internal Control over Financial Reporting*

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. This internal control system has been designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation and fair presentation of the Company's published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Under the supervision and with the participation of management, including the Company's principal executive officer and principal financial officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2015 based on the framework set forth in *Internal Control—Integrated Framework* , issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation and its assessment , management concluded that the Company's internal control over financial reporting was effective as of December 31, 2015 .

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**Item 9B. Other Information**

None.

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this Item 10 is included under the captions "Corporate Governance and Related Matters," "Director Compensation for 2015," "Section 16(a) Beneficial Ownership Reporting Compliance," and "Proposal 1 - Election of Directors," in our Proxy Statement, filed or to be filed in connection with our 2016 Annual Meeting of Stockholders (our "2016 Proxy Statement"), which information is incorporated herein by reference.

**Item 11. Executive Compensation**

The information required by this Item 11 is included under the caption "Executive Compensation" in our 2016 Proxy Statement, which information is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this Item 12 is included under the captions "Beneficial Ownership," and "Equity Compensation Plan Information," in our 2016 Proxy Statement, which information is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this Item 13 is included under the captions "Related Party Transactions," and "Corporate Governance and Related Matters - Director Independence," in our 2016 Proxy Statement, which information is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The information required by this Item 14 is included under the captions "Proposal 2 - Ratification of the Selection of the Independent Registered Public Accounting Firm , " and "Audit Committee Report" in our 2016 Proxy Statement, which information is incorporated herein by reference.

PART IV

**Item 15. Exhibits and Financial Statements Schedules**

**Financial Statements and Schedules**

(1) The financial statements as set forth under Item 8 of this report on Form 10-K are included herein.
(2) The required financial statement schedules are omitted because the information is disclosed elsewhere herein.

**Exhibits**

We describe the exhibits filed as part of, or incorporated by reference into, this 2015 Form 10-K in the attached Exhibit Index.

**EXHIBIT INDEX**

| Exhibit No. | Description of Document |
| --- | --- |
| 2.1 | Membership Interest Purchase Agreement, dated as of December 21, 2015, by and among Novation Companies, Inc., Corvisa Services LLC and ShoreTel, Inc. (incorporated by reference to Exhibit 2.1 to the Current Report on Form 8-K filed on December 21, 2015). |
| 3.1 | Articles of Amendment and Restatement (incorporated by reference to Exhibit 3.1 to the Quarterly Report on Form 10-Q filed on August 7, 2015). |
| 3.2 | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.1 to the Current Report on Form 8-K filed on April 6, 2015). |
| 3.3 | Amendment to the Amended and Restated Bylaws (incorporated by reference to Exhibit 3.2.1 to the Current Report on Form 8-K filed on March 16, 2009). |
| 4.1 | Specimen Common Stock Certificate (incorporated by reference to Exhibit 4.1 to the Quarterly Report Form 10-Q filed on August 5, 2005). |
| 4.2 | Registration Rights Agreement, dated March 15, 2011, between the Company and W. Lance Anderson (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on March 21, 2011). |
| 4.3 | Registration Rights Agreement, dated June 23, 2011, among NovaStar Financial, Inc., Jefferies Capital Partners IV L.P., Jefferies Employee Partners IV LLC, JCP Partners IV LLC and Massachusetts Mutual Life Insurance Company (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on June 29, 2011). |
| 4.4 | Rights Agreement, dated as of September 15, 2011, by and between NovaStar Financial, Inc. and Computershare Trust Company, N.A., as rights agent (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on September 21, 2011). |
| 4.5 | First Amendment to Rights Agreement, dated June 20, 2014, by and between the Company and Computershare Trust Company, N.A. (incorporated by reference to Exhibit 4.2 to Form 8-A/A filed on June 20, 2014). |
| 4.6 | Second Amendment to Rights Agreement, dated August 24, 2015, by and between the Company and Computershare Trust Company, N.A. (incorporated by reference to Exhibit 4.3 to the Form 8-A12G filed on August 28, 2015). |
| 4.7 | Series 1 Senior Notes Indenture, dated as of March 22, 2011, by and among NovaStar Financial, Inc. and The Bank Of New York Mellon Trust Company, National Association (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed under Form 425 on March 22, 2011). |
| 4.8 | Series 2 Senior Notes Indenture, dated as of March 22, 2011, by and among NovaStar Financial, Inc. and The Bank Of New York Mellon Trust Company, National Association (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed under Form 425 on March 22, 2011). |
| 4.9 | Series 3 Senior Notes Indenture, dated as of March 22, 2011, by and among NovaStar Financial, Inc. and The Bank Of New York Mellon Trust Company, National Association (incorporated by reference to Exhibit 10.5 to the Current Report on Form 8-K filed under Form 425 on March 22, 2011). |
| 10.1 | Employment Agreement, dated as of January 7, 2008, by and between NovaStar Financial, Inc. and Rodney E. Schwatken (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K/A filed on January 10, 2008).* |
| 10.2 | Employee Non-Qualified Stock Option Agreement, between the Company and Rodney Schwatken, dated August 18, 2015 (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on August 20, 2015).* |
| 10.3 | Form of Indemnification Agreement for Officers and Directors of NovaStar Financial, Inc. and its Subsidiaries (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on November 16, 2005).* |
| 10.4 | Novation Companies, Inc. 2015 Incentive Stock Plan (incorporated by reference to Exhibit 10.1 to the Quarterly Report Form 10-Q filed on August 7, 2015).* |
| 10.5 | Amended and Restated Employee Non-Qualified Stock Option Agreement, dated as of March 2, 2015, by and between Novation Companies, Inc. and Rodney E. Schwatken (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on March 3, 2015).* |
| 10.6 | Amended and Restated 2004 Incentive Stock Plan (as amended May 29, 2014) (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on May 30, 2014).* |

40

| 10.7 | First Amendment to the Company's Amended and Restated 2004 Incentive Stock Plan (incorporated by reference to Appendix A to Form DEF 14A filed on April 25, 2014).* |
| 10.8 | Form of Stock Option Agreement under NovaStar Financial, Inc. 2004 Incentive Stock Plan (incorporated by reference to Exhibit 10.25.1 to the Current Report on Form 8-K filed on February 4, 2005).* |
| 10.9 | Form of Restricted Stock Award for Non-Employee Directors under the Novation Companies, Inc. 2015 Incentive Stock Plan (incorporated by reference to Exhibit 10.2 to the Quarterly Report Form 10-Q filed on August 7, 2015).* |
| 10.10 | Form of Option Award for Key Executives under the Novation Companies, Inc. 2015 Incentive Stock Plan (incorporated by reference to Exhibit 10.3 to the Quarterly Report Form 10-Q filed on August 7, 2015).* |
| 10.11 | Form of Option Award for Corvisa Employees under the Novation Companies, Inc. 2015 Incentive Stock Plan (incorporated by reference to Exhibit 10.4 to the Quarterly Report Form 10-Q filed on August 7, 2015).* |
| 10.12 | Form of Restricted Stock Award Agreement under NovaStar Financial, Inc. 2004 Incentive Stock Plan (incorporated by reference to Exhibit 10.25.2 to the Current Report on Form 8-K filed on February 4, 2005).* |
| 10.13 | Second Amended and Restated Stock Option Agreement, dated August 14, 2015, between the Company and W. Lance Anderson (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on August 14, 2015).* |
| 10.14 | 2011 Compensation Plan for Independent Directors (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on August 15, 2011).* |
| 10.15 | Employment Agreement, dated as of March 2, 2012, by and between NovaStar Financial, Inc. and Matthew Lautz (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed on March 9, 2012).* |
| 10.16 | Second Amended and Restated Employee Non-Qualified Stock Option Agreement, by and between Novation Companies, Inc. and Matthew Lautz (incorporated by reference to Exhibit 10.15 to the Form 10-K/A filed on April 30, 2015).* |
| 10.17 | Employee Non-Qualified Stock Option Agreement, between the Company and Matthew Lautz, dated August 18, 2015 (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on August 20, 2015).* |
| 10.18 | Employment Agreement, dated as of March 1, 2012, by and between NovaStar Financial, Inc. and Brett Monger (incorporated by reference to Exhibit 10.5 to the Current Report on Form 8-K filed on March 9, 2012).* |
| 10.19 | Employee Non-Qualified Stock Option Agreement, dated March 8, 2012, by and between NovaStar Financial, Inc. and Brett Monger (incorporated by reference to Exhibit 10.6 to the Current Report on Form 8-K filed on March 9, 2012).* |
| 10.20 | Amended and Restated Restricted Stock Award Agreement to Non-Employee Director, by and between the Company and Gregory T. Barmore, dated March 2, 2015 (incorporated by reference to Exhibit 10.19 to the Form 10-K/A filed on April 30, 2015).* |
| 10.21 | Amended and Restated Restricted Stock Award Agreement to Non-Employee Director, by and between the Company and Art. N. Burtscher, dated March 2, 2015 (incorporated by reference to Exhibit 10.20 to the Form 10-K/A filed on April 30, 2015).* |
| 10.22 | Amended and Restated Restricted Stock Award Agreement to Non-Employee Director, by and between the Company and Edward W. Mehrer, dated March 2, 2015 (incorporated by reference to Exhibit 10.21 to the Form 10-K/A filed on April 30, 2015).* |
| 10.23 | Amended and Restated Restricted Stock Award Agreement to Non-Employee Director, by and between the Company and Howard M. Amster, dated March 2, 2015 (incorporated by reference to Exhibit 10.22 to the Form 10-K/A filed on April 30, 2015).* |
| 10.24 | Amended and Restated Restricted Stock Award Agreement to Non-Employee Director, by and between the Company and Barry A. Igdaloff, dated March 2, 2015 (incorporated by reference to Exhibit 10.23 to the Form 10-K/A filed on April 30, 2015).* |
| 10.25 | Form of Employee Non-Qualified Stock Option Agreement under the Company's Amended and Restated 2004 Incentive Stock Plan (incorporated by reference to Exhibit 10.4 to the Annual Report on Form 10-Q filed on August 7, 2014).* |
| 10.26 | Transaction Bonus and Release Agreement, dated December 20, 2015, by and between the Company and Matthew Lautz.* |
| 10.27 | Agreement, by and among Novation Companies, Inc. a Maryland corporation, Lone Star Value Investors, LP, Lone Star Value Investors GP, LLC, Lone Star Value Management, LLC and Jeffrey E. Eberwein, dated April 22, 2015 (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on April 27, 2015). |
| 21.1 | Subsidiaries of the Registrant. |
| 23.1 | Consent of Grant Thornton LLP. |
| 31.1 | Chief Executive Officer and Chief Financial Officer Certification filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Chief Executive Officer and Chief Financial Officer Certification furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

101    The following financial information from Novation Companies, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2015, formatted in XBRL (Extensible Business Reporting Language) includes: (i) Consolidated Balance Sheets as of December 31, 2015 and December 31, 2014, (ii) Consolidated Statements of Operations for the years ended December 31, 2015 and 2014, (iii) Consolidated Statements of Comprehensive Income for the years ended December 31, 2015 and 2014, (iv) Consolidated Statements of Shareholders' Deficit for the years ended December 31, 2015 and 2014, (v) Consolidated Statements of Cash Flows for the years ended December 31, 2015 and 2014, and (vi) the Notes to Consolidated Financial Statements.

* Management contract or compensatory plan or arrangement.

42

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

NOVATION COMPANIES, INC.

DATE:    February 16, 2016                                    /s/ RODNEY E. SCHWATKEN
_____
                                                             Rodney E. Schwatken, Chief Executive Officer and
                                                             and Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and dates indicated.

DATE:    February 16, 2016                                    /s/ RODNEY E. SCHWATKEN
_____
                                                             Rodney E. Schwatken, Chief Executive Officer and
                                                             Chief Financial Officer
                                                             (Principal Executive Officer and Principal Financial Officer)

DATE:    February 16, 2016                                    /s/ BRETT A. MONGER
_____
                                                             Brett A. Monger, Vice President,
                                                             Controller and Chief Accounting Officer
                                                             (Principal Accounting Officer)

DATE:    February 16, 2016                                    /s/ HOWARD M. AMSTER
_____
                                                             Howard M. Amster, Director

DATE:    February 16, 2016                                    /s/ ART N. BURTSCHER
_____
                                                             Art N. Burtscher, Director

DATE:    February 16, 2016                                    /s/ JEFFREY E. EBERWEIN
_____
                                                             Jeffrey E. Eberwein, Director

DATE:    February 16, 2016                                    /s/ CHARLES M. GILLMAN
_____
                                                             Charles M. Gillman, Director

DATE:    February 16, 2016                                    /s/ BARRY A. IGDALOFF
_____
                                                             Barry A. Igdaloff, Director

DATE:    February 16, 2016                                    /s/ ROBERT G. PEARSE
_____
                                                             Robert G. Pearse, Director

Exhibit 10.26

## TRANSACTION BONUS AND RELEASE AGREEMENT

TRANSACTION BONUS AND RELEASE AGREEMENT (this "Agreement") by and between MATTHEW LAUTZ ("Employee") with an address of N36 W23672 Oak Hill Lane, Pewaukee WI 53072 and NOVATION COMPANIES, INC. ("Novation", and together with its parents, subsidiaries and affiliates, the "Company") with an address at 2114 Central Street, Suite 600, Kansas City, MO 64108 .

1. <u>Termination Upon Transaction</u> . Upon the closing of the sale by Novation and Corvisa Services LLC of Corvisa LLC ("Corvisa") to ShoreTel, Inc. or an affiliate thereof (the "Transaction"), Employee's duties, responsibilities, office and title with the Company shall cease. Employee agrees that, effective on the date of the closing of the Transaction (the "Transaction Date"), he shall resign from all of his positions with the Company, including but not limited to any officer or director positions with Novation, its subsidiaries and affiliates, and any entity related thereto. Company agrees that it will pay Employee his unpaid salary earned up until the time of his resignation, and the Company will pay Employee for his unused vacation days, with both such payments to be made no later than 14 days following Employee's resignation. This Agreement shall automatically be deemed null and void and the obligations of the parties hereunder shall be terminated at 12:00 a.m. Central Time on March 1, 2016 if the Transaction has not closed prior to such time.

2. <u>Transaction Bonus</u> .

(a) The Company shall pay to Employee a bonus of $285,000 (the "Transaction Bonus"), in accordance with the terms and conditions set forth below:

(i) If, for Bona Fide Business Reasons (as defined below) only, the purchase price of the Transaction agreed to at closing ("Agreed Purchase Price") is less than $8.0 million, then the Transaction Bonus shall be reduced by the same percentage that the Agreed Purchase Price is reduced relative to an $8.5 million purchase price. For clarity and by way of example only, if the Agreed Purchase Price were $7.6 million, then the Agreed Purchase Price would reflect a 10.59 percent reduction relative to $8.5 million ($900,000/$8,500,000 = .1059), and the Transaction Bonus would be reduced by 10.59 percent to $254,818.50.

(ii) "Bona Fide Business Reasons" shall mean reasons related to the valuation of the business, such as, for example, change of circumstances regarding key customer accounts or valuation of business assets.

(iii) The Transaction Bonus shall be paid to the Employee in full on the Transaction Date.

(b) For the avoidance of doubt, no payment shall be made under this Agreement if the Transaction has not closed prior to 12:00 a.m. Central Time on March 1, 2016.

3. <u>Consideration</u> . Employee agrees and acknowledges that the payment provided for in Paragraph 2 is valid consideration for this Agreement.

4.    <u>Evaluation Period</u> . Employee shall have up to seven (7) days from the date of his receipt of this Agreement to consider the terms and conditions of this Agreement. Employee may accept this Agreement at any time within the seven (7) day period by executing it and returning it to Rodney Schwatken, Chief Executive Officer, Novation Companies, Inc., 2114 Central Street, Suite 600, Kansas City, MO 64108 , no later than 5:00 p.m. Central Time on the seventh (7 th ) day after Employee's receipt of this Agreement. The effective date of this Agreement shall be the day following Employee's signing of this Agreement (the "Release Effective Date"). In the event Employee does not accept this Agreement as set forth above, or if the Transaction has not closed prior to 12:00 a.m. Central Time on March 1, 2016, this Agreement, including but not limited to the obligation of the Company and its subsidiaries and affiliates to provide the payment referred to in Paragraph 2, shall automatically be deemed null and void.

5.    <u>Releases</u> .

The following subsections (a) - (d) within this paragraph 5 shall become effective upon the Transaction closing:

(a)    (i) In consideration of the payment referred to in Paragraph 2, Employee for himself and for his heirs, executors, and assigns (hereinafter collectively referred to as the "Releasors"), forever releases and discharges the Company, the Company Group (as such term is defined in the Employment Agreement entered into as of March 2, 2012 by and between Employee and Novation (f/k/a Novastar Financial, Inc.), attached hereto as <u>Exhibit A</u> (the "Employment Agreement")), and any and all of its parent corporations, subsidiaries, divisions, affiliated entities, predecessors, successors and assigns, and any and all of its or their employee benefit and/or pension plans or funds, and any of its or their past or present officers, directors, stockholders, agents, trustees, administrators, employees or assigns (whether acting as agents for such entities or in their individual capacities) (hereinafter collectively referred to as the "Company Releasees"), from any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever (based upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, federal, state, local or otherwise), whether known or unknown, which Releasors ever had, now have or may have against the Company Releasees by reason of any actual or alleged act, omission, transaction, practice, conduct, occurrence, or other matter from the beginning of the world up to and including the day the Employee or the Company sign this Agreement, except for the obligations of the Company under this Agreement.

(b)    Without limiting the generality of the foregoing subparagraph (a), this Agreement is intended to and shall release the Company Releasees from any and all claims arising out of Employee's employment with Releasees and/or the termination of Employee's employment, including but not limited to any claim(s) under or arising out of (i) Title VII of the Civil Rights Act of 1964, as amended; (ii) the Americans with Disabilities Act, as amended; (iii) the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (excluding claims for accrued, vested benefits under any employee benefit plan of the Company in accordance with the terms of such plan and applicable law); (iv) the Age Discrimination in Employment Act, as amended, or the Older Workers Benefit Protection Act; (v) the Missouri Human Rights Act; (vi) alleged discrimination or retaliation in employment (whether based on federal, state or local law, statutory or decisional); (vii) the terms and conditions of Employee's employment with the Company, the termination of such employment, and/or any of the events relating directly or indirectly to or surrounding that termination; and (viii) any law (statutory or decisional) providing for attorneys' fees, costs, disbursements and/or the like.

(c)    Notwithstanding the foregoing, nothing in this Agreement shall be construed to prevent Employee from filing a charge with or participating in an investigation conducted by any g

overnmental agency, including, without limitation, the United States Equal Employment Opportunity Commission ("EEOC") the Securities and Exchange Commission ("SEC"), or applicable state or city fair employment practices agency, to the extent required or permitted by law, including SEC compliance investigations. Nevertheless, Employee understands and agrees that he is waiving any relief available (including, for example, monetary damages or reinstatement) under any of the claims and/or causes of action waived in Paragraphs 5(a) and (b), including but not limited to financial benefit or monetary recovery from any lawsuit filed or settlement reached by the EEOC or anyone else with respect to any claims released and waived in this Agreement.

(d)    Except for any claims arising out of Employee's intentional or fraudulent conduct, or claims arising out of actions outside the scope of Employee's employment with the Company, which claims are not released or discharged, the Company, the Company Group, and any and all of their parent corporations, subsidiaries, divisions, affiliated entities, predecessors, successors and assigns, and any and all of their past or present officers, directors, agents, trustees, administrators, and employees ("Company Releasors"), forever release and discharge Employee from any and all claims, demands, causes of action, fees and liabilities whatsoever (based upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, federal, state, local or otherwise), whether known or unknown, which Company Releasors ever had, now have or may have against Employee by reason of any actual or alleged act, omission, transaction, practice, conduct occurrence, or other matter from the beginning of the world up to and including the Release Effective Date, except for the obligations of the Employee under this Agreement.

6.    <u>Restrictive Covenants</u> . Except for information related to Corvisa, which is part of the Transaction, Employee agrees and acknowledges that the terms of Section 5.1, Obligation to Maintain Confidentiality, Section 5.2, Ownership of Property, Section 5.3, Third Party Information, Section 5.5, Non-Disparagement and Section 5.6, Cooperation, of the Employment Agreement are incorporated herein by reference, and the Employee agrees and acknowledges that he is bound by their terms, provided that nothing in this Agreement shall prevent Employee from working for Corvisa or its successor following the Transaction Date. The parties further agree that Employee is released from and not bound by Section 5.4, Noncompetition and Nonsolicitation of the Employment Agreement, such section of the Employment Agreement being deemed void upon the parties' execution of this Agreement.

7.    <u>Miscellaneous</u> .

(a)    Upon request, Employee agrees to return to the Company any and all originals and copies of documents, materials, records, computers, smartphones, tablets and other electronic devices or other items which (i) are not part of the Transaction, (ii) are in the Employee's possession or control, and (iii) are belonging to the Company or containing proprietary information relating to the Company.

(b)    For a period of one (1) year following his execution of this Agreement, Employee will cooperate with the Company and/or its subsidiaries and affiliates and its/their counsel in connection with any reasonable requests for cooperation with an investigation, administrative proceeding or litigation relating to any matter in which Employee was involved or of which Employee has knowledge. The Company will pay Employee's actual out-of-pocket expenses incurred in connection with such cooperation.

(c)    Employee agrees that, in the event he is subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony (in a deposition, court proceeding or otherwise) which in any way relates to Employee's employment with the Company, he will give prompt notice of such request to the Company. Employee shall contact the Company, to seek such written consent, a

nd except as required by law will make no disclosure until the Company has had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

8.    <u>Compromise</u>.

(a)    The making of this Agreement is not intended, and shall not be construed, as an admission that either the Company or Employee have violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract, or committed any wrong whatsoever.

(b)    The parties agree that this Agreement may not be used as evidence in a subsequent proceeding except in a proceeding to enforce the terms of this Agreement.

9.    <u>Additional Terms</u>.

(a)    Employee acknowledges that: (i) he has carefully read this Agreement in its entirety; (ii) he has had an opportunity to consider fully the terms of this Agreement; (iii) he has been advised by the Company in writing to consult with an attorney of his choosing in connection with this Agreement; (iv) he fully understands the significance of all of the terms and conditions of this Agreement and he has discussed it with his independent legal counsel, or has had a reasonable opportunity to do so; (v) he has had answered to his satisfaction any questions he has asked with regard to the meaning and significance of any of the provisions of this Agreement; and (vi) he is signing this Agreement voluntarily and of his own free will and assents to all the terms and conditions contained herein.

(b)    This Agreement is binding upon, and shall inure to the benefit of, the parties and their respective heirs, executors, administrators, successors and assigns.

(c)    If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, void, or unenforceable, such provision shall be of no force and effect. However, the illegality or unenforceability of such provision shall have no effect upon, and shall not impair the enforceability of, any other provision of this Agreement; provided, however, that, upon any finding by a court of competent jurisdiction that the release and covenants provided for by Paragraph 5 of this Agreement is illegal, void, or unenforceable, the parties agree to execute a release, waiver and/or covenant that is legal and enforceable.

(d)    This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Missouri without regard to the conflict of laws provisions thereof. Actions to enforce the terms of this Agreement, or that relate to Employee's employment with the Company shall be submitted to the exclusive jurisdiction of any state or federal court sitting in Missouri.

(e)    This Agreement may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument of this Agreement.

(f)    This Agreement, together with all exhibits hereto, constitutes the complete understanding between the parties with respect to the termination of the Employee's employment at the Company and supersedes any and all agreements, understandings, and discussions, whether written or oral, between the parties. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the parties.

*[Signature page follows]*

*[Signature Page to Transaction Bonus and Release Agreement]*

MATTHEW LAUTZ

By:    /s/ Matthew Lautz                                    Date:    12/20/2015
       Matthew Lautz

NOVATION COMPANIES, INC.

By:    /s/ Rodney Schwatken                                 Date:    12/20/2015
       Rodney Schwatken
       Chief Executive Officer

EXHIBIT 21.1

**SUBSIDIARIES OF THE REGISTRANT**

Novation Holdings, Inc., a Delaware Corporation
      NovaStar Mortgage LLC, a Virginia limited liability company
           ▪   NovaStar Mortgage Funding Corporation, a Delaware corporation
           ▪   NovaStar REMIC Financing Corporation, a Delaware corporation
NovaStar CDO Holdings, Inc., a Delaware corporation
      NovaStar ABS CDO I, Inc., a Delaware corporation
      NovaStar ABS CDO I, Ltd., a Cayman Islands corporation
NCIP Holdings, LLC, a Delaware limited liability company
2114 Central, LLC, a Delaware limited liability company

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We have issued our report dated February 16, 2016, with respect to the consolidated financial statements included in the Annual Report of Novation Companies, Inc. on Form 10-K for the year ended December 31, 2015. We hereby consent to the incorporation by reference of said report in the Registration Statements of Novation Companies, Inc. on Form S-8 (File No. 333-206184, File No. 333-196909 and File No. 333-116998).

/s/ GRANT THORNTON LLP

Kansas City, Missouri
February 16, 2016

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Rodney E. Schwatken, certify that:

1.      I have reviewed this Annual Report on Form 10-K of Novation Companies, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

      a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.


DATE:      February 16, 2016                          /s/ Rodney E. Schwatken
                                                       _____
                                                       Rodney E. Schwatken

                                                       Chief Executive Officer and Chief Financial Officer

                                                       (Principal Executive and Financial Officer)

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Novation Companies, Inc. (the "Company") on Form 10-K for the period ended December 31, 2015 , as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Rodney E. Schwatken, Chief Executive Officer and Chief Financial Officer of the Company, certify as of the date hereof, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, that to my knowledge:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


DATE:      February 16, 2016                              /s/ Rodney E. Schwatken
                                                          _____
                                                          Rodney E. Schwatken

                                                          Chief Executive Officer and Chief Financial Officer

                                                          (Principal Executive and Financial Officer)

# EXHIBIT E

# UNITED STATES OF AMERICA
### Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 80038 / February 14, 2017**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-17847**

| | |
|---|---|
| In the Matter of<br><br>    Jeffrey E. Eberwein; Lone Star Value Management, LLC; Charles M. Gillman; Boston Avenue Capital, LLC; and Heartland Advisors, Inc.,<br><br>Respondents. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER AND CIVIL PENALTIES** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Jeffrey E. Eberwein ("Eberwein"), Lone Star Value Management, LLC, ("Lone Star"), Charles M. Gillman ("Gillman"), Boston Avenue Capital, LLC ("Boston Avenue"), and Heartland Advisors, Inc. ("Heartland") ("Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over Respondents and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order and Civil Penalties ("Order") as set forth below.

# III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

## Summary

1.        These proceedings arise out of violations of the beneficial ownership reporting requirements of the federal securities laws committed by investors working together from 2012 through 2014.  Respondents Eberwein and Gillman were longtime friends and financial professionals who sometimes acted together to pursue shareholder activism beginning in early 2012, as set forth herein.  At the time, Gillman had an advisory relationship with Boston Avenue, an investment vehicle for a family office where he had worked.  Gillman, Boston Avenue, and other parties had engaged in a proxy contest together with Heartland, a registered investment adviser, in 2010, and Gillman maintained occasional contact with Heartland thereafter.  Eberwein joined Gillman and Heartland as they periodically pursued shareholder-activist campaigns together, beginning in early 2012.  Eberwein invested for his own account during 2012-13 and for his newly-formed hedge fund, Lone Star Value Fund, beginning in the second half of 2013.

2.        Section 13(d) of the Exchange Act and related rules require any person or group who directly or indirectly acquires beneficial ownership of more than five percent of certain equity securities to file a statement with the Commission, within ten days, disclosing information relating to such beneficial ownership.  Section 13(d) is a key regulatory provision that allows shareholders and potential investors to evaluate substantial shareholdings and the implications of such shareholdings for their own investment in the security.  Whenever a material change occurs to the facts set forth in any disclosure statement filed on Schedule 13D, the filing must be promptly amended.  To the extent that certain large investors qualify to report their beneficial ownership on Schedule 13G, the applicable regulatory provisions allow disclosure of much more limited information.

3.        The Respondents violated the beneficial ownership reporting requirements under the Exchange Act.  In particular:

- Eberwein, Gillman, and Boston Avenue worked together in 2012 involving control of Aetrium, Inc. ("Aetrium") and NTS, Inc. ("NTS").  Eberwein's ownership filings did not fully disclose the group's plan regarding Aetrium, and, in the case of NTS, the filings were untimely;

- Eberwein, Gillman, and Boston Avenue worked together with Heartland with respect to Digirad, Inc. ("Digirad") in 2012 and Analysts International Corp. ("Analysts International") in 2013, both regarding efforts to make changes to the boards of directors.  Regarding Digirad, Heartland failed to timely file a Schedule 13D to supersede its Schedule 13G, reflecting this collaboration.  Regarding

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

Analysts International, Eberwein, Gillman, and Boston Avenue failed to make any of the required filings; and

- Gillman worked with Heartland in late 2013 to file a Schedule 13D disclosing their campaign to encourage Hudson Global, Inc. ("Hudson") to make changes to its corporate governance. In early 2014, Eberwein and Lone Star disclosed a separate, more extensive campaign, nominating candidates for election to Hudson's board. Gillman acted together with Eberwein and Lone Star, yet their respective ownership filings did not acknowledge their joint action.

## Respondents

4.       Respondent Eberwein, age 46, is a Connecticut resident. He is CEO of Lone Star and the portfolio manager of Lone Star Value Fund, a hedge fund that describes itself as seeking to "unlock" the value in undervalued stocks through "constructive activism, often in partnership with other shareholders."

5.       Respondent Lone Star is a Connecticut limited liability company controlled by Eberwein and headquartered in Old Greenwich, CT. Eberwein formed Lone Star in early 2013. Lone Star began managing outside investor capital on October 1, 2013 and has been registered with the Commission as an investment adviser since April 2015. Lone Star advises Lone Star Value Fund.

6.       Respondent Gillman, age 46, is a California resident and private activist investor. Until June 2013, Gillman was an employee of an Oklahoma "family office" and made investment recommendations to the portfolio managers of Boston Avenue, which was an investment vehicle for the family office.

7.       Respondent Boston Avenue is an Oklahoma limited liability company headquartered in Tulsa, OK.

8.       Respondent Heartland is a Wisconsin corporation headquartered in Milwaukee, WI and registered with the Commission as an investment adviser. Heartland advises fund portfolios of a registered investment company, Heartland Group, Inc., separately managed accounts, and other clients. Heartland pursues self-described value investing strategies and occasionally engages in shareholder activism.

## Issuers

9.       Digirad is a medical imaging company incorporated in Delaware and headquartered in Suwanee, Georgia. Its common stock is registered under Section 12(b) of the Exchange Act and trades on the NASDAQ Global Market.

10.      Aetrium (now named ATRM Holdings, Inc.) is a former semiconductor test-equipment company incorporated in Minnesota and headquartered in St. Paul, Minnesota. At all

times relevant to these proceedings, Aetrium's common stock was registered under Section 12(b) of the Exchange Act and traded on the NASDAQ Capital Market.

11.     NTS is a telecommunications service provider incorporated in Nevada and headquartered in Lubbock, Texas.  At all times relevant to these proceedings, NTS's common stock was registered under Section 12(b) of the Exchange Act and traded on the NYSE MKT exchange.

12.     Analysts International is an IT staffing company incorporated in Minnesota and headquartered in Minneapolis, Minnesota.  At all times relevant to these proceedings, Analysts International's common stock was registered under Section 12(b) of the Exchange Act and traded on the NASDAQ Global Market.

13.     Hudson is a global HR company incorporated in Delaware and headquartered in New York, NY.  Its common stock is registered under Section 12(b) of the Exchange Act and trades on the NASDAQ Stock Market.

## Legal Framework

Beneficial Ownership Reporting under Schedule 13D: General Requirements

14.     Section 13(d)(1) of the Exchange Act and Rule 13d-1(a) together require any person or group who has acquired, directly or indirectly, beneficial ownership of more than five percent of a class of a registered equity security to file a statement with the Commission disclosing the identity of its members and the purpose of its acquisition. *See generally GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972).  Individuals or entities comply with this requirement by filing a Schedule 13D with the Commission no later than ten days after they acquire the requisite beneficial ownership.

15.     Schedule 13D requires disclosure of, among other things:  (l) the identity of the acquirer, including beneficial owners;[2] (2) a description, in Item 4, of the purpose(s) of the acquisition, including any plans (i) to affect the issuer's Board of Directors; (ii) to cause an extraordinary corporate transaction, such as a merger, reorganization, or liquidation; (iii) to sell or transfer a material amount of assets of the issuer or any of its subsidiaries; or (iv) to otherwise materially change the issuer's business or corporate structure; and (3) the interest of all persons making the filing, including those acting together as a group.  A duty to file under Section 13(d) and Rule 13d-1 creates the duty to file truthfully and completely.  *SEC v. Savoy Indus.,* 587 F.2d 1149, 1165 (D.C. Cir. 1978) *cert. denied,* 440 U.S. 913 (1979).  *Scienter* is not required to establish a violation of Section 13(d).  *Id.* at 1167; *SEC v. Levy,* 706 F. Supp. 61, 69 (D.D.C. 1989).

---

[2] Whether a person is a "beneficial owner" is determined through the application of Rule 13d-3, which broadly includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise" has or shares voting or investment power with respect to a registered equity security. *See* Rule 13d-3(a); *see also SEC v. First City Financial Corp.,* 890 F.2d 1215, 1221 (D.C. Cir. 1989).

16.     The disclosures made in Schedule 13D have been viewed as contributing to the information available to help investors make fully informed investment decisions with respect to their securities.[3]  An additional regulatory objective served by these disclosures is to provide management of the issuer with information to "appropriately protect the interests of its security holders."[4]  In enacting the original Section 13(d) legislation, Congress made clear that it intended to avoid "tipping the balance of regulation either in favor of management or in favor of the person [potentially] making [a] takeover bid."[5]  In addition to providing information to issuers and security holders, Section 13(d) was adopted with a view toward alerting "the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control."[6]  On the basis of the information disclosed, the market would "value the shares accordingly"[7] due to the increased prospects for price

---

[3] *See Computer Network Corp. v. Spohler* [1982 Transfer Binder] Fed Sec. L. Rep (CCH) ¶ 98,623 at 93,087 (D.D.C. March 23, 1982).  *See also San Francisco Real Estate Investors v. REIT of America*, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,874, at 94,557 (D. Mass. Nov. 19, 1982), *aff'd in part, rev'd in part* 701 F.2d 1000 (1st Cir. 1983).  The Commission also has recognized that Section 13(d) was enacted primarily to provide "adequate disclosure to stockholders in connection with any substantial acquisition of securities within a relatively short period of time."  Adoption of Beneficial Ownership Disclosure Requirements, Exch. Act Rel. No. 13291, (Feb. 24, 1977) [42 FR 12342] *citing* S. Rep. No. 550, at 7 (1967).

[4] H.R. Rep. No. 1655, at 3 (1970); *see,e.g., Additional Consumer Protection in Corporate Takeovers and Increasing the Sec. Act Exemptions for Small Businessmen, Hearing Before the Sec. Subcomm. of the S. Banking and Currency Comm. on S. 336 and S. 343*, 91st Cong., 2d Sess. (1970). *See also Bath Indus. v. Blot*, 427 F.2d 97, 113 (7th Cir. 1970).  Disclosures made in compliance with Section 13(d) also provide issuers that file registration statements, annual reports, proxy statements and other disclosure documents with the information they use to disclose all beneficial owners of more than five percent of certain classes of the issuer's equity securities as required by Item 403 of Regulation S-K. [17 CFR 229.403].  *See generally* H.R. Rep. No. 1655.

[5] H.R. Rep. No. 1711, at 4 (1968); S. Rep. No. 550, at 3 (1967).  Both the House and Senate reports emphasized that Section 13(d) was enacted "to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case."

[6] *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d. Cir. 1971), *cert. denied*, 406 U.S. 910 (1972).

[7] *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 94 (1st Cir. 1977); see also S. Rep. No. 550, at 3 ("But where no information is available about the persons seeking control, or their plans, the shareholder is forced to make a decision on the basis of a market price which reflects an evaluation of the company based on the assumption that the present management and its policies will continue. The persons seeking control, however, have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based.").

discovery.[8]

17.        Section 13(d)(2) of the Exchange Act and Rule 13d-2(a) together require a filer to promptly amend the filer's Schedule 13D when there are material changes to the facts previously reported.

## Schedule 13G Reports

18.        Under Exchange Act Rule 13d-1(b), certain persons required to file under Section 13(d) of the Exchange Act may instead file with the Commission a short-form Schedule 13G if "[the] person has acquired [the] securities in the ordinary course of his business and not with the purpose nor with the effect of changing or influencing the control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect." The filer must sign a certification specifically attesting to the lack of any such "control" purpose or effect. The availability of a short-form Schedule 13G is designed to ensure adequate disclosure to the marketplace while minimizing the burden on passive investors who would otherwise be required to complete a comprehensive Schedule 13D filing. After an initial Schedule 13G has been filed, the filer must update the filing annually to the extent any changes occur in the information previously reported, and recertify the continued lack of a control purpose or effect. Pursuant to Rule 13d-1(e), any person who has filed a Schedule 13G pursuant to Rule 13d-1(b) becomes immediately subject to Rule 13d-1(a) and must, within ten days, file a Schedule 13D if the investor now holds the securities with a disqualifying control purpose or effect.

19.        The definition of "control" in Rule 12b-2 of the Exchange Act determines whether a person has a purpose to influence control: "possession . . . of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." This means that in seeking to influence policies, management or actions of the issuer, an investor has a purpose to influence control of the issuer. *See Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 246 (8th Cir. 1979). The analysis in finding a purpose to influence control or an effect of influencing control is fact specific.

## Schedule 13D Reports

20.        Section 13(d)(3) of the Exchange Act provides that "When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person'" for purposes of Schedule 13D and 13G filing requirements. "Holding" securities

---

[8] *Takeover Bids, Hearings on H.R. 14475 and S. 510 before the Subcomm. on Commerce and Fin. of the H. Comm. on Interstate and Foreign Commerce*, 90th Cong. 2d Sess. 12 (1968) (statement of Hon. Manuel F. Cohen, Chairman, U.S. Securities and Exchange Commission, "But I might ask, how can an investor evaluate the adequacy of the price if he cannot assess the possible impact of a change in control? Certainly without such information he cannot judge its adequacy by the current or recent market price. That price presumably reflects the assumption that the company's present business control and management will continue. If that assumption is changed, is it not likely that the market price might change?").

encompasses voting of such securities. *See Filing and Disclosure Requirements Relating to Beneficial ownership*, Exchange Act Release No. 14,692 (Apr. 21, 1978) (adopting release). The group provision was added to the Exchange Act in order to protect other shareholders from the evasion of disclosure requirements by persons who collectively sought to change or influence control of an issuer yet who each acquired and held an amount of beneficial ownership at or just below the reporting threshold. *See* Senate Report No. 550, 90th Congress, 1st Session 8 (1967) and House Report No. 1711, 90th Congress, 2d Session 8-9 (1968). Under this provision, groups of shareholders collectively owning more than five percent of a class of equity securities cannot act together without disclosing their joint efforts.

<u>Ten-Percent or Greater Ownership Disclosures</u>

21.      Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder require, among other things, that direct or indirect beneficial owners of more than ten percent of a class of equity securities registered under Section 12 file a statement reporting ownership and changes in ownership. Rule 16a-3 requires: (1) that initial statements of beneficial ownership be filed on Form 3 within ten days after a "person" becomes a greater-than-ten-percent direct or indirect beneficial owner; (2) that changes in beneficial ownership be filed on Form 4 within two business days; and (3) that annual statements be filed on Form 5 unless all transactions otherwise required to be reported on Form 5 have already been reported.

22.      Under Rule 16a-1(a)(1), the term "beneficial owner" means, with certain exceptions not relevant here, "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." Membership in a group for purposes of Section 16(a) and the rules thereunder is thus determined by using the legal standards set forth under Section 13(d).

**Violations of the Beneficial Reporting Provisions**

<u>Digirad</u>

23.      Certain Heartland clients had a longstanding position in Digirad shares. Heartland filed an amended Schedule 13G on February 10, 2011 disclosing a 9.4% beneficial ownership interest (1.8 million shares) in Digirad's common stock and another amended Schedule 13G on February 10, 2012 disclosing a 9.2% interest (1.8 million shares) in the stock. In filing these Schedules 13G, Heartland certified that the shares were "not held for the purpose or with the effect of changing or influencing the control of the issuer," Digirad. By early 2012, the certification was inaccurate, yet Heartland failed to file a Schedule 13D as required.

24.      In the year between the two Schedule 13G filings, Heartland had begun discussions with Gillman concerning Digirad. Heartland and Gillman wanted Digirad to sell itself or a significant amount of its assets. Short of a proxy fight, Heartland first sought voluntary compliance from Digirad with its requests. In January 2012, Heartland asked Digirad to open its board of directors to one or more new appointees named by Heartland. When Digirad's board tentatively agreed, Heartland discussed the position with Gillman and then presented him to the board as Heartland's choice. Gillman encouraged Heartland to also name Eberwein, on the basis of his strong relationship with Gillman. After Digirad issued a press release in March 2012

formally seeking director nominees from its "largest shareholders," Heartland formally nominated both Gillman and Eberwein. With Heartland's approval and support, Gillman and Eberwein began working to ensure that new members would constitute a majority of the board and to bring on another of Gillman's associates as an additional "ally" on the board for Gillman and Eberwein. Gillman threatened the incumbent board with a proxy fight if his demands and the demands of Eberwein were not satisfied.

25.     Digirad formally appointed Gillman and Eberwein as directors in April 2012 and appointed their associate the following month, totaling three of four new directors. At that time, Gillman, Eberwein, and their ally occupied three of eight director seats on the board, and an additional new member, nominated by a different shareholder, occupied a fourth seat. Throughout the process, Heartland expressed its support for the changes and the newly constituted board. By early 2013, the three allied directors had consolidated their power on a shrinking board of directors and now occupied three of six board seats and, shortly thereafter, three of five seats, with Eberwein taking over as board chairman.

26.     As a greater than five-percent beneficial owner of Digirad common stock, Heartland was subject to the reporting requirements of Section 13(d) of the Exchange Act.

27.     Given Heartland's efforts to change and influence the composition of Digirad's board, as described above, it should have filed a Schedule 13D by no later than March 2012 to supersede its previously filed Schedule 13G. Because it failed to file a Schedule 13D, Heartland violated Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.

<u>Aetrium</u>

28.     Eberwein, Gillman, Boston Avenue, and others formed a group in August 2012 for the purpose of acquiring, holding, and voting Aetrium shares. The group filed a Schedule 13D on August 14, 2012 disclosing beneficial ownership of 16.7% of Aetrium's common stock. In that filing, Eberwein disclosed a 6.64% ownership interest, while Gillman and Boston Avenue filed as group members but owned no shares. Subsequently, the group filed five amended Schedules 13D from August 30, 2012 through October 9, 2012. The group intensified its efforts by filing a preliminary proxy statement on October 23, 2012, which contained additional information. However, neither the original Schedule 13D nor the five amendments fully disclosed the group's plans for Aetrium.

29.     In numerous emails, Eberwein repeatedly stated that the group's plan for Aetrium was to sell off its existing line of business (*i.e.*, semiconductor test-equipment) and use Aetrium as a shell for acquisitions, which would provide the opportunity to use the issuer's accumulated tax losses as an offset against income generated by a more profitable business. For example, in a July 11, 2012 email, Eberwein asked Gillman to "think about [the] optimal board slate … considering our likely path forward (convert this into an acq shell)." However, the group's Schedule 13D and amendments failed to make any meaningful disclosure of this plan. Instead, each of these filings provided an identical, standardized paragraph that included a statement only that the group "may discuss ideas [with one or more stockholders, officers, or directors of Aetrium] that, if effected may result in … an extraordinary corporate transaction involving [Aetrium] and/or other changes

in the board of directors of [Aetrium], its operations or its corporate structure."  Eberwein, as group spokesperson, highlighted the group's inadequate approach to its disclosure obligations in a September 2012 newspaper interview:  "We have many, many ideas for how to create value for [Aetrium] shareholders…. We're just not going to show all of our cards at this time."  On October 1, 2012, Eberwein emailed two business contacts: "We just launched on ATRM US … it is a very small company, but if we sell the assets we will have cash, NOLs [i.e., net operating (tax) losses], and can then turn it into an acquisition vehicle."  (Ellipses in original.)  The very next day, Eberwein's group filed the fourth of its five Schedule 13D amendments that failed to disclose plans to sell Aetrium's operating assets and convert it into an acquisition vehicle.

30.  After engaging in an extended proxy fight with Aetrium's existing board and management, Eberwein and several associates were appointed to Aetrium's board in early 2013 and consolidated their control, with Eberwein ultimately taking over as board chairman.  In fulfillment of the undisclosed plan, Aetrium subsequently sold off all of its semiconductor test-equipment businesses and acquired a modular-housing manufacturer, anticipating that the new business line's profits would be shielded by Aetrium's accumulated tax losses.  Today, Eberwein and Lone Star beneficially own approximately 48 percent of the common stock of Aetrium, and Aetrium is principally engaged in the manufacture of modular-housing units.

31.  As a member of a group with greater than five-percent beneficial ownership of Aetrium common stock, Eberwein was subject to the reporting requirements of Section 13(d) of the Exchange Act.

32.  As a member of the aforementioned group, Eberwein failed to fully comply with Item 4 of Schedule 13D in the initial filing by omitting to provide adequate and accurate disclosure of the purpose of the group's acquisition and holding of Aetrium securities.  The required disclosure also did not appear in any of the aforementioned five subsequent amendments to the Schedule 13D.  As a result, Eberwein violated Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.

<u>NTS</u>

33.  During the first two weeks of September 2012, Eberwein negotiated a shareholder group agreement with a 5.5% shareholder of NTS on behalf of himself and several associates, including Gillman and Boston Avenue, yet the group failed to file its required Schedule 13D until late October 2012.  As of September 14, 2012, Eberwein and the 5.5% shareholder had agreed to act as a group "for the purpose of taking such actions as … deem[ed] advisable in order to enhance the shareholder value of [NTS]" and finalized a written agreement to be signed by each of the group members.  However, Eberwein and the 5.5% percent shareholder decided that the group members should wait an additional month before signing their written agreement and filing a Schedule 13D to "give our team more time to buy stock" and provide the issuer "much less time to do defensive measures to thwart us."  Eberwein used the intervening month to accumulate a 5.34% position in NTS common stock, although Gillman and Boston Avenue did not purchase shares or own shares.  The group eventually filed a Schedule 13D on October 24, 2012—almost six weeks after an agreement had been reached—disclosing its beneficial ownership of 12.17% of NTS common stock and attaching as an exhibit a signed group agreement, dated October 16, 2012.

9

34.     As a member of a group with greater than five-percent beneficial ownership of NTS common stock, Eberwein was subject to the reporting requirements of Section 13(d) of the Exchange Act.

35.     As a member of the aforementioned group, Eberwein failed to timely file a Schedule 13D disclosing the identity of the group's members, its beneficial ownership, and the purpose of its acquisition.  As a result, Eberwein violated Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.

36.     As a member of a group with greater than ten-percent beneficial ownership of NTS common stock, Eberwein also was subject to the reporting requirements of Section 16(a) of the Exchange Act.

37.     As a member of the aforementioned group, Eberwein failed to timely file an initial statement of beneficial ownership on Form 3 and changes in beneficial ownership on Forms 4.  As a result, Eberwein violated Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder.

<u>Analysts International</u>

38.     Certain Heartland clients had a longstanding position in Analysts International stock.  On December 10, 2012, Heartland filed a Schedule 13D disclosing a 9.4% beneficial ownership of Analysts International common stock and stating that it had sent a shareholder proposal to Analysts International for inclusion in the issuer's next proxy statement.  After Analysts International refused to include Heartland's proposal in its proxy statement, Heartland began working with Gillman, Boston Avenue, and Eberwein, but the group's existence was never disclosed by Heartland or the others.  On May 20, 2013, Heartland filed an amended Schedule 13D, stating that the issuer should immediately add three new board members and that Heartland had identified three qualified candidates.  Although unstated, Heartland's three candidates were: (1) Gillman, (2) an associate of Gillman and Eberwein's, and, (3) tentatively, Eberwein.  Heartland had begun discussing group activism involving Analysts International with Gillman in April 2013, including replacement of the entire board, and continued the discussions during the following months.  Gillman brought Eberwein as well as their mutual associate into the discussions and, in June 2013, Gillman signed a nondisclosure agreement with Heartland.  Gillman, Boston Avenue, and Eberwein, acting as a group with Heartland, acquired shares of Analysts International common stock, from April 30, 2013 to August 21, 2013, accumulating a 4.35% position.  In total, by August 21, 2013, the group as a whole  had beneficial ownership of 13.75% of Analysts International common stock.

39.     As members of a group with greater than five-percent beneficial ownership of Analysts International common stock, Heartland, Eberwein, Gillman, and Boston Avenue were subject to the reporting requirements of Section 13(d) of the Exchange Act.

40.     As a member of the aforementioned group, Heartland failed to timely amend its Schedule 13D, on or before May 2013, to disclose the group's formation and collective beneficial

ownership of Analysts International common stock. Eberwein, Gillman, and Boston Avenue failed to timely file a Schedule 13D disclosing their group beneficial ownership of Analysts International common stock. As a result, Heartland violated Section 13(d)(2) of the Exchange Act and Rule 13d-2(a) thereunder, and Eberwein, Gillman, and Boston Avenue violated Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.

41.        As members of a group with greater than ten-percent beneficial ownership of Analysts International common stock, Heartland, Eberwein, Gillman, and Boston Avenue were subject to the reporting requirements of Section 16(a) of the Exchange Act.

42.        As members of the aforementioned group, Heartland, Eberwein, Gillman, and Boston Avenue failed to timely file initial statements of beneficial ownership on Form 3, and Eberwein, Gillman, and Boston Avenue failed to timely file changes in beneficial ownership on Forms 4. As a result, Heartland, Eberwein, Gillman, and Boston Avenue violated Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder.

Hudson

43.        Certain Heartland clients had a longstanding position in Hudson stock. In May 2013, Heartland began discussing potential group activism against Hudson with Gillman, including changes to the board of directors, and continued these discussions from time to time over the following months. During this time, Heartland introduced Gillman to Hudson's board as a potential director appointee, and Gillman, independently of Heartland, periodically updated Eberwein on the status of his and Heartland's discussions and activities involving Hudson. Gillman, Eberwein, and Lone Star did not own shares of Hudson common stock during summer 2013. Eberwein, however, began evaluating a position in Hudson shares for Lone Star, which would open to outside investors on October 1, 2013. In furtherance thereof, Eberwein met with a large Hudson shareholder in September 2013 and then met with Hudson's management the following month. Eberwein updated Gillman on these meetings and, in October 2013, began purchasing shares of Hudson common stock for Lone Star. Gillman also shared his proprietary Hudson research with Eberwein on an ongoing basis.

44.        In November 2013, Heartland and Gillman began negotiating a written shareholder-group agreement, and Gillman kept Eberwein updated on the negotiations. Gillman subsequently purchased approximately 0.7% of Hudson Global's common stock. Heartland, Gillman, and several of Gillman's associates ("Heartland-Gillman Group") filed a Schedule 13D on December 2, 2013 disclosing their agreement to encourage Hudson to change its corporate governance, as well as their total beneficial ownership of approximately 14.6% of Hudson's common stock. During December 2013, Gillman and Eberwein shared research on Hudson, and they regularly discussed targets for their joint activism and launched a proxy campaign together against another issuer. By late December 2013, the Heartland-Gillman Group had essentially ceased activities, and Eberwein began preparing to initiate a Hudson proxy fight. Eberwein, Lone Star, and two of Eberwein's associates known also to Gillman ("Eberwein Group") filed a group Schedule 13D on January 21, 2014 nominating Eberwein and one of the associates as candidates for election as Hudson directors. Gillman had worked previously with Eberwein and the other director candidate on the Aetrium and NTS efforts discussed above. The Eberwein Group's Schedule 13D disclosed

11

a collective beneficial ownership of approximately 6.8% of Hudson's common stock. In an amended Schedule 13D filed on May 19, 2014, the Eberwein Group disclosed additional information and a revised beneficial ownership of approximately 7.4%. Neither the initial Schedule 13D nor the amendment named Gillman as a group member.

45.    Although not named in the group's ownership filings, Gillman acted as a member of the Eberwein Group. Gillman shared his proprietary research with Eberwein, strategized with Eberwein, encouraged a mutual associate to provide a key reference for Eberwein in support of Eberwein's initial efforts to be appointed voluntarily to Hudson's board, and prepared and provided draft proxy-solicitation materials to Eberwein and Eberwein's running mate in an effort to assist their campaign. Gillman also acquired additional shares of Hudson common stock, increasing his beneficial ownership to approximately 0.94%, and voted his shares for Eberwein and his running mate in advance of Hudson's May 2014 annual shareholder meeting.

46.    As members of a group with greater than five-percent beneficial ownership of Hudson Global common stock, Eberwein, Lone Star, and Gillman were subject to the reporting requirements of Section 13(d) of the Exchange Act.

47.    As a member of the aforementioned group, Gillman failed to timely amend his Schedule 13D, by January 21, 2014, to disclose the group's formation and collective beneficial ownership of Hudson Global common stock. Eberwein and Lone Star failed to timely file a Schedule 13D, by January 21, 2014, completely disclosing the group's membership and collective beneficial ownership of Hudson Global common stock. As a result, Gillman violated Section 13(d)(2) of the Exchange Act and Rule 13d-2(a) thereunder, and Eberwein and Lone Star violated Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.

## Violations

48.    As a result of the conduct described in paragraphs 23 through 47, above, Eberwein, Lone Star, Gillman, Boston Avenue, and Heartland violated Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder; Eberwein, Lone Star, Gillman, and Heartland violated Section 13(d)(2) of the Exchange Act and Rule 13d-2(a) thereunder; and Eberwein, Gillman, Boston Avenue, and Heartland violated Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that:

A.    Pursuant to Section 21C of the Exchange Act, Respondents Eberwein, Lone Star, Gillman, Boston Avenue, and Heartland cease and desist from committing or causing any violations and any future violations of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 promulgated thereunder.

B.      Pursuant to Section 21C of the Exchange Act, Respondents Eberwein, Gillman, Boston Avenue, and Heartland cease and desist from committing or causing any violations and any future violations of Section16(a) of the Exchange Act and Rules 16a-2 and 16a-3 promulgated thereunder.

C.      Respondent Eberwein shall pay a civil money penalty in the amount of $90,000 to the Securities and Exchange Commission, for transmission to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  Payment shall be made in the following four installments: (1) $22,000 within 14 days of entry of this order; (2) $22,000 within 180 days of entry of this order; (3) $22,000 within 270 days of entry of this order; and (4) $24,000 within 360 days of entry of this order.  If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of the civil money penalty, plus any additional interest accrued pursuant 31 U.S.C. §3717, shall be due and payable immediately, without further application.

D.      Respondent Lone Star shall pay a civil money penalty in the amount of $120,000 to the Securities and Exchange Commission, for transmission to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  Payment shall be made in the following four installments: (1) $30,000 within 14 days of entry of this order; (2) $30,000 within 180 days of entry of this order; (3) $30,000 within 270 days of entry of this order; and (4) $30,000 within 360 days of entry of this order.  If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of the civil money penalty, plus any additional interest accrued pursuant 31 U.S.C. §3717, shall be due and payable immediately, without further application.

E.      Respondent Gillman shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $30,000 to the Securities and Exchange Commission, for transmission to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C §3717.

F.      Respondent Heartland shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $180,000 to the Securities and Exchange Commission, for transmission to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C §3717.

G.      Payment must be made in one of the following ways:

(1)      Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying the above-named Respondent as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Gerald Hodgkins, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

H.     Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents Eberwein, Lone Star, Gillman, and Heartland agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondents Eberwein, Lone Star, Gillman, and Heartland agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondents Eberwein and Gillman, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents Eberwein and Gillman under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by them of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary