**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **NOVATION COMPANIES, INC.,** *et al.*,[1] | **Case Nos. 16-19745, 19747-19749 DER** |
| | **(Jointly Administered)** |
| **Debtors.** | |

**(I) OBJECTION OF TABERNA PREFERRED FUNDING I, LTD.
AND TABERNA PREFERRED FUNDING II, LTD. TO DEBTORS'
DISCLOSURE STATEMENT AND (II) JOINDER IN THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS' OBJECTION TO DISCLOSURE STATEMENT**

Taberna Preferred Funding I, Ltd. ("Fund I") and Taberna Preferred Funding II, Ltd. ("Fund II," together with Fund I, the "Funds"), by and through TP Management LLC, solely in its capacity as attorney-in-fact ("TPM"),[2] hereby (A) object to the *Disclosure Statement Regarding Joint Chapter 11 Plan of Reorganization of (i) Novation Companies, Inc. and (ii) Novastar Mortgage, LLC* [D.E. 303] (the "Disclosure Statement") and (B) join in the *Objection of the Creditors' Committee to the Disclosure Statement Regarding Joint Chapter 11 Plan of Reorganization of (i) Novation Companies, Inc and (ii) NovaStar Mortgage LLC* [D.E. 368] (the "Objection") and respectfully state as follows:

### I.   INTRODUCTION

1.   The Funds collectively hold unsecured senior notes in the unpaid principal

---

[1] The Debtors in these chapter 11 cases are: (i) Novation Companies, Inc. f/k/a NovaStar Financial, Inc. ("Novation"); (ii) NovaStar Mortgage LLC f/k/a NovaStar Mortgage, Inc. ("NovaStar Mortgage", together with Novation, the "Plan Debtors"); (iii) NovaStar Mortgage Funding Corporation; and (iv) 2114 Central, LLC f/k/a Advent Financial Services, LLC.

[2] TPM serves as attorney-in-fact (as the delegate of the Funds' collateral manager, Taberna Capital Management, LLC ("TCM")) as authorized by: (A) Collateral Management Agreements, dated March 15, 2005, and December 23, 2005; (B) Indentures, dated March 15, 2005, and December 23, 2005; and (C) the Delegation Agreement, dated April 21, 2010, between TCM and TPM, and the Delegation Agreement, dated December 1, 2014, between TCM and TPM.

amount of $55,000,000.00 issued by Novation under: (i) the Indenture dated March 22, 2011 (the "Taberna I Indenture"), between Novation and The Bank of New York Mellon Trust Company, National Association, as Trustee ("BNYM"); and (ii) the Indenture dated March 22, 2011, between Novation and BNYM (the "Taberna II Indenture," together with the Taberna I Indenture, the "Taberna Indentures").[3] The Funds thus hold 64% of the principal amount of the Senior Notes issued by Novation.[4] After Novation failed to pay interest on March 30, 2016, and such default remained uncured for more than thirty days, BNYM accelerated the Taberna Senior Notes on May 6, 2016, at the Funds' direction.[5] The default rate of interest that has been accruing and which continues to accrue on the overdue principal and overdue interest under the Taberna Indentures is two times (2x) LIBOR + 3.50% (that is, the "Full Rate" at LIBOR + 3.50% *plus* "Additional Interest" at LIBOR + 3.50%). *See* Taberna Indentures §§ 3.1(a)(ii).[6] The Senior Notes comprise over ninety-nine percent of the liquidated, non-contingent, and undisputed claims against Novation, thereby representing the largest creditor constituency that will be impacted by *Debtors' Joint Chapter 11 Plan of Reorganization of (i) Novation*

---

[3] *See* Case No. 16-19745, Proof of Claim No. 12-1 & 13-1, Exhibit A (the Indentures are attached to the proofs of claims as Exhibit A and not separately attached hereto because they are voluminous).

[4] Specifically, on March 22, 2011, Novation issued to Fund I unsecured senior notes in the principal amount of $27,500,000.00 (the "Series I Senior Notes") under the Taberna I Indenture. Novation simultaneously issued unsecured senior notes to Fund II in the principal amount of $27,500,000.00 (the "Series II Senior Notes," together with the Series I Senior Notes, the "Taberna Senior Notes") under the Taberna II Indenture. Novation also issued a third series of unsecured senior notes to Kodiak CDO I, Ltd. in the principal amount of $30,937,500.00 (the "Series III Senior Notes"; together with the Series I Senior Notes and the Series II Senior Notes, the "Senior Notes") under an indenture providing the terms and conditions governing the Series III Senior Notes (the "Kodiak Indenture").

[5] A copy of the May 6, 2016 Notice of Acceleration is attached hereto as Exhibit A.

[6] Section 3.1(a)(ii) of each Taberna Indenture—the operative interest provision after January 1, 2016—states that interest shall accrue "at the Full Rate, such interest to accrue from the Original Interest Accrual Date or from the most recent Interest Payment Date to which interest has been paid or duly provided for, *and any overdue principal, premium, if any, or any overdue installment of interest shall bear Additional Interest at the rate equal to the interest rate then applicable to unpaid principal amounts as provided in clauses (i) or (ii)* above compounded quarterly from the dates such amounts are due until they are paid or funds for the payment thereof are made available for payment." (emphasis added). The principal amounts owing under the Taberna Indentures—totaling $55 million—became overdue upon BNYM's Notice of Acceleration, and Novation has failed to pay such overdue principal. Thus, Novation's statement in the Disclosure Statement that "no principal payments are due until maturity on March 30, 2033" is simply inaccurate; the Taberna Senior Notes matured and became fully due and owing on May 6, 2016. *See* Exhibit A hereto.

*Companies, Inc and (ii) NovaStar Mortgage LLC* [D.E. 303, Exhibit A] (the "Plan").

2. The Funds object to the Disclosure Statement for two fundamental reasons: (1) the Disclosure Statement lacks the adequate information required under section 1125 of the Bankruptcy Code in numerous areas in which adequate disclosure is critical for creditors to make an informed decision of whether to vote to accept or reject the Plan; and (2) the Disclosure Statement describes a patently unconfirmable Plan.

3. First, the Disclosure Statement suffers from material disclosure inadequacies surrounding the HCS transaction, and specifically, how the HCS transaction complies with the Taberna Indentures, including the affirmative and negative covenants therein. The Disclosure Statement is also seriously flawed because it describes a Plan that fails to cure the Funds' default interest as required under sections 1123 and 1124 of the Bankruptcy Code.

4. Second, the Disclosure Statement describes a patently unconfirmable plan. The Plan contains inappropriate third-party non-debtor releases, injunctions, exculpations, and limitations of liability. The Plan also unfairly discriminates against Class 2—the class in which the Funds fall—because the Plan would involuntarily subject Class 2 to releases, injunctions, and limitation of liability provisions, while simultaneously allowing other unsecured creditors (such as those in Class 3A) the ability to accept the Plan but opt-out of the same releases, injunctions, and limitation of liability provisions.[7] The Disclosure Statement also describes a Plan that artificially impairs Class 3A and obfuscates the Plan cramdown confirmation requirements under section 1129 of the Bankruptcy Code—that voting is calculated on a per-Debtor, not a per-Plan basis. In short, this Court should not permit the Plan Debtors to solicit any votes on the Plan without material amendments to the Disclosure Statement and Plan.

---

[7] *See* Solicitation Procedures Motion, D.E. 345-1 (Annex I) allowing Class 3A and 3B to check a box to "ELECT TO OPT OUT."

## II. ARGUMENT

### A. The Disclosure Statement Standard

5. Bankruptcy courts, including those within the Fourth Circuit, have repeatedly emphasized the importance of the disclosure statement and the "adequate information" requirement in section 1125 of the Bankruptcy Code to the plan process. *See, e.g.*, *In re Point Wylie Co.*, 78 B.R. 453, 460 n.6 (Bankr. D.S.C. 1987) ("[t]he preparing and filing of a disclosure statement is a most important step in the reorganization of a Chapter 11 debtor"); *In re Ferguson*, 474 B.R. 466, 471 (Bankr. D.S.C. 2012) (denying motion to approve disclosure statement for inadequacy of information). Section 1125 of the Bankruptcy Code requires a debtor's disclosure statement to contain "adequate information," which the Bankruptcy Code defines as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125.

6. Adequate disclosure "'is designed to provide information to creditors to permit them to determine whether to vote for or against the plan[;] [i]t plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's acceptability." *Ferguson*, 474 B.R. at 471 (quoting *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 216 B.R. 175, 180 (Bankr. E.D. Va. 1997)); *see also Eastover Bank for Sav. v. Smith (In re Little)*, 126 B.R. 861, 867 (Bankr. N.D. Miss. 1991) (explaining that "[t]he preparing and filing of a disclosure statement is

a critical step in the reorganization of a Chapter 11 debtor . . . [and] [t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (stating that "[b]ecause creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

7. The Disclosure Statement is the primary medium through which a debtor gives its creditors information necessary for them to determine whether to accept or reject the Plan. *In re Applegate Prop. Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) (stating that "[a] court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take."). Although the determination of whether a disclosure statement contains adequate information is subjective and analyzed on a case-by-case basis, the Disclosure Statement should nonetheless set forth "'all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan.'" *Compare Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) *with In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

8. Although the Funds recognize that a distinction exists between the purpose of the Disclosure Statement hearing and a Plan confirmation hearing, the law is nonetheless clear that there is no need for engaging in the "wasteful and fruitless exercise of sending the [D]isclosure

[S]tatement to creditors and soliciting votes on the proposed [P]lan when [it] is unconfirmable on its face." *See, e.g.*, *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face."); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement."); *In re Dakota Rail, Inc.*, 104 B.R. 138, 145 (Bankr. D. Minn. 1989) (denying the approval of a "facially defective disclosure statement" describing an infeasible plan). In *In re Robert's Plumbing & Heating, LLC*, for example, Judge Gordon issued an opinion denying debtor's disclosure statement because it was patently unconfirmable. *See* Nos. 10-23221 et al, 10-23221, 2011 Bankr. LEXIS 2879, at *7 (Bankr. D. Md. July 20, 2011). Judge Gordon held that he would not "approve a disclosure statement when it describes a fatally flawed plan, incapable of confirmation." *Id.* In so holding, the Court held that the plan violated section 524(e) of the Bankruptcy Code in providing for third-party releases in favor of non-debtor parties and that the plan unfairly discriminated among creditors of the same class. *Id.* at *14.

      **B.**    **Areas Lacking Material Disclosure**

           **1.**    **Lack of Adequate Information Regarding How Novation's Plan and the HCS Transaction Satisfy the Monetary and Non-Monetary Obligations under the Taberna Indentures**

                *a)*    *Failure to Comply with Covenants under the Taberna Indentures*

9.    The Plan is premised on Novation causing its wholly owned subsidiary, Novation Holding, Inc., a Delaware corporation ("Holdings"), to acquire Healthcare Staffing, Inc., a Georgia corporation ("HCS"), via a stock purchase transaction for $24 million in cash as

evidenced by the Stock Purchase Agreement dated February 1, 2017 (the "SPA"). HCS is presently owned by Butler America, LLC ("Butler"), which itself acquired HCS less than one year before Novation filed bankruptcy in this Court. The HCS transaction will require Novation to use substantially all of its available assets, presumably requiring Novation to contribute such assets to Holdings, which is not a counterparty to the Taberna Indentures. *Compare* SPA, Exhibit D *with* D.E. 97 (Schedule A/B listing total assets of Novation at $33,148,750.00 and liquid assets at approximately $31 million). In short, Novation seeks to deploy substantially all of its assets—assets that would otherwise be available to pay its creditors—for the HCS transaction.

10. Despite the potentially harmful implications of using all of Novation's cash that is now available to pay Novation's creditors, including the Funds, the Disclosure Statement includes only conclusory statements regarding how the Plan, and specifically, the HCS transaction, complies with the Taberna Indentures, including the various requirements and covenants therein. The Disclosure Statement says nothing more than:

> Following the financial crisis beginning in 2007, aside from managing a significant portfolio of existing mortgage backed securities, the Debtors exited the loan origination and servicing business and turned their attention on acquiring other businesses for the benefit of the stakeholders of the Company. Such acquisitions are entirely permissible under the terms of the Indentures, however the acquisition targets are required to comply with covenants of the Indentures. *The HCS Transaction contemplated by the Plan Debtors complies with the terms of the Indentures.*[8]

11. This disclosure is patently deficient for numerous reasons. Section 1124(1) provides that a class of claims or interests is impaired *unless* the Plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Alternatively, under section 1124(2), a claim may be deemed

---

[8] Disclosure Statement § 4.03(1) at 20 (emphasis added).

unimpaired when the Plan cures past defaults and reinstates the maturity of an obligation as it existed before the default "notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment." *Id.* § 1124(2). Specifically, section 1124(2) sets forth the following five conditions, all of which a plan of reorganization must satisfy in order to de-accelerate an accelerated claim, reinstate, and leave the holder of that claim truly unimpaired:

   a. curing the default other than any default of a kind that is not required to be cured under § 365(b)(2);
   b. reinstating the maturity as such maturity existed before such default;
   c. compensating the holder of the claim for damages resulting from its "reasonable reliance" on the acceleration;
   d. if the claim arises from a nonmonetary default, compensating the holder of such claim for any such nonmonetary default; and
   e. otherwise leaving all other legal, equitable, or contractual rights of the holder unaltered.[9]

*See, e.g., Litton v. Wachovia Bank (In re Litton)*, 330 F.3d 636, 644 (4th Cir. 2003) (under chapter 11 or chapter 13, "a 'cure' merely reinstates a debt to its pre-default position, or it returns the debtor and creditor to their respective positions before the default."). Section 1124(2) must also be read in conjunction with Section 1123. Section 1123(a)(5)(G) requires that the Plan "provide adequate means for the plan's implementation, such as . . . (G) curing or waiving of any default." 11 U.S.C. § 1123(a)(5)(G).

12. Section 1124 of the Bankruptcy Code defines impairment "in the broadest possible terms." *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982). "Any alteration, even one that enhances those rights, constitutes impairment." *E.g. In re Downtown Athletic Club of N.Y. City, Inc.*, No. 98 B 41419 JLG, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998); *In re 7th St. & Beardsley P'Ship*, 181 B.R. 426, 431 (Bankr. D. Ariz. 1994) ("[A]ny change in creditor's

---

[9] *Id.* § 1124(2)(A)–(E).

- 8 -

rights, whether for the better or for the worse, constitutes impairment. . . .").

13. Other than paying mere lip service to the Taberna Indentures, the Disclosure Statement ignores material affirmative and negative covenants and other requirements in the Taberna Indentures that must be satisfied to (a) cure all monetary and non-monetary defaults and (b) ensure that the Plan, if ever confirmed, will not result in an immediate event of default upon its Effective Date. These material disclosure inadequacies include:

- How Novation's Plan will comply with the negative covenants in Section 10.6(a)–(d) of the Taberna Indentures, which, among other things: (A) prohibits HCS—as a "Subsidiary" of Novation—from having "Debt" in certain instances or any "Lien" following the closing of the HCS transaction; (B) requires Novation to satisfy on a pro forma basis following the HCS transaction certain financial covenants, as to which Debtors have provided insufficient information in the Disclosure Statement to allow TPM, on behalf of the Funds, to assess; and (C) requires "a duly completed and executed certificate substantially and substantively in the form attached [to the Taberna Indentures] as <u>Exhibit A</u>, demonstrating" such covenant compliance. *See also* Taberna Indentures §§ 1.2;

- Whether Novation will require Holdings, which is receiving substantially all of Novation's cash (via contribution or otherwise) to effectuate the purchase of HCS under the SPA,[10] to execute a supplemental indenture as required by section 8.1 of the Taberna Indentures. *See* Taberna Indentures §§ 8.1(a) (requiring that Holdings—as the recipient of Novation's assets—"shall expressly assume, by an indenture supplemental hereto . . . the due and punctual payment of the principal of and any premium and interest (including Additional Interest) on all the Senior Notes and the performance of every covenant of this Indenture. . . ."); and

- Whether Novation will deliver to the Trustee "an Officer's Certificate and an Opinion of Counsel, stating that the HCS transaction and the supplemental indenture comply with Article VIII of the Taberna Indentures "and that all conditions precedent [in the Taberna Indentures] relating to such transaction have been complied with. . . ." Taberna Indentures §§ 8.1(c).

---

[10] The Disclosure Statement states that "Novation had approximately $31.6 million in available cash and liquid securities and NovaStar Mortgage had approximately $743,000.00 in cash." Disclosure Statement at 30.

- 9 -

Whether disclosed or not, Novation and the Plan cannot be confirmed without complying with these provisions of the Taberna Indentures under sections 1123 and 1124 of the Bankruptcy Code.

### b) Failure to Pay Additional (or Default) Interest

14. The Disclosure Statement also incorrectly discloses Novation's obligations to the Funds under sections 1123(a)(5)(G) and 1124(2) of the Bankruptcy Code regarding Additional Interest or default interest. Novation states that it intends to reinstate the indebtedness it owes the Funds and pay the Funds "non-default interest" under section 1124. Disclosure Statement at 4, 26–27. Yet in addition to non-default interest at the "Full Rate," the Funds are entitled to be paid all "Additional Interest"—or default interest—as defined under section 3.1(a)(ii) of the Taberna Indentures in accordance with section 1123(a)(5)(G) of the Bankruptcy Code. The default rate of interest that has been and which continues to accrue on the overdue principal and overdue interest owing under the Taberna Indentures is two times (2x) LIBOR + 3.50% (that is, the "Full Rate" at LIBOR + 3.50% *plus* "Additional Interest" at LIBOR + 3.50%). *See* Taberna Indentures §§ 3.1(a)(ii).[11]

15. As recently explained by the Eleventh Circuit and later confirmed by the Ninth Circuit, "where 'the underlying agreement' calls for default-rate interest and the 'applicable nonbankruptcy law' permits it, a party cannot cure its default without paying the agreed-upon default-rate interest." *JPMCC 2006-LDP7 Miami Beach Lodging, LLC v. Sagamore Partners, Ltd. (In re Sagamore Partners, Ltd.),* 620 F. App'x 864, 869 (11th Cir. 2015) (stating further than we cannot *"*ignore the clear mandate of § 1123 that allows a creditor to demand default-rate interest as a condition for reinstating the loan."); *accord Pacifica L 51 LLC v. New Invs. Inc. (In re New Invs., Inc.)*, 840 F.3d 1137, 1141 (9th Cir. 2016) (holding that "[t]he plain language of

---

[11] *See* n. 7, *supra*.

§ 1123(d) compels the holding that a debtor cannot nullify a preexisting obligation in a loan agreement to pay post-default interest solely by proposing a cure."); *In re K & J Properties, Inc.*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005) ("[S]ection 1124(2) provide[s] no basis to nullify . . . post-petition default interest claimed . . . to the extent it is otherwise allowable under [the] loan documents and applicable nonbankruptcy law."). *See also Anderson v. Hancock*, 820 F.3d 670, 673 (4th Cir. 2016) (holding that to cure a creditor under § 1322(b), debtor must pay default interest, else the plan would effect a modification of the creditor's rights under § 1322).

16. New York law—the governing law under the Taberna Indentures—permits default interest. *In re 785 Partners LLC*, 470 B.R. 126, 135 (Bankr. S.D.N.Y. 2012); *In re South Side House, LLC*, 451 B.R. 248, 266 (Bankr. E.D.N.Y. 2011) ("The Lender's claim for prepetition interest at a default rate of five percent is a permissible charge under New York law."). Because the Funds are owed interest at the Full Rate *plus* Additional Interest, which totals $5,281,639.24[12] and which will continue to accrue until the Effective Date of any confirmed Plan, the Disclosure Statement lacks adequate information; in other words, the Disclosure Statement incorrectly describes (and fails to satisfy) Novation's obligation to pay the Funds interest at the Full Rate (LIBOR + 3.50%) *plus* Additional Interest on overdue principal and interest (LIBOR + 3.50%), which must be cured to deaccelerate and reinstate the indebtedness arising under Taberna Indentures in accordance with §§ 1123 and 1124. The Disclosure Statement should also include a clear statement of the total amount of principal to be reinstated under the Taberna Indentures and the Kodiak Indenture, as well as the total interest cure payments associated with each indenture plus BNYM's fees and expenses, including attorneys' fees and expenses. With the inadequacy of disclosures and improper proposed treatment relating

---

[12] The calculation of interest required to cure the amounts owing under the Taberna Indentures is attached hereto as <u>Exhibit B</u>. Again, such interest will continue to accrue.

- 11 -

to the Funds' claims, which claims are clearly impaired under section 1124 in the Plan, this Court should not permit the Plan Debtors to solicit votes on the Plan. *See, e.g.*, Disclosure Statement at 27 (inaccurately stating that the "Noteholder Claims are Unimpaired and as a result such Holders are not entitled to vote to accept or reject the Plan.").

### 2. Lack of Adequate Information About the Healthcare Staffing, Inc. Acquisition

17. Not only does the Disclosure Statement fail to contain adequate information as to how the Plan satisfies the monetary and non-monetary obligations under the Taberna Indentures, the Disclosure Statement contains scant information on material issues surrounding the HCS transaction, including:

- Whether the pro forma financial statements in Exhibit B to the Disclosure Statement are consistent with HCS's historical performance [D.E. 320-1], including, without limitation, the assumptions regarding revenue (e.g., HCS generated $55 million in 2016, yet Debtors are projecting approximately $70.4 million in 2017) and revenue growth (annual growth at 5% and the drivers thereof, including when or how the putative CSB market in Georgia might flatten in terms of growth), cost of revenue (remaining flat at 86.5%), and operating expenses;

- Whether HCS has secured or other indebtedness, the form of the same (e.g., revolver/term loan/notes), maturity, and related material terms, which are material to the Taberna Indentures (see, e.g., Taberna Indentures, Article VIII and § 10.6(b));

- The current and proposed employment terms for HCS's CEO, who will be retained by the Plan Debtors, including the terms of such employment contracts, compensation, and so forth;

- An explanation of how Plan Debtors determined the purchase price of $24 million and why Butler is selling its interest so soon after acquiring HCS, including whether the Plan Debtors are paying a premium for HCS (and how much);

- An explanation of the ability of the Plan Debtors to utilize net operating losses (NOLs) in connection with the HCS transaction; and

- Failure to include the exhibits and schedules to the SPA.

### 3. Lack of Adequate Information Regarding the Residual Bonds and 10% Return on Investment Income

18. The Plan Debtors' disclosures surrounding the cash flow the Plan Debtors forecast from the residual bonds and investment income for the next sixteen years are woefully inadequate. Based on Exhibit B to the Disclosure Statement, without these alleged cash flows, the Plan Debtors could not fund their interest expense on the Senior Notes from HCS operations until 2024. *See* Exhibit B to Disclosure Statement (*compare* "Income from Operations" *with* "Interest Expense"). Indeed, over 56% of the Plan Debtors' projected revenues—and thus their ability to feasibly comply with the Plan—comes solely from the residual bond and investment income. Creditors are entitled to understand all risks relating to the projected performance of the residual bonds, as well as how the Plan Debtors can reasonably forecast generating a 10% return on excess cash each year for the next 16 years. As written, the Disclosure Statement asks creditors, such as the Funds, to take on faith that Novation and NovaStar Mortgage—debtors in a chapter 11 proceeding—can essentially beat the performance of S&P 500 over the last decade.

### 4. Lack of Adequate Information Regarding Effective Date Funding and Administrative Claims

19. The Debtors must also adequately disclose estimated administrative expenses, including attorneys' and professionals' fees, which the Disclosure Statement does no presently do. *In re United States Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996). Likewise, the Plan Debtors must apportion their fees to the Novation estate and the NovaStar Mortgage estate as they are different estates with different creditors and fees. The Disclosure Statement also states that "[o]n the Effective Date, the Plan Debtors shall use cash on hand to fund all payments required under the Plan and to close the HCS Transaction." Disclosure Statement at 30 (noting

that 98% of available cash shall come from Novation's estate).[13] The Disclosure Statement should include a detailed description of the total amount of "Effective Date Funds" required to be paid on the Effective Date, including—as discussed above—the total interest required to cure and reinstate the Taberna Indentures and the Kodiak Indenture in accordance with §§ 1123 and 1124 of the Bankruptcy Code. Because this important information is missing from the Disclosure Statement, the Court should find that the Disclosure Statement lacks adequate information and order that it be supplemented. These disclosures directly implicate the feasibility of the Plan, among other things. *See* 11 U.S.C. § 1129(a)(11).

    **C.    The Plan is Patently Unconfirmable**

        **1.    The Injunction, Releases, Exculpation, and Limitation of Liability Render the Plan Patently Unconfirmable**

20. The Disclosure Statement is patently unconfirmable. *See In re Robert's Plumbing & Heating, LLC*, Nos. 10-23221 et al, 10-23221, 2011 Bankr. LEXIS 2879, at *7 (Bankr. D. Md. July 20, 2011) (bankruptcy court would not "approve a disclosure statement when it describes a fatally flawed plan, incapable of confirmation."). On the one hand, Novation states that it is curing and reinstating the Taberna Indentures and thus leaving unaltered the contractual rights of the Funds—that is, unimpairment. On the other hand, the injunction, releases, exculpation and limitation of liability described in sections 11.05, 11.06, and 11.07 of the Disclosure Statement immediately alter and take away—immediately impair—the Funds' rights under the Indentures by insulating the Plan Debtors and a third-party non-debtor—Butler—from claims that might exist or arise, including claims under the "reinstated" Taberna Indentures. For example, the injunction in section 11.05 purports to limit and permanently enjoin the Funds and BNYM from enforcing their contractual rights against Novation and Holdings (upon Holding's execution of a

---

[13] The Disclosure Statement states that "Novation had approximately $31.6 million in available cash and liquid securities and NovaStar Mortgage had approximately $743,000.00 in cash." Disclosure Statement at 30.

supplemental indenture as required), including enforcing the negative covenants in Section 10.6 of the Taberna Indentures. Thus, the Disclosure Statement inadequately and incorrectly discloses to creditors and other parties in interest that the Taberna Senior Notes are unimpaired and not entitled to vote.

21. The Disclosure Statement similarly fails to articulate why Butler or the Plan Debtors' directors, officers, and other non-debtor third parties are entitled to a release and the benefits of a permanent injunction. *See* Disclosure Statement § 11.06(b)(i). Section 524(e) of the Bankruptcy Code provides that the "discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Though the Fourth Circuit has approved third-party non-debtor releases in certain rare circumstances, the Fourth Circuit has cautioned that non-debtor releases "should only be approved 'cautiously and infrequently.'" *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014); *accord Behrmann v. Nat'l Heritage Found., Inc.*, 663 F.3d 704, 712 (4th Cir. 2011) ("No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique.") (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005)).

22. In *Nat'l Heritage Foundation*, the Fourth Circuit stated that six factors should be analyzed in considering whether to grant third-party, non-debtor releases: (1) the identity of interests between the debtor and the third-party; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to the reorganization; (4) the impacted class, or classes, has overwhelmingly voted to accept the plan; (5) the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; and (6) the plan provides an opportunity for those claimants who choose not to settle to recover

in full. *Id*. The *National Heritage* Court denied third-party releases that would enjoin claims against the debtor's directors and officers where the analysis of these factors resulted in the satisfaction of only one factor. The court held (i) the releasees made no substantial financial contribution as continuing to perform debtor-related duties was not a relevant contribution; (ii) the releases were not essential because there was no evidence the plan was "doomed" without them; (iii) the creditors' support of the plan was questionable because the class most affected by the releases was ineligible to vote; (iv) the plan provided no mechanism to pay for the classes affected by the release; and (v) there was no opportunity for non-settling parties to recover in full. *Nat'l Heritage Found*., 760 F.3d at 348-51. The Fourth Circuit's analysis, specifically with respect to factor (ii) and (iii) above, plainly demonstrates its disfavor for third-party releases. The Court explained that although there was an identity of interest between the debtor and its directors and officers, there was no evidence the debtor faced "a strong possibility of suits that would trigger its indemnity obligation, much less that such suits would threaten its reorganization." *Id.* at 351. Thus, the releases were not essential.

23.  As to Butler, Butler is not contributing anything to the Plan; nor are the Plan Debtors' directors and officers. Instead, Novation is using substantially all of its liquid assets to purchase HCS from Butler, so the financial benefit flows to Butler, not to the Plan Debtors' estates. Similarly, Butler and the Plan Debtors have no identity of interest, and there is no showing, justification, or other explanation in the Disclosure Statement why the injunction is "essential" to the Plan Debtors' reorganization.

24.  Moreover, similar to *National Heritage*, the way in which the Plan Debtors have described the injunction and release in entirely inappropriate. The Plan states that "each holder of a claim that does not vote to reject the Plan and any person who receives a distribution under the

Plan . . . will be deemed to consensually forever release, waiver and discharge all claims . . . that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Plan Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement against any Released Party," which includes the Plan Debtors' "directors, officers, employees, agents, members, shareholders, advisors and professionals. . . ." *See* Plan § 10.06(b).

25. But Novation is not allowing the Funds to vote on the Plan under the guise of unimpairment. In other words, the Funds are being forced into the injunction, release, and limitation of liability provisions of the Plan, without being provided any related option to opt-out of such provisions. Indeed, unlike Class 3A, which is entitled to both accept the Plan but opt-out of the releases in § 10.06(b),[14] the Disclosure Statement and Plan provides that, because the Taberna Senior Notes are allegedly unimpaired, Class 2 is not entitled to vote and is deemed to accept the Plan. Thus, the Plan Debtors are forcing Class 2—the Funds—into the releases, injunctions, and limitations of liability, and in so doing, the Plan Debtors are unfairly discriminating between the Class 2 unsecured creditors (who have no opt-out rights) and Class 3A unsecured creditors (who have opt-out rights). Thus, like in *National Heritage*, because the class most affected by the Plan's proposed injunction, release and limitation of liability provisions—that is, the Senior Notes who hold over ninety-nine percent of the liquidated, non-contingent, and undisputed claims against Novation—is both ineligible to vote and ineligible to opt-out of such provisions (while other unsecured creditors are allowed to opt-out), the Plan cannot be confirmed.

---

[14] *See* Solicitation Procedures Motion, D.E. 345-1 (Annex I) allowing Class 3A and 3B to check a box to "ELECT TO OPT OUT."

### 2. Artificial Impairment of Unsecured Creditors in Class 3A Renders the Plan Unconfirmable

26. The Disclosure Statement fails to set forth any facts or analysis that justify artificially impairing the general unsecured claims against Novation in Class 3A for the purpose of obtaining an impaired accepting class under section 1129(a)(10). *See* Disclosure Statement at 5; *see also In re Dunes,* 188 B.R. 174, 186 (Bankr. D.S.C. 1995) (noting that the Fourth Circuit Court of Appeals likely would join the Eighth Circuit's condemnation of artificial impairment schemes designed to engineer technical compliance with 1129(a)(10)); *In re Swartville, LLC*, No. 11-08676-8-SWH, 2012 Bankr. LEXIS 3809, at *10 (U.S. Bankr. E.D.N.C. Aug. 17, 2012) (applying the good faith standard in § 1129(a)(3) to find artificial impairment under § 1124). To be sure, the Plan Debtors fail to mention any justifiable reasons why Class 3A is artificially impaired (arbitrarily stretching payment of $1.145 million in Class 3A unsecured claims over one year) because it appears obvious that the Plan Debtors are attempting to manipulate voting on the Novation Plan for the improper purpose of trying to create an impaired accepting class to cram down the Funds (in anticipation of the fact that the Funds are in fact impaired under the proposed Plan as set forth herein).

### D. Misleading Disclosure Regarding Plan Confirmation Requirements

27. Throughout the Disclosure Statement, the Debtors confuse or conflate the fact that: (i) creditors of Novation and creditors of NovaStar Mortgage must independently vote in favor of the Plan according to the confirmation requirements under Section 1129(b) of the Bankruptcy Code; (ii) each case is separately considered; and (iii) the creditors in each case and their votes are separately considered. Novation and NovaStar Mortgage have not been (nor could they be) substantively consolidated. And if the Debtors are seeking to use joint administration as a tool to abridge the law, specifically section 1129(a)(10) of the Bankruptcy Code, the Disclosure

Statement must be rejected.[15]

28. Though these cases are jointly administered, joint administration is merely a tool of convenience. The Advisory Committee Note to Rule 1015 of the Federal Rules of Bankruptcy Procedure states that:

> Joint administration as distinguished from consolidation may include combining the estates by using a single docket for the matters occurring in the administration, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other *purely administrative* matters that may aid in expediting the cases and rendering the process less costly.

Fed. R. Bankr. P. 1015, advisory committee note (emphasis added). A debtor cannot use joint administration to override substantive legal requirements, including the requisite hurdles that must be cleared to confirm a plan under Section 1129(a) of the Bankruptcy Code. *See, e.g.*, *In re H.H. Distributions, L.P.*, 400 B.R. 44, 54 n.15 (Bankr. E.D. Pa. 2009) ("[s]ubstantive consolidation differs from procedural consolidation, more commonly known as joint administration, in that the latter does not [a]ffect the *substantive rights of creditors or their respective debtor estates* but rather is a tool of administrative convenience and cost efficiency.") (emphasis added).

29. One such hurdle that each non-substantively consolidated Debtor must clear before reaching the question of whether those debtors can cramdown their joint plan on a class of dissenting creditors of each separate case is whether each debtor in each non-consolidated case has an impaired, non-insider class of creditors that vote to accept the plan. 11 U.S.C. § 1129(a)(10). Plan Debtors' apparent reading of Section 1129(a)(10) would permit NovaStar Mortgage's creditors to have a voice in Novation's bankruptcy case, which could ultimately result in the Plan being crammed down on Novation's creditors, even if not one single impaired

---

[15] The Disclosure Statement also fails to disclose the quantum of intercompany claims to be "deemed cancelled" under the Plan or how cancelling such claims might impact Novation's creditors. *See* Disclosure Statement § 6.06.

class under the Novation Plan voted to accept the Plan as it applies to Novation.

### III. JOINDER

30. The Funds fully join in and support the Objection of the Official Committee of Unsecured Creditors. The Funds also reserve all rights to object to the confirmation of the Plan on similar or different grounds.

WHEREFORE, the Funds respectfully requests that the Court enter an order denying approval of the Debtors' Disclosure Statement and granting the Funds such other and further relief as the Court deems just and appropriate.

Dated this 22nd day of March, 2017.

*/s/ Scott J. Pivnick*
Scott J. Pivnick (MD No. 15168)
The Atlantic Building
950 F Street, NW
Washington, DC 20004
(202) 239-3300
scott.pivnick@alston.com

-and-

John W. Weiss, Esq. (NY No. 4222)
Jonathan T. Edwards (GA 134100)
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
(212) 210-9400
john.weiss@alston.com
jonathan.edwards@alston.com

*Counsel for Taberna Preferred Funding I, Ltd. and Taberna Preferred Funding II, Ltd., by and through TP Management LLC, solely in its capacity as attorney-in-fact*