IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| **NOVATION COMPANIES, INC., *et al.*,**[1] | * | Case No. 16-19745, 16-19747-19749 |
| | * | (Jointly Administered) |
| | * | |
| Debtors. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAN DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO APPROVAL
OF DISCLOSURE STATEMENT AND SOLICITATION AND VOTING PROCEDURES**

Novation Companies, Inc. ("Novation") and NovaStar Mortgage LLC (NovaStar Mortgage), two of the debtors and debtors in possession (the "Plan Debtors") in the above referenced cases, by and through their undersigned counsel, respectfully submit this omnibus reply to the objections filed in opposition to approval of the Plan Debtors' Disclosure Statement dated February 14, 2017 [Docket No. 303][2] and to the motion to establish solicitation and voting procedures dated March 7, 2017 [Docket No. 345].[3] In support of this response, the Plan Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases are: (i) Novation Companies, Inc. f/k/a NovaStar Financial, Inc., (ii) NovaStar Mortgage LLC f/k/a NovaStar Mortgage, Inc., (iii) NovaStar Mortgage Funding Corporation and (iv) 2114 Central, LLC f/k/a Advent Financial Services, LLC.

[2] These objections consist of the (i) Objection to the Disclosure Statement on behalf of Taberna Preferred Funding I, Ltd, Taberna Preferred Funding II, Ltd., dated March 22, 2017 (Docket No. 370) (the "Taberna Objection"); (ii) Objection to the Disclosure Statement on behalf of Creditors' Committee dated March 22, 2017 (Docket No. 368) (the "Committee Objection"); (iii) Objection on behalf of US Trustee – Baltimore, dated March 21, 2017 (Docket No. 366) (the "UST Objection"); and (iv) Objection on behalf of Bank of New York Mellon Trust Company, N.A., not in its individual capacity but solely in its capacity as Trustee under certain Indentures, dated March 22, 2017 (Docket No. 367) (the "Indenture Trustee Objection").

[3] These objections consist of the (i) Objection to the Solicitation and Voting Procedures Motion of the Creditors' Committee, dated March 21, 2017 (Docket No. 364) (the "Committee Procedures Objection) and (ii) Objection to the Solicitation and Voting Procedures Motion of Taberna Preferred Funding I, Ltd, Taberna Preferred Funding II, Ltd., dated March 21, 2017 (Docket No. 365) (the "Taberna Procedures Objection").

4083294-8

A.      **Preliminary Statement**

1.      The Plan Debtors have proposed a Plan that represents the best possible outcome for all classes of creditors and equity holders in these Chapter 11 Cases. By using available cash on hand to acquire a profitable business, Healthcare Staffing, Inc. ("HCS"), managing and monetizing a valuable bond portfolio which the Debtors estimate will generate approximately $50 million in future cash flows, and preserving upwards of $700 million in NOL's, the Debtors have proposed a Plan that pays creditors in full and preserves equity value to public shareholders (shareholders whose holdings were decimated after the legacy sub-prime lending business of the Debtors was shuttered). The Debtors are utilizing the rehabilitative tools and fulfilling the rehabilitative purpose of the Bankruptcy Code and fulfilling their fiduciary duties under applicable Maryland Law owing to all stakeholders in the case, creditors and equity holders alike. The narrow question currently before the Court is whether the Disclosure Statement contains "adequate information" within the meaning of section 1125(a)(1) of the Bankruptcy Code for holders of claims and interests entitled to vote to make an informed decision regarding whether to vote to accept or reject the Plan.

2.      Under guise of disclosure statement objections, the Creditors Committee and its largest note holder member (and affiliate) Taberna Preferred Funding I and Taberna Preferred Funding II (collectively "Taberna"), and their Indenture Trustee (who they direct), gang tackle the Debtors and pile on densely repetitive and substantively similar objections. However, these objections should be seen for what they are: a continuation by Taberna (and its sister bondholder Kodiak) of their plan to contest every aspect of this bankruptcy case. The objections are in essence plan objections that Taberna (and the Committee) seemingly will never back off of; and no matter the length, comprehensiveness, or breadth of new disclosures that are made to the Disclosure Statement will stop them from their continued onslaught. Simply said, the Debtors will never be

able to file any disclosure statement that satisfies these parties (even though they possess much of the information they claim they need), because they have repeatedly shown that they (and the Committee they control) will never agree to the Plan and will continue, as they have since even before the Petition Date, to demand for the liquidation of the Debtors. Such a liquidation would not maximize, but would utterly annihilate, the value of the Debtors assets and would not be in the best interest of creditors and equity holders.

3. At the proper time—the confirmation hearing—the Debtors will present evidence showing that the Debtors' plan is feasible, that there will be sufficient cash on hand to close the proposed transaction with HCS and for the Plan to go effective. The Committee and Taberna will have a full and fair opportunity to challenge that evidence.

4. While the Debtors believe that the Disclosure Statement contains more than adequate information, in an attempt to respond to legitimate objections, the Debtors have made changes through the filing of an Amended Plan [Docket No   ] and by presenting a proposed Amended Disclosure Statement to address the objections. Attached as <u>Exhibit A</u> is a redline comparing the originally filed plan with the Amended Plan filed contemporaneously herewith. Also attached as <u>Exhibit B</u> is a draft of the proposed Amended Disclosure Statement which evidences the changes made in redline to address all of the objections. Annexed hereto as <u>Exhibit C</u> is chart which, for ease of reference, summarizes all of the disclosure objections, with page citations to the additional disclosures contained in the redlined Amended Disclosure Statement.[4]

---

[4] The Debtors are prepared to file the revised Disclosure Statement upon approval of and as a condition to such approval of the Disclosure Statement. However, recognizing that the Court may require further changes to the Disclosure Statement (and in order to avoid any further confusion in the Court docket) the Debtors have not yet filed the proposed Amended Disclosure Statement, but instead submit a redline of same as an exhibit at this time for the Court's consideration. The Debtors have discussed this approach with the Office of The United States Trustee and they have indicated that it is acceptable to them.

5. Included in the redlined of the proposed Amended Disclosure Statement are also amendments made to consensually resolve the informal comments of the Securities Exchange Commission ("SEC"), comments from the Lead Plaintiffs for the New Jersey Carpenters Health Fund class action case ("NJC") and the objection filed by the Office of the United States Trustee.

6. As also set forth in the reservation of rights that the NJC filed [Docket No. 369], that action has been (favorably) resolved and settled, such that the largest of the contingent RMBS litigations claims has been settled, removing one of the largest contingencies in the case. The Debtors will be filing a motion under Bankruptcy Rule 9019 to approve that settlement in the coming days.

7. Certain objections have also been filed that argue that the Plan is "patently unconfirmable." The Debtors address each of these objections below. Aside from the Committee, Taberna and the Indenture Trustee, the U.S. Trustee primarily argues that the Plan is patently unconfirmable primarily because of the third party releases in the Plan. The Debtors addressed these concerns in their proposed ballots when they allowed for any creditor to voluntarily "opt out" of the releases." Given that the release is voluntary and in exchange for a proposed 100% (plus interest) recovery to creditors, the Debtors believe the releases are appropriate and reasonable, and will support such releases at the confirmation hearing. However, in the event the Court does not agree, the Debtors will seek confirmation without the third party releases, ensuring that the releases will not stand in the way of confirmation of the Plan. The Debtors will also work with the U. S. Trustee to ensure there are agreed upon "carve outs" from the Third Party Releases, as were suggested by the U.S. Trustee in its objection.

**B.     The Disclosure Statement Contains Adequate Information to Permit Voting Creditors to Make an Informed Judgment About the Plan**

8. The Court may approve a disclosure statement that contains "adequate information." Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan, but *adequate information need not include such information about any other possible or proposed plan* . . . .

11 U.S.C. § 1125(a)(1) (emphasis added).

9. A court has broad discretion in applying the "adequate information" standard. *Id*. at 142-3 (court has "wide discretion to determine on a case-by-case basis whether a disclosure statement contains adequate information, without burdensome, unnecessary, and cumbersome detail"); *In re Copy Crafters Quickprint, Inc*., 92 B.R. 973 (Bankr. N.D.N.Y. 1988) (adequacy of information in disclosure statement determined on case-specific basis under flexible standard that promotes policy of chapter 11 of fair settlement through negotiations among informed, interested parties); *In re Brandon Mills Farms, Ltd*., 37 B.R. 190, 192 (Bankr. N.D. Ga. 1984) (adequacy of disclosure statement is left to court's discretion on case-by-case basis).

10. In enacting section 1125 of the Bankruptcy Code, Congress envisioned that courts would take a practical and flexible approach, basing the determination of adequate disclosure on the unique facts and circumstances of each case. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408-09 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6364-66. "In reorganization cases, there is frequently great uncertainty. Therefore, the need for flexibility is greatest." *Id*. at 409. As delineated by Congress, speed is an important factor in determining adequacy of information in certain instances:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as . . . the need for relative speed in solicitation and confirmation . . . .

*Id.*

11. Notwithstanding the arguments to the contrary, the Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and should be approved. The Disclosure Statement, as modified, contains approximately 78 pages of disclosure, plus exhibits, for stakeholders to consider when voting on the Plan.

### C. Confirmation Objections Should Not Be Considered At The Disclosure Statement Hearing.

12. It is widely acknowledged that the disclosure statement hearing should not be converted into a premature hearing on plan confirmation. *See, e.g., In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) (court must be careful so as not to convert disclosure statement hearing into confirmation hearing); *In re Cardinal-Congregate I*, 121 B.R. 760, 763-64 (Bankr. S.D. Ohio 1990) (objections to, *inter alia*, classification, treatment of claims, and protection of creditor interests properly addressed at confirmation hearing); *In re Dakota Rail, Inc.*, 104 B.R. at 144 (whether plan could be confirmed without violating absolute priority rule was not ripe for determination at disclosure statement hearing).

13. Approval of a disclosure statement is an interlocutory action in the progress of a chapter 11 reorganization leading to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan. *In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 26-27 (S.D.N.Y. 1995) (almost without exception, courts have found that orders approving disclosure statements are interlocutory); *In re Waterville Timeshare Group*, 67 B.R. 412, 413 (Bankr. D.N.H. 1986) ("[A]pproval of a disclosure statement is an interlocutory action in the progress of a Chapter 11 reorganization effort leading to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan."). Such interlocutory action is not intended to be the primary focus of litigation in a contested chapter 11 case. *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing."). The court's focus should

be on the adequacy of, and the probability that a hypothetical investor can make an informed judgment based on, the information provided in the disclosure statement:

> If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation. Therefore, the Debtor need not obtain creditors' approval of the plan; it need only provide them with adequate information as that term is defined in 11 U.S.C. § 1125(a)(1).

*In re Scioto Valley Mortgage Co*., 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988).

14. In short, objections relating to the substantive provisions of the Plan are best left for the confirmation hearing itself. At this stage, only the adequacy of the information contained in the Disclosure Statement needs to be addressed. To address confirmation issues at the disclosure statement hearing would delay the course of these cases unnecessarily by converting the disclosure hearing into a premature confirmation hearing.

15. Nevertheless, some courts have looked beyond disclosure issues and addressed plan confirmation issues at the disclosure hearing. The plans before the courts in those cases, however, were inherently flawed and clearly facially unconfirmable. *See In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) (disclosure statement not approved where plan has patent legal defects and is not confirmable); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. at 980 (plan too speculative); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va 1986) (facially invalid plan precludes approval of disclosure statement). The *Copy Crafters* court nevertheless warned that "care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing." In *re Copy Crafters Quickprint, Inc*., 92 B.R. at 980. The Debtors respectfully submit that the Plan hardly can be called a "fruitless venture" or "impossible to confirm."

16. Among the types of objections that courts have held that do <u>not</u> rise to the level of making a plan "patently unconfirmable" are those related to (a) classification and treatment of

7

various claims; (b) feasibility, (c) disparate treatment of claims; and (g) distribution of non-debtor funds. *Compare Cardinal Congregate, 121 B.R. at 763-64* (overruling objections to classification and treatment of claims, protection of security interests and feasibility) *and Monroe Well Servs.*, 80 B.R. at 333 (holding that objections considered must be limited to defects that could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed). Simply put, objections under section 1129 of the Bankruptcy Code are not properly raised and addressed at the disclosure statement stage. *See Copy Crafters Quickprint*, 92 B.R. at 980 citing *Monroe Well Servs.*, 80 B.R. at 333.

17.     While the Debtors believes that there is legal support for all aspects of the Plan, even if such objections are meritorious, any perceived deficiencies in the Plan in no way rise to the level of being so "fatal" that solicitation of the Plan would be a wasted effort. Below, the Debtors address each of the allegedly "patently confirmable plan" objections.

(i)     **Plan Objection #1: The Plan Does Not Pay Default Rate Interest on the Notes**

18.     First and foremost, it is troubling that the Committee seeks to prosecute arguments that only serve the interests of two of its constituent members and not all unsecured creditors as a whole. The role of a creditors committee is not to argue the interests of individual creditors—and charge the estate for such work—- but instead to act as a fiduciary to all creditors at large. It appears as though the Committee counsel, which previously represented Taberna in pre-petition negotiations with the Debtors and again individually in this case is still representing Taberna and remains intent on elevating the interests of those funds over the interests of all other unsecured creditors in Classes 3 and 4.[5]

---

[5] For instance, it should be noted that Taberna did not raise default rate interest as an issue that rises to the level of "patently unconfirmable." The Committee did. Instead, Taberna raised this as a more typical "inadequate" disclosure argument.

8

19. The Creditors Committee argues that the Plan is patently unconformable under Section 1123 of the Bankruptcy Code [Docket No. 368, at ¶¶ 19-24], while Taberna argues that the Disclosure Statement does not contain adequate information required by Section 1125(b) of the Bankruptcy Code because the Plan and Disclosure Statement fail to provide for the payment of "default rate" interest to the unsecured claims of the Note Holders. [Docket No. 368, at ¶¶ 53-56, Docket No., at ¶¶ 14-16]. The argument is based upon a mischaracterization of the Indentures and the Plan.

20. Presumably to fit within the rubric of the case the Committee and Taberna rely upon,[6] they misleadingly interchange the term "default interest" (which is not to be found in the Indentures) with the defined term of Additional Interest, an amount that is payable in certain circumstances under Section 3.1(a)(ii) of the Indentures. *See* Docket No. 370 at ¶ 14. However, the Indentures do not contain an express provision allowing for default rate interest. Rather, Section 3.1(a)(ii) of the Indentures refers to "Additional Interest," a term defined at Section 1.1 of the Indentures to mean interest that accrues on any payment not made on the applicable Interest Payment Date. In these interest only facilities the Interest Payment Dates are the quarterly dates when interest payments were due.[7] *See* Indentures at Section 1.1.

---

[6] The Committee and Taberna rely upon *JPMCC 2006-LDP7 Miami Beach Lodging, LLC v. Sagamore Partners, Ltd. (In re Sagamore Partners, Ltd)*; 620 F. App'x 864, 869 (11th Cir. 2015). In Sagamore the 11th Circuit held that in order to cure an over-secured creditor's claim (the lower court found that the debtor could refinance the underlying collateral), default interest had to be paid because the express terms of the underlying loan agreement provided for such default rate interest. However, unlike the facts before this Court, the Sagmore loan agreement provided that upon an event of default "the unpaid principal balance of the loan… shall accrue interest at the Default Rate…" The Indentures have no such express provision allowing for default interest on the unpaid principal balance or otherwise.

[7] By contrast the Indentures contain a defined term "Defaulted Interest, which means "any interest on any Security that is due and payable, but is not timey paid or duly provided for, on any Interest Payment Date…" See Indentures at Section 3.1(d).

9

21.     Therefore, the Plan need not expressly refer to or provide for "default interest" and Section 3.02(b)(2)(B) of the Plan providing for non-default interest is consistent with the Indentures. However, to address the semantical issues raised by Taberna and the Committee, the Plan has been amended to provide that the Plan Debtors will pay "accrued and unpaid interest" and not "non-default rate interest" as previously provided for, to make it clear and to ensure the Class 2 noteholders are paid whatever amount is due and owing on account of allowed accrued and unpaid interest.

22.     Similarly, the Committee's and Taberna's argument that the Disclosure Statement did not provide for "default" interest and therefore understated the cure amount by $3.6M is based on the incorrect assumption that the Debtors' $4,800,000.00 cure amount did not attempt to include Additional Interest-which it did. [Docket No. 368, at ¶ 22]. In drafting the Disclosure Statement, counsel for the Debtors incorrectly included that amount, but has since determined that it should have been stated as $5,783,000.00 through June 30, 2017.[8] This mistake has been corrected in the proposed Amended Disclosure Statement. This amount includes interest compounded quarterly at Libor + 3.50% on the missed interest payments as provided in Section 3.1(a)(ii) of the Indentures. The Committee's and Taberna's argument that Additional Interest also accrues on the principal balance of the Notes is contrary to the terms of the Indentures and attempts to create an ambiguity in those agreements. In any event, even if the Committee and Taberna were correct (they are not) the Debtors will establish at the confirmation hearing that they have sufficient resources to pay the additional sums claims by Committee and Taberna.

23.     Accordingly, the Plan is not patently unconfirmable.

---

[8] Notwithstanding the scrivener's error, the projections did, in fact, include a cure amount of approximately $5,500,000.

**(ii)** **Plan Objection #2: The Plan Incorrectly States That the Class 2 Noteholder Claims are Unimpaired**

24. The Committee makes two arguments to support a claim that Class 2 is "impaired." First, the Committee argues that the Third Party Releases alters the legal and equitable rights of these creditors, in violation of Bankruptcy Code §1124(1). The U.S. Trustee's objection also primarily rests on an objection to the third party releases (addressed herein). Second, the Committee argues that Class 2 is impaired because the Debtors have not agreed to pay the "default rate interest" in the Indentures. This latter argument has been addressed above.

25. Regarding the third party releases, the Debtors have previously submitted proposed ballots and have now revised the Plan to expressly provide for a voluntary "opt out" of all Third Party Releases, thus making clear that such releases are consensual in nature and non-binding on any creditor that does not wish to be bound. While the Debtors concede there are cases which have not permitted "opt out" ballots, other courts have ruled such provisions appropriate and in this case they are indeed appropriate, as explained below. *See, In re Indianapolis Downs LLC*, 486 B.R. 286, 304-06 (Bankr. D. Del. 2013) (approving third party releases when creditors were allowed to opt out of the releases by checking a box on the voting ballot); *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 285 (Bankr. D. Del. 2016) (same) see also *In re DBSD N. Am., Inc.*, 419 B.R. 179, at 218-19 (S.D.N.Y. 2009) (determining that adequate notice of the proposed release was given to impaired creditors, and the ballots set forth the effect of abstaining without opting out of the release); *see also In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding a release provision binding impaired creditors who abstained from voting on the plan and did not otherwise opt out to be consensual); *In re Calpine Corp.*, No. 05-60200 (BRL) 2007 WL 4565223, *18 (Bankr. S.D.N.Y. Dec. 19, 2007) (holders of claims and interests who voted in favor of the plan, or abstained from voting, received adequate notice of the third party releases in the plan and

therefore were bound by such releases, absent an affirmative election to opt out of such releases). Clearly, such opt out releases do not make the plan "patently unconfirmable."

26. Given that the third party releases are voluntary and in exchange for a proposed 100% (plus interest) recovery to creditors, the Debtors believe the releases are appropriate and reasonable, and will support such releases at the confirmation hearing. However, in the event the Court does not agree, the Debtors will seek confirmation without the third party releases, ensuring that the releases will not stand in the way of confirmation of the Plan. Finally, for purposes of the Plan, the Debtors will "deem" the Taberna Creditors to have opted out of the releases, given their objection to them at this stage of the case.

27. With respect to the argument about the purported failure to pay Class 2 "default rate" interest, as explained above, the Indentures do not provide for "default rate" interest. Moreover, the Debtors have amended to the Disclosure Statement to provide for a reinstatement cure payment of $5,783,000.00 for Class 2. In the event the Court determines the amount to reinstate the notes is more, the Debtors will have sufficient assets and resources to pay the amount owing, and will establish same at the confirmation hearing.

28. Accordingly, the Plan is not patently unconfirmable.

**(iii)** **"Patently Unconfirmable" Plan Objection #3: Plan Artificially Impairs Classes 3a and 3b**

29. The Committee and Taberna spend extensive time in their objections (i) arguing that the Debtors do not have enough funds to reinstate the notes, (ii) asserting that the Debtors may not have enough cash on hand to pay disputed "default interest " to the Class 2 noteholders, (iii) objecting to the assumptions in the Budget and (iv) arguing that the Debtors may not have enough funds to pay administrative claims. Yet, in the very next breath, the Committee argues that Class 3 (General Unsecured Claims) is "artificially impaired" because the Debtors have "sufficient assets or pay all Class 3 Claims in full on the Effective Date. Thus, the Debtors should do so." Aside

from the lack of consistency and contradictory nature of the arguments, there is nothing in the Plan that artificially impairs the Class 3 claims, nor has any individual members of such class objected on those grounds.

30. On a faulty premise, the Committee asserts that the "Disclosure Statement fails to set forth any facts or analysis that justify artificially impairing the unsecured claims against Novation in Class 3A for the purpose of obtaining an impaired accepting class under section 1129(a)(10)." Com. Obj. ¶ 26. Class 3A is impaired, but not artificially so. There is nothing arbitrary about terming out payment of $1.145 million for an entire year, rather than paying such a large sum in cash on the Effective Date, when the Plan Debtors estimate they will need most of their cash on hand to pay the purchase price for the HCS Transaction ($24 million), reinstate the Class 2 notes (approximately $5.75 million) and pay estimated administrative fees of approximately $2.0M.

31. At most, courts require a reasonable basis in order to impair a class. *See e.g.*, *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 42 (Bankr. D. Del. 2000) ("the Debtors have a reasonable basis for the impairment: the funds are necessary to meet the distribution requirements of the Modified Plan"). Here, impairment is not only reasonable, but absolutely necessary to go effective.

32. The Debtors' Budget is carefully planned to allow for the use of $24 million for the HCS purchase price, while setting aside enough funds to pay the accrued interest owing to the noteholders upon reinstatement, pay all administrative expenses, and have sufficient funding and liquidity to operate the go forward business. As the evidence will show at the confirmation hearing, the Debtors likely will not have enough funds on hand to pay Class 3 in full on the

Effective Date, plus all of the foregoing exit costs.[9] Moreover, if default interest were applicable in the amounts the Committee alleges is due and owing, , there would not be enough funds to pay the Class 3 creditors in full on the Effective Date. These undisputed facts establish that the Class 3 pay out was not artificially impaired but economically required.

33. The necessity of impairment of Class 3A in this case is incomparable to the clear abuse found in the two cases cited by the Committee: *In re Dunes*, 188 B.R. 174, 186 (Bankr. D. S.C. 1995) (artificial impairment of a $2,139.57 claim where the Debtor had the ability to pay $40 million to another class on the Effective Date) and *In re Swartville*, No. 11-08676-8-SWK 2012 WL 3564171 (Bankr. E.D.N.C. Aug. 17. 2012) (single non-insider accepting impaired claim for $1,170 could not cram down $1.16 million secured creditor). Moreover, many courts have rejected the artificial impairment theory entirely and allow impairment regardless of motive. *See e.g., In re Village at Camp Bowie I, L.P.,* 710 F.3d 239, 345 ("[T]oday we expressly reject [*In re Windsor on the River Associates, Ltd.*, 7 F.3d 127 (8th Cir. 1993)] and join the Ninth Circuit in holding that § 1129(a)(10) does not distinguish between discretionary and economically driven impairment."); *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D.N.J. 2000) ("Under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims. If an impaired class accepts the plan, the requirement of section 1129(a)(10) is satisfied."); *In re Duval Manor Assocs.*, 191 B.R. 622, 628 (Bankr. E.D. Pa. 1996) (concluding that "artificial" impairment is clearly permitted under the plain meaning of section 1129(a)(10)). *See In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 678 (D. Ariz. 1994) ("it is not the court's role to ask whether alternative payment structures could produce a

---

[9] Ironically a large part of the administrative expenses are the legal fees the Committee incurred in filing repeated objections to routine motions and for actions such as forcing a contested exclusivity hearing and filing needless discovery

different scenario in regard to impairment of classes; nor does the Code require that a plan proponent use all efforts to create unimpaired classes").

34. The cases cited by the Committee each discuss a split of authority on this issue and note that the Fourth Circuit has not yet opined on this issue. *See Dunes* 188 B.R. at 186; *Swartville,* 2012 WL at *2-4. Nonetheless, regardless of which authority is applied, the rationale for impairment is evident here.

### D. Response to Remainder of Objections to the Proposed Disclosure Statement

35. As noted above, in order to address the various objections to the Disclosure Statement, the Plan Debtors have filed an Amended Plan and attached hereto a proposed Amended Disclosure Statement, which the Plan Debtors contend appropriately resolves those objections and which the Debtors.

36. For ease of review and in order to address each of the remaining substantive objections to the Disclosure Statement the Debtors have attached in chart form, a listing of each remaining objection and how the Debtors have proposed to address such objection. *See* Ex. B, attached hereto.

### E. Amendment of Plan

37. The Debtors have amended the Plan to conform to the aforementioned amendments to their Disclosure Statement. Given the tight deadlines imposed by the HCS Stock Purchase Agreement, to ensure that the Debtors will be able to confirm the Plan in the time required, the Debtors have also amended the Plan to provide a "toggle" feature for the Class 2 noteholders. The Amended Plan now provides that Class 2 will be treated as follows:

> Class 2 – Noteholder Claims Against Novation.
>
> Allowance. On the Effective Date, the Noteholder Claims shall be deemed Allowed in the amount determined pursuant to the terms of the respective Indentures and consistent with the Bankruptcy Code and shall not be subject to defense, avoidance,

recharacterization, disgorgement, subordination, setoff, recoupment, or other contest (whether legal or equitable), for all purposes of the Plan.

<u>Treatment</u>. On the Effective Date, the Noteholder Claims and each of the Indentures shall be reinstated pursuant to Bankruptcy Code section 1124. All principal, accrued and unpaid interest, fees, expenses, costs, charges or other such valid and allowable amounts due and payable on or before the Effective Date under the Indentures that were not paid by Debtor Novation prior to or during the Chapter 11 Case shall be paid in full in cash in immediately available funds to the extent required by Bankruptcy Code section 1124; ***provided however***, that should the Debtors elect, or if the Bankruptcy Court determines that the Debtors have insufficient funds to reinstate the Noteholder Claims in the amount needed to reinstate the Noteholder Claims, then on the Effective Date, the holders of Noteholder Claims shall instead receive: (a) a lump sum payment in an amount equal to accrued post-petition interest on account of such Noteholder Claims at the federal judgment rate and (b) their pro rata share of the Amended Senior Notes payments. For the avoidance of doubt, the Amended Senior Notes shall only be issued in the event the Noteholder Claims are not reinstated as provided herein.

<u>Voting</u>. Solely to the extent the Noteholder Claims are not reinstated as of the Effective Date, the Noteholder Claims will be Impaired. As a result such Holders are entitled to provisionally vote to accept or reject the Plan and Holders shall receive provisional ballots on account of such Noteholder Claims. Should the Noteholder Claims be reinstated on the Effective Date, the Noteholder Claims will be Unimpaired and the provisional ballots shall not be counted.

38. In summary, the new feature provides for the same treatment as originally proposed under the reinstatement scenario, but allows the Debtors to seek cram down against Class 2 noteholders in the event the Note Holders "default rate" argument is pursued and sustained, and it therefore proves necessary to slightly adjust the Plan to protect the rights of all stakeholders. To ensure that the Debtors can pursue confirmation of the Plan without sacrificing the timeline imposed by the HCS Stock Purchase Agreement, while at the same time ensuring that the Class 2 noteholders voting rights, if any, in the event a cram down is needed, the Class 2 noteholders will be provided provisional ballots which will enable them to vote on the alternative cram down treatment proposed. Moreover, the Debtors have also annexed to the Amended Disclosure Statement an additional set of projections for the cram down scenario.

**F.     The Solicitation Order Should be Approved, as Modified**

39.     The Committee and Taberna also filed objections to the Debtors motion to approve proposed solicitation and voting procedures. The Committee's proposed counter-order was annexed to its objection. The Debtors have considered the objections and have agreed to many, but not all, of the suggested changes. Attached hereto as <u>Exhibit D</u> is the proposed order approving ballots and solicitation procedures, compared to the version the Committee filed with its objection. The Debtors submit that the attached proposed order complies with applicable law and will facilitate a smooth and efficient distribution of the Solicitation Package and solicitation of votes to accept or reject the Plan.

## **CONCLUSION**

40.     The Debtors Disclosure Statement contains adequate information and should be approved, so that the Debtors may proceed to solicit votes on the Plan and seek confirmation of the Plan.

Dated: April 4, 2017                                            Respectfully submitted,

/s/ *Joel I. Sher*
Joel I. Sher, Bar No. 00719
Daniel J. Zeller, Bar No. 28107
SHAPIRO SHER GUINOT & SANDLER
250 W. Pratt Street, Suite 2000
Baltimore, Maryland 21201
Tel: 410-385-4277
Fax: 410-539-7611
Email: jis@shapirosher.com
             -and-
/s/ *Adam H. Friedman*
Adam H. Friedman, admitted *pro hac vice*
Thomas J. Fleming, admitted *pro hac vice*
Lauren B. Irby
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
Tel: 212-451-2216
Fax: 212-451-2222
Email: AFriedman@olshanlaw.com
*Counsel to the Debtors and Debtors in Possession*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of April, 2017, a copy of the *Plan Debtors' Omnibus Response to Objections to Approval of Disclosure Statement and Solicitation and Voting Procedures* was served by electronic mail and UPS overnight delivery on the parties listed below:

Hugh Bernstein, Esquire
Katherine A. Levin, Esquire
OFFICE OF THE U.S. TRUSTEE
101 West Lombard Street, Suite 2625
Baltimore, MD 21201
Hugh.M.Bernstein@usdoj.gov
Katherine.A.Levin@usdoj.gov

Jason W. Harbour, Esquire
Nathan Kramer, Esquire
Tyler P. Brown, Esquire
HUNTON & WILLIAMS, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
jharbour@hunton.com
nkramer@hunton.com
tpbrown@hunton.com

Thomas C. Goodhue, Esquire
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
tgoodhue@hunton.com

*Counsel for Creditors' Committee*

John W. Weiss, Esquire
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
John.weiss@alston.com

Jonathan T. Edwards, Esquire
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Jonathan.edwards@alston.com

Scott J. Pivnick, Esquire
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, N.W.
Washington, D.C. 20004
Scott.pivnick@alston.com

*Attorneys for Taberna Preferred Funding I, Ltd. and Taberna Preferred Funding II, Ltd. and TP Management LLC*

Susan R. Sherrill-Beard, Esquire
U.S. SECURITIES AND EXCHANGE COMMISSION
Office of Reorganization (Atlanta Regional Office)
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA 30326-1382
sherrill-beards@sec.gov
*Counsel for U.S. Securities and Exchange Commission*

**Interested Parties Requesting Notice**:

Michael S. Etkin, Esquire
Andrew Behlmann, Esquire
Keara M. Waldron, Esquire
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey 07068
metkin@lownstein.com
abehlmann@lownstein.com
kwaldron@lownestein.com

Joel P. Laitman, Esquire
Christopher Lometti, Esquire
Michael B. Eisenkraft, Esquire
Daniel B. Rehns, Esquire
Robert Dumas, Esquire
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
New York, New York 10005
jlaitman@cohenmilstein.com
colmetti@cohenmilstein.com
meisenkraft@cohenmilstein.com
drehns@cohenmilstein.com
rdumas@cohenmilstein.com

Alan M. Grochal, Esquire
TYDINGS & ROSENBERG LLP
100 East. Pratt Street, 26th Floor
Baltimore, Maryland 21201
agrochal@tydingslaw.com
*Counsel for Interested Party, New Jersey Carpenters Health Fund*

Kyle J. Moulding, Esquire
MCCABE, WEISBERG & CONWAY, LLC
312 Marshall Avenue, Suite 800
Laurel, Maryland 20707
bankruptcymd@mwc-law.com
*Counsel for Creditor U.S. Bank National Association, as Trustee for J.P. Morgan Mortgage Acquisition Trust 2006-HE3, Asset Backed Pass-Through Certificates, Series 2006-HE3*

Irving E. Walker, Esquire
Cole Schotz P.C
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
iwalker@coleschotz.com

Mark Tsukerman, Esquire
Cole Schotz P.C
1325 Avenue of the Americas
19th Floor
New York, NY 10019
mtsukerman@coleschotz.com

*Counsel for Oberon Securities, LLC*

Stephen A. Opler, Esquire
BARNES & THORNBURG LLP
Prominence in Buckhead
3475 Piedmont Road N.W., Suite 1700
Atlanta, Georgia 30305
Stephen.Opler@btlaw.com

Paul Laurin, Esquire
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
Paul.Laurin@btlaw.com

*Counsel for Butler America, LLC and Healthcare Staffing, Inc.*


Thomas C. Rice, Esquire
Alan C. Turner, Esquire
Christopher G. Lee, Esquire
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
trice@stblaw.com
aturner@stblaw.com
cglee@stblaw.com

*Attorneys for Deutsche Bank Securities Inc. and Its Affiliates, RBS Securities Inc. (f/k/a Greenwich Capital Markets. Inc.) and Its Affiliates and Wells Fargo Securities, LLC (f/k/a Wachovia Capital Markets, LLC) and Its Affiliates*


Martin H. Schreiber, II, Esquire
Law Office of Martin H. Schreiber II, LLC
3600 Clipper Mill Road, Suite 201
Baltimore, Maryland 21211
mhs@schreiber-law.com

James Gadsden, Esquire
Leonardo Trivigno, Esquire
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, New York
bankruptcy@clm.com

*Counsel for The Bank of New York Mellon Trust Company, N.A., not in its individual capacity but solely in its capacity as Trustee under certain Indentures*


/s/ *Joel I. Sher*
Joel I. Sher