# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re | Bankruptcy Case No.:   16-19745-DER, |
| | 16-19747-DER, |
| **NOVATION COMPANIES, INC.,** *et al* | 16-19748-DER, |
| | 16-19749-DER |
| Debtors. | Chapter 11 |
| | (Jointly Administered) |

**THE UNITED STATES TRUSTEE'S OBJECTION CONFIRMATION OF
JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF (i) NOVATION COMPANIES INC AND (ii) NOVASTAR MORTGAGE, LLC**

The United States Trustee for Region Four, which includes the District of
Maryland, Baltimore Division (the "United States Trustee"), pursuant to 11 U.S.C.
§ 1129, and in furtherance of the administrative responsibilities imposed pursuant to 28
U.S.C. § 586(a), hereby objects to confirmation of the "First Amended Joint Chapter 11
Plan of Reorganization of (i) Novation Companies, Inc. and (ii) Novastar Mortgage,
LLC" filed as document 396 in the above-captioned jointly administered bankruptcy
cases.

In support thereof, the United States Trustee represents and argues as follows:

## INTRODUCTION

In the First Amended Joint Chapter 11 Plan of Reorganization of (i) Novation
Companies, Inc. and (ii) Novastar Mortgage, LLC, (the "Plan"), Debtors Novation
Companies, Inc. and Novstar Mortgage, LLC (collectively "Novation") seek broad
immunity from liability for an assortment of non-debtors, such as Novation's officers and

directors, the Creditors' Committee, bankruptcy professionals, and the third-party seller of a business entity Novation intends to purchase. The Fourth Circuit has made clear that these types of immunity provisions are disfavored and are to be permitted only in the most extraordinary and unusual circumstances, none of which exist here. Here, the Plan is being used by the individuals responsible for authoring the Plan and others with influence in the authoring of the Plan to shield themselves from potential liability solely for their own personal benefit (an unabashedly improper use of such provisions and of a Chapter 11 Plan).

Novation cannot satisfy the Fourth Circuit test for allowing these types of immunity provisions in a Chapter 11 Plan. Apparently recognizing that, Novation seems to argue that it can circumvent that test by obtaining the consent of the parties whose rights are being impaired. First, Novation is incorrect that consent provides a stand-alone basis to permit the inclusion of these types of immunity provisions in a Chapter 11 Plan. Second, even if consent were sufficient to allow confirmation of a plan with such provisions, the procedure Novation proposes to "impute" alleged consent upon the affected parties is wholly inadequate to support any legitimate finding of the requisite consent. Indeed, the proposed procedure is designed more as a trap for the unwary than as a realistic means of demonstrating true consent. All of which again demonstrates that the true motivations at play are the personal protection of the Plan's individual authors.

For the reasons outlined above and described more fully below, the Court should deny confirmation of the Plan.

A.    **Background.**

Novation Companies, Inc., NovaStar Mortgage, LLC, NovaStar Mortgage Funding Corporation, and 2114 Central, LLC, each commenced a Chapter 11 bankruptcy case on July 20, 2016.   The cases of all four of these debtors are being jointly administered under *In re Novation Companies, Inc.*, Case No. 16-19745.  (*See* Doc 40.) On February 14, 2017, two of the debtors, Novation, filed a proposed plan of reorganization.  (*See* Docs. 302, 303).  After a number of objections to the original plan of reorganization were lodged, Novation revised the plan of reorganization and filed the Plan on April 4, 2017.

The basics of the Plan are rather simple.   Novation proposes to acquire an operating company known as Healthcare Staffing, Inc., from Butler America, LLC. ("Butler").    Using its cash on hand, as well as the income stream provided by Healthcare Staffing, Inc., Novation intends to repay portions of its debts in accordance with a schedule provided in the Plan.  (*See generally* Doc. 396.)

As part of the Plan, Novation requests that this Court grant broad immunity from liability for a variety of acts to a variety of persons.  Why such immunity is necessary to carry out the provisions of the Plan, or is an appropriate gift to be bestowed by this Court, is unclear and is not explained in the Plan or any related documents.

As described with greater specificity below, the proposed broad grants of immunity Novation requests are inappropriate and preclude confirmation of the Plan.

### B.    The Third-Party Releases and Exculpation Clause Are Inappropriate.

Sections 10.06(b) and 10.06(b)(I) of the Plan (the "Third-Party Releases") provide that Novation's creditors will release various non-debtors from any claims or causes of action those creditors may have against them.  (*See* Doc. 396 at 32-33.)  Section 10.07 of the Plan (the "Exculpation Provision") provides that Novation's attorneys and other professionals, the Creditors Committee, Butler, and various other non-debtors will be free from liability against both Novation and various non-debtors for various claims, including many that are also redundantly included in the Third-Party Releases.  (*See* Doc. 396 at 33-34.)

The primary difference between the Exculpation Provision and the Third-Party Releases are (a) the Exculpation Provision uses the language that its beneficiaries will have no liability to the claim-holders, as opposed to the claim-holders "release" the beneficiaries from liability,[1] (b) the Exculpation Provision protects a broader group of persons than the Third-Party Releases, and (c) the Exculpation Provision addresses a somewhat different, though clearly overlapping, scope of claims.  In essence, however, the Exculpation Provision is still a release of certain liabilities between non-debtors.

Unlike Novation, which made the disclosures and performed the obligations required by the Bankruptcy Code in exchange for its discharge, the non-debtor parties being released through the Third-Party Releases and Exculpation Clause have performed

---

[1] Although § 10.06(b)(I)) does provide that in addition to being "released" by the claim-holders, Butler shall have no liability to the claim-holders.

no such obligations nor made any disclosures.  They seek their discharge solely by virtue of their control over these bankruptcy proceedings.

Although there is no *per se* prohibition against a Chapter 11 plan imposing releases of non-debtors by other non-debtors, those releases are not appropriate in every case, or even in most cases.  *See In re A.H. Robins Co., Inc.*, 880 F.2d 694, 702 (4th Cir. 1989).  Such releases and exculpatory clauses are the exception not the rule, and their approval "should be granted cautiously and infrequently."  *Behrmann v. National Heritage Foundation*, 633 F.3d 704, 712 (4th Cir. 2011).  Indeed, the cases cited by the Fourth Circuit make clear that such releases and exculpatory clauses are "dramatic measure[s]," permissible only in "unique" and "extraordinary" circumstances.  *Id.* (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 413 F.3d 136, 142 (2d Cir. 2005); *Class 5 Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning, Corp.*), 280 F.3d 468, 657-58 (6th Cir. 2000); and *Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 212-13 (3d Cir. 2000)).

Here, the Third-Party Releases and the Exculpation Provision are improper and overly broad.

## 1.    The Misleading Opt-Out Clause.

As a threshold matter, in amending the original Plan, Novation added the following "Opt-Out" language to the Third-Party Releases:

> All creditors may elect to "opt out" of the following Third
> Party Releases, by checking the "opt out" box in the ballots

received.  If a creditor decides to opt out of the release on the ballot, such releases shall not be binding upon such creditors.

(*See* Doc. 396 at 32.)  The legal implication, if any, of this language is discussed, *infra*, at Section B.6.  However, preliminarily, it should be noted that this Opt-Out clause is misleading and inaccurate when it indicates that "all creditors" have the ability to elect to "opt out" of the Third-Party Releases.  In fact, a large group of creditors do not have the ability to opt out of the Third-Party Releases.  Specifically, those creditors whose claims are deemed "unimpaired" and, therefore, who do not get to vote to accept or reject the Plan cannot opt out.

On April 11, 2017, this Court entered an Order establishing the solicitation and voting procedures for the Plan.  (*See* Doc. 408.)  The Order makes clear that ballots will not be provided to the holders of any creditors in Class 1 (Priority Non-Tax Claims), or to any "holders of Claims ... who are unimpaired or unclassified under the Plan."  (*See* Doc. 408 at 2-3 and at ¶ 7.)  Since these creditors are not even receiving ballots, it is clear they cannot return a ballot opting out of the Third-Party Releases.  If the Court confirms this Plan with the Third-Party Releases, these Creditors (which include the United States Trustee) cannot opt out of the Third-Party Releases and, thus, would appear to be bound by them without their consent.[2]

Creditors holding Class 2 Claims are also precluded from electing to opt out.  In one part of the Plan, they are also identified as unimpaired and, thus, not entitled to vote.

---

[2] United States Trustee fees constitute "Unclassified Claims" under the Plan.  (*See* Doc. 396 at § 2.02.) Thus, the holder of such claims (*i.e.* the United States Trustee) is not entitled to receive or return a ballot and, thus, cannot opt out of the Third-Party Releases.  (*See* Doc. 408 at ¶ 7.)

(*See* Doc. 396 at § 2.03.)  However, if Novation elects, or if the Court determines there are insufficient funds to reinstate the Class 2 Note claims, Class 2 appears to become impaired.  (*See* Doc. 396 at § 3.02.b.2.B & C.)  Thus, Class 2 claimants will be provided a provisional ballot. (*See* Doc. 408 at 3.)  However, the provisional ballot approved by the Court does not give the Class 2 claimants the ability to opt out of the Third-Party Releases.  Instead, the provisional ballot falsely indicates that the Plan provides the Third-Party Releases do not apply to Class 2.  The provisional ballot falsely represents that Section 10.06(b) of the Plan includes the following language:

> Notwithstanding anything else in the Plan and notwithstanding the receipt of any distribution under the Plan, the Third Party Release shall not apply to or otherwise be binding upon the holders of Class 2 claims.

(*See* Doc. 408 at 16 of 36.)  That language is not included in Section 10.06(b) of the Plan or anywhere else in the Plan.  There is nothing in the Plan that provides the Third-Party Releases are inapplicable to Class 2.

As such, it is not accurate that "all creditors" can elect to opt out of the Third Party Releases.  Significant portions of the creditor body cannot do so.  In fact, the only creditors who appear to have the ability to opt out of the Third-Party Releases are Class 3 and 4 creditors.  Moreover, as discussed, *infra*, the ability to opt out, even where it exists, does not cure the fundamental impropriety of the Third-Party Releases (and does not even apply to the Exculpation Provision).[3]

---

[3] Holders of interests also cannot opt out of the Third-Party Releases, although because they are not "creditors" the Plan at least does not misleadingly represent that they can.

2.  **The Incomprehensible Ambiguity of the Term "Claim" in the Third-Party Releases and Exculpation Provisions Renders the Plan Unconfirmable.**

A second threshold matter is that the Third-Party Releases and Exculpation Provisions are rendered incomprehensibly ambiguous by the use of the defined term "claim" in ways that are inherently inconsistent with the definition. Thus, it is unclear whether the term "claim" in the Third-Party Releases is used in its defined sense or in its more generally accepted usage.

The term "Claim" is defined in the Plan as meaning "a 'claim' as defined in section 101(5) of the Bankruptcy Code against any one or more of the *Plan Debtors, or their property*, whether or not asserted." (*See* Doc. 396 at 7; emphasis added.) Of course, the entire point of the Third-Party Releases is the release of "claims" against persons other than the Plan Debtors. The Third-Party releases purport to release claims against Butler as well as all of the "Released Parties," which includes numerous persons other than the Plan Debtors, such as the Creditors' Committee, and all of its professionals and advisors. (*See* Doc. 396 at 32-33.) If the term "claim" as used in the Third-Party Releases is defined as claims only against the Plan Debtors, then the entire section is nonsensical and incomprehensible.

Similarly, although the Exculpation Provision does not use the term "claim," the injunction against any person pursuing anything prohibited by either the Third-Party Releases or the Exculpation Provision again uses the term "claim" in a manner entirely inconsistent with the Plan definition. (*See* Doc. 396 at 34, § 10.08.)

The use of the term "claim" in these provisions renders the Plan incomprehensibly ambiguous as to what is actually required or prohibited under the Plan and, thus, precludes confirmation.

### 3.    The Language of the Third Party Releases and Exculpation Provision

Leaving aside (i) the inaccuracy of the Third-Party Releases and Exculpation Provision and the ballots, and (ii) the ambiguity of the provisions, both of which are discussed above, and before addressing the legal insufficiency of the Third-Party Releases, here is what the Third-Party Releases and Exculpation Provision actually provide.  Starting with the Third-Party Releases:  If a number of the extraneous words are removed, the first part of the section essentially provides as follows:

> ... Each holder of a claim that does not vote to reject the Plan and any person who receives a distribution under the plan ... will be deemed to consensually forever release, waive and discharge all claims, ... debts, ... causes of action or liabilities ... then existing or thereafter arising ... based on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Plan Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement against any Released Party.

(*See* Doc. 396, § 10.06(b) at 32-33.)

Looking first at who is doing the releasing:  Leaving aside persons that may be able to opt out, the Third-Party Releases provide for two groups of persons granting releases, though this is misleading because the second group completely envelops the first.

The first group of persons who are releasing non-debtor entities consists of "[e]ach holder of a claim that does not vote to reject the plan."  (*See* Doc. 396 at 32.)  Although at first glance one might equate this group with claim-holders who vote to accept the Plan, it actually includes both claim-holders who vote to accept the Plan *and* claim-holders who do not return a ballot at all (including claim-holders who never actually receive a ballot due to no fault of their own).  It also includes any claim-holder who is not entitled to vote on the Plan or who by law is "deemed" to have accepted the Plan since none of those groups would be able to "vote to reject the plan."

The second group of persons who are releasing non-debtor entities consists of "any person who receives a distribution under the plan."  (*See* Doc. 396 at 32.)  Of course, even claim-holders who vote against the Plan may receive a distribution under the Plan.  Thus, to the extent the first category of releasing claim-holders excluded claim-holders who voted against the Plan, this second category brings those claim-holders right back into the group of releasing claim-holders.  Moreover, the Plan in this case proposes to repay 100% of the claims, so every claim-holder is receiving a distribution under the Plan.

In other words, the language about "[e]ach holder of a claim that does not vote to reject the Plan" is meaningless.  Every claim-holder, regardless of how it votes, is a releasing claim-holder because every claim-holder, regardless of how it votes, will receive a distribution under the Plan.

Looking next at who is being released:  Under the Third-Party Release Provision, every claim-holder is releasing Butler, as well as every "Released Party."  The "Released Parties" consist of:

> a)  All of the directors, officers, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons) of Novation Companies, Inc., and NovaStar Mortgage, LLC; and
>
> b)  The Creditors' Committee and all of its members, advisors and professionals (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons).

(*See* Doc. 396 at 8, ¶ 28 and at 13, ¶ 71.)

Finally, looking at the scope of the releases:  The Third-Party Releases provide that every claim-holder receiving a distribution releases all of the Released Parties from any type of claim based on any event, act or omission, from the beginning of time through the Effective Date that is "in any way relating to the Plan Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement." (*See* Doc. 396 at 32, § 10.06(b).)

By way of example, if a claim-holder who votes against the Plan but receives a distribution under the Plan was traveling to the Court to attend a hearing on the confirmation of the Plan and was hit by a car driven by one of Novation's attorneys, the claim-holder can have no claim for his or her injuries because that claim-holder has released that attorney.

The Third-Party Releases then provide that Butler (the entity selling Healthcare Staffing, Inc. to Novation) "shall have no liability and shall be released from all claims

- 11 -

asserted by Holders of Claims or Interests."  (*See* Doc. 396 at 32, § 10.06(b)(I).)  This release seemingly has no limitations in time or scope at all.  Rather, it takes two groups ((1) Butler, and (2) entities with claims against Novation), who have no connection to each other whatsoever, and provides that one of those groups (entities with claims against Novation) can never assert a claim against the other (Butler), regardless of the nature of the claim or the time the claim arose.[4]

By way of example, if years from now, an entity that currently happens to hold a claim against Novation enters into a contract with Butler in connection with a joint venture the two choose to pursue and both breach that contract causing each other significant harm, Butler could sue the claim-holder, but the claim-holder could not bring a counter-claim.

The Exculpation Provision is similar.  It provides (stripped of some extraneous language):

> None of the Plan Debtors, the Reorganized Plan Debtors, the Disbursing Agent, the Creditors Committee, Butler and any of their respective directors, officers, employees, members, attorneys, consultants, advisors, and agents ... shall have or incur any liability to any holder of any claim ... for any act or omission up to, and including the Effective Date in connection with, related to or arising out of the Plan, Debtors' Restructuring and the Chapter 11 Cases ... and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, gross negligence, or willful misconduct as determined by a final order of the bankruptcy court.

---

[4] Indeed, while the releases granted to the "Released Parties" in the Third-Party Releases at least exclude claims for gross negligence, fraud and willful misconduct from their scope, the releases applicable to Butler appear to have no limitations of any sort and would appear to release Butler even from liability for blatant criminal acts of violence against holders of claims against Novation.  It is also unclear exactly who is protected by this section of the Third-Party Releases as the term "Butler" is not defined.  Thus, it could presumably be interpreted to include Butler's employees, officers, directors, shareholders, representatives, agents, professionals, and independent contractors, etc.

Obviously, much of the releases in both provisions overlap. For example, both the Third-Party Releases and the Exculpation Provision eliminate liability of any member of the Creditors Committee to any claim-holder for ordinary negligence related to the Chapter 11 Cases. Similarly, both provisions protect Butler from any liability to a claim-holder for injuries resulting from ordinary negligence if related to the Plan.

### 4. Legal Standards for Third-Party Releases and Exculpation Clauses

In the Fourth Circuit, consideration of whether third-party releases or exculpation provisions are appropriate is dependent upon the facts and circumstances of each particular case. *Behrman v. National Heritage Foundation,* 663 F.3d 704, 711 (4th Cir. 2011). Approval of non-debtor releases and exculpatory clauses "should be granted cautiously and infrequently." *Id.*, at 712.

In *Behrmann,* the Court also made clear that in order to support these types of releases, the Bankruptcy Court must "find facts sufficient to support its legal conclusion that a particular debtor's circumstances entitle it to such relief." *Behrmann,* 663 F.3d at 706-07. Indeed, in *Behrmann*, the Fourth Circuit reversed the bankruptcy court's legal conclusions that the releases at issue were essential and that the bankruptcy case was unique because the Court failed to support its conclusions with concrete factual findings. *Id.* at 708, 712-13.

The *Behrmann* decision enumerates a number of factors that should be considered in determining whether the release provisions are appropriate in a particular case. These include, but are not limited to, the following:

(a)     There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(b)     The non-debtor has contributed substantial assets to the reorganization;

(c)     The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(d)     The impacted class, or classes, has overwhelmingly voted to accept the plan;

(e)     The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(f)     The plan provides an opportunity for those claimants who choose not to settle to recover in full; and

(g)     The bankruptcy court made a record of specific factual findings that support its conclusions.[5]

As of this time Novation has not yet presented any factual or evidentiary support for the proposed release and exculpation provisions.

---

[5] The Fourth Circuit compiled this non-exhaustive list from *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 649, 658 (6th Cir. 2002), and *In re Railworks Corp.*, 345 B.R. 529, 536 (Bankr. D. Md. 2006). The Fourth Circuit described these factors as "instructive." *Behrmann*, 663 F.3d at 712.

### 5.    Novation is Unlikely to be Able to Satisfy the *Behrmann* Test

#### a.    Is there an identity of interests between the debtor and the released parties?

This generally refers to an indemnification obligation between the parties. *Highbourne Foundation*, 760 F.3d at 348.  It is likely that there are some contractual indemnification obligations from Novation to its own officers and directors.  However, many of the other Released Parties would not be the beneficiary of any such contractual obligation.  For example, it is unlikely Novation has an indemnification agreement with its attorneys or shareholders.  It is even more unlikely that Novation has such an obligation to the Creditors Committee, or any of its members or attorneys.

#### b.    Did the Released Parties contribute substantial assets to the reorganization?

The simple answer here appears to be no.  Most of the Released Parties seem to be professionals (attorneys, investment bankers, etc.).  Moreover, the Plan does not call for any capital contributions or other contributions of assets by any of the Released Parties. Butler is, of course, providing Healthcare Staffing, Inc.  However, it is also receiving market value payment for that.

#### c.    Is the injunction essential to reorganization; does the reorganization hinge on the Debtor being free from indirect suits against parties who would have indemnity or contribution claims against the Debtor?

First, as described above, most of the Released Parties would not appear to be subject to indemnification or contribution claims.  Moreover, the scope of the Third-Party

- 15 -

Releases is far broader than causes of action where Novation would have indemnification or contribution obligations.

In any event, the reorganization does not appear to hinge on Novation being free from indirect suits. Many of the Released Parties (such as the Creditors Committee and its members) will have no involvement in Novation's day-to-day operations after the Effective Date. Moreover, the Plan itself seems to be based entirely upon Novation's own cash and the income stream provided by Healthcare Staffing, Inc. Resources diverted to defending any suits against the Released Parties should not impede the Plan in any manner.

Finally, Novation concedes in the Plan itself that the Third-Party Releases and the Exculpation Provision are not essential to the success of the Plan. Section 13.02 of the Plan, titled "Severability," provides:

> Should the Bankruptcy Court determine prior to entry of the Confirmation Order, that any provision of the Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which the provision is illegal. Unless otherwise determined by the Bankruptcy Court, such a determination shall in no way limit or affect the enforceability and operative effect of any other provisions of the Plan. The Plan Debtors reserve the right not to proceed with Confirmation and/or consummation of the Plan if any such ruling occurs.

(*See* Doc. 396 at 39.) The Fourth Circuit has held that including language that allows the Plan to remain enforceable even if a provision such as the Third-Party Releases or the Exculpation Provision is found unenforceable indicates that those provisions are not

essential to the reorganization. *Highbourne Foundation*, 760 F.3d at 349; *Behrmann*, 663 F.3d at 714. If the Third-Party Releases and Exculpation provisions were truly essential to the Plan, Novation could have and should have excluded them from the severability clause. *See id.*

> **d.    Has the impacted class voted overwhelmingly to accept the plan?**

At this point, it is not possible to determine whether the creditors will vote overwhelmingly to accept the Plan, though as described above, many of the impacted creditors are not permitted to vote. Moreover, even if they do overwhelmingly support the Plan, the Fourth Circuit has counselled that this factor is marginal at best. *Highbourne Foundation*, 760 F.3d at 350. "Creditor support does not make up for the fact that most of the other ... factors weigh against enforcing the Release Provision." *Id.*

> **e.    Does the Plan provide a mechanism to pay for all, or substantially all, of the class affected by the injunction?**

This factor does seem to weigh in Debtor's favor. The Plan does provide for 100% payment to all creditors. What is less clear is why such payment would or should result in the Third-Party Releases provided here. These releases go well beyond suits to recover payment on claims covered by the Plan.

> **f.    Does the plan provide an opportunity for those claimants who choose not to settle to recover in full?**

See above, § B.5.e.

### 6. Consent is Not a Stand-Alone Basis for Approving Third-Party Releases and Exculpation Clauses; Consent is Merely One of the *Behrmann* Factors.

One curious phrase in the Third-Party Releases is that any claim-holder subject to the Third-Party Releases (*i.e.* every claim-holder who receives a distribution) is "deemed to *consensually* forever release" the Released Parties. Additionally, as described above, the proposed ballot provides some creditors an "opt-out" option purportedly allowing some claim-holders to opt-out of the Third-Party Releases (though not the Exculpation Provision). (*See* Doc. 408 at at 14-26.)

Thus, with respect to the Third-Party Releases, Novation appears to rely upon the principles of *In re Neogenix Oncology, Inc.*, 508 B.R. 345 (Bankr. D. Md. 2014), to argue (a) that it need not comply with Fourth Circuit standards of *Behrmann* if it can demonstrate the parties against whom the Third-Party Release Provisions operate consent to the releases, and (b) that such consent can be demonstrated by merely failing to return a ballot or by failing to check the "opt-out" box on the ballot. Debtor is wrong on both counts.[6]

It is true that in *Neogenix* a Maryland Bankruptcy Court held that, where application of *Behrmann* "leads to the conclusion that the third party releases should not be approved, the court can nevertheless approve the releases with the consent of the releasing parties." *Neogenix*, 508 B.R. at 361. However, subsequent to *Neogenix*, the

---

[6] Neither the Plan nor the ballots provides for a method of opting out of the Exculpation Provision so it does not appear that Novation is attempting to have that approved by consent. Thus, it would appear that even Novation concedes the Exculpation Provision must meet the *Behrmann* standard. *See Behrmann*, 663 F.3d at 707 (defining the term "Release Provisions" as used in that opinion as including both the third-party releases and the exculpation clauses provided in the plan).

Fourth Circuit issued another opinion on third-party releases holding that consent is merely an element of one of the *Behrmann* factors. As the Fourth Circuit made clear, "[c]reditor support does not make up for the fact that most of the other [*Behrmann*] factors weigh against enforcing the Release Provisions." *National Heritage Foundation, Inc. v. Highbourne Foundation*, *supra*, 760 F.3d at 350.

In *Highbourne Foundation*, which was decided four months after *Neogenix*, the Fourth Circuit again considered the third-party releases it initially rejected for lack of evidentiary support in *Behrmann*. On remand, the Bankruptcy Court found that those releases were not permissible under the *Behrmann* standards and the debtor appealed. *Id.* at 346, 347.[7]

In affirming the Bankruptcy Court's rejection of the third-party releases, the Fourth Circuit considered the evidence presented on each of the *Behrmann* factors. The fourth factor required the debtor to demonstrate that "the class ... affected by the Release Provision overwhelmingly voted in favor of the Plan" – in other words, the class affected by the release consented to it. *Id.* at 350.

Because the class most affected by the releases in the *Highbourne Foundation* case was unimpaired, it was deemed to have voted in favor of the plan. The Fourth Circuit first questioned whether that legal fiction could substitute for actual consent to the plan and its release provisions. It determined, however, that the issue did not need to be resolved because, even if such a legal fiction were sufficient to demonstrate consent to

---

[7] The debtor appealed only the third-party releases. The Bankruptcy Court held that the exculpation provisions were appropriate and no one appealed that decision. *Id.* at 346 n.2.

the releases, it did not matter because that single factor "does not make up for the fact that most of the other ... factors weigh against enforcing the Release Provisions." *Id.* Thus, the Fourth Circuit made clear that, contrary to the ruling in *Neogenix*, consent is not a stand-alone basis for permitting third-party releases. Rather, consent is simply one factor among all of those that must be considered and a factor that is not sufficient to carry the day by itself.

In light of the Fourth Circuit's post-*Neogenix* ruling in *Highbourne Foundation* that consent alone is not sufficient to overcome a finding that the other *Behrmann* factors require denial of a particular third-party release, it is clear that Novation must show more than mere consent for the Court to approve the Third-Party Release Provisions.

### 7. Even if Consent Were a Stand-Alone Basis for Allowing the Third-Party Release Provisions, Debtor's Proposed "Opt-Out" Procedure is Insufficient to Demonstrate Consent.

Even assuming, *arguendo*, that consent to an otherwise improper third-party release is sufficient to allow the Court to confirm a Plan containing such releases, the mere failure to return a ballot or the failure to "opt out" of the release is insufficient to evidence such consent. The courts that have permitted third-party releases in a Chapter 11 plans based upon consent alone have varied on what is required to demonstrate consent. The Fourth Circuit has made clear that third-party releases are disfavored and are the exception not the rule. *Behrmann*, 663 F.3d at 712 (approval of third-party releases "should be granted cautiously and infrequently"). Such releases are a "dramatic measure" and to be approved only in "extraordinary cases." *Id.* Thus, the United States

Trustee submits that, if this Court were inclined to allow releases by consent alone, it should follow those courts that require strict evidence of actual consent by the affected parties. The Court should not permit mere failure to return a ballot or even the failure to "opt out" of the Third-Party Release Provisions as sufficient evidence to demonstrate consent to such an extraordinary remedy as the Third-Party Release Provisions. The United States Trustee submits that, if the Fourth Circuit were to reverse its *Highbourne Foundation* decision and allow third-party releases based on consent alone, it would require the affected parties to affirmatively "opt in" to the release.

In *In re Arrowmill Dev. Corp.*, 211 B.R. 497 (Bankr. D.N.J. 1997), one of the first cases to find consent as a stand-alone basis for allowing third-party releases, the Court held that merely failing to vote or even merely voting for the plan was insufficient to demonstrate consent. Rather the affected creditor must unambiguously manifest assent to the release:

> [I]t is not enough for a creditor to abstain from voting for a plan, or even to simply vote "yes" as to the plan. Rather the "validity of the release ... hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order. Thus, the court must ascertain whether the creditor unambiguously manifested assent to the release of the nondebtor from liability on its debt.
>
> In this case, creditor Delliturri did not vote for the plan and clearly did not manifest any assent to have his claim against John Caglianone released. Accordingly [the release provisions of the plan] do not release Mr. Caglianone from any liability he may have had to Mr. Delliturri.

*Arrowmill*, 211 B.R. at 507 (citations omitted).

Similarly, in *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011), the Court held that mere "opt out" procedures were insufficient, particularly with respect to creditors who did not return ballots:

> [T]he Court concludes that the opt out mechanism is not sufficient to support the third party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a third party release. Therefore, the Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases.

*Id.* at 355 (citations omitted).

Here, even leaving aside the provision that all claim-holders receiving a distribution under the Plan are deemed to consent to the release, Novation still seeks to bind creditors who (a) fail to return a ballot – regardless of reason – including creditors who may not have actually received their ballot, creditors who were out of town between receipt of the ballot and the voting deadline, or creditors whose ballot containing an "opt out" option may have been lost in the mail despite being mailed back, and (b) who voted against the Plan or abstained from voting if they did not also check the "opt out" box. None of these creditors has truly manifested an unambiguous consent to the Third-Party Release Provisions and none of these creditors should be found to have manifested such consent by the legal fiction of an "opt out" requirement. *In re Chassix Holdings, Inc.*, 553 B.R. 64, 78-82 (Bankr. S.D.N.Y. 2015).

The only reason to use an "opt out" procedure is the hope that more creditors will be caught asleep at the switch. *Id.* at 79-82. If a creditor is truly consenting to the Third-

Party Releases, then that creditor will have no problem "opting in" to the provision. Failure to opt out, however, does not necessarily manifest consent and the underlying purpose of using that particular procedure is not to demonstrate actual consent.[8] *Id.*

Debtor's proposal turns the primary directive of *Behrmann* on its head.   As discussed above, *Behrmann* makes clear that third-party releases are to be approved only in extraordinary circumstances.   Such releases are the exception, not the rule.   If, however, the Court permits such releases by consent alone, and particularly by consent manifested merely by the failure to opt out, those provisions will become the norm and will be included in every Chapter 11 Plan.   Indeed, if the Court allows confirmation of plans containing such provisions based solely on the failure to affirmatively "opt out," there is no reason for a debtor to ever leave such a provision out of the plan since that debtor is likely to get at least a few inattentive creditors to inadvertently "consent" to the releases.

### 8.    The Exculpation Provisions Fail to Meet the *Behrmann* Standards, are Impermissibly Broad and Lack the Required Exception for Court Approved Suits.

Unlike the Third-Party Releases, Novation did not include a means to opt out of the Exculpation Provision.   Thus, it appears that Novation is not attempting to use consent to avoid the *Behrmann* standards for the Exculpation Provision.   In *Behrmann*,

---

[8] The United States Trustee recognizes that some courts have allowed very release-favoring provisions to constitute evidence of consent.  *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (approving releases against any creditor that abstained from voting or that voted to reject the plan but failed to opt out of the releases).  The United States Trustee submits that following such cases would be inconsistent with *Behrmann* and *Highbourne Foundation*.

the Fourth Circuit was very clear that the standards it set forth apply to both third-party releases and exculpation provisions.  At page 707 of the *Behrmann* Opinion, the Fourth Circuit defined the term "Release Provisions" as including the various "release, injunction and *exculpation* provisions" included in the plan before it.  *Behrmann*, 663 F.3d at 707 (emphasis added).  It then held that the factors it set forth were the applicable test for considering all of the "Release Provisions."  *Id.* at 712.  Finally, the Fourth Circuit reversed and remanded the bankruptcy court's decision in *Behrmann,* holding, "the present record does not allow us to assess ... whether NHF's circumstances entitle it to the benefit of the Release Provisions."  *Id.* at 713.

Thus, even if consent evidenced by the failure to return a ballot on which an "opt out" box is checked were sufficient to allow confirmation of the Plan with Third-Party Release Provisions that fail to meet the *Behrmann* test, it would not be sufficient to allow confirmation of the Plan here unless the Exculpation Provision still meets the *Behrmann* test.

In addition to the fact that entitlement to the Exculpation Provision has not been demonstrated as required by *Behrmann*, the Exculpation Provision is impermissibly broad on its face because, *inter alia*, (i) it is too broad with respect to who is exculpated (for example, and as described in more detail below, its exculpates creditors and estate professionals), and (ii) it does not provide an exception allowing for suits against the released parties where prior court approval is obtained.

In *In re National Heritage Foundation, Inc.*, 478 B.R. 216 (Bankr. E.D. Va. 2012), *aff'd, National Heritage Foundation v. Highbourne Foundation*, 760 F.3d 344 (4th Cir.

2014),[9] the Bankruptcy Court addressed exculpation clauses such as the one in this Plan. There, the Court recognized that separate and apart from the *Behrmann* requirements, exculpation provisions are permissible only if they are "properly limited and not over broad." *Id.* at 234. In order to avoid over-breadth, exculpation clauses must be:

(a)    narrowly tailored to meet the needs of the bankruptcy estate;

(b)    limited to parties who have performed necessary and valuable duties in connection with the case (excluding estate professionals);

(c)    limited to acts and omissions taken in connection with the bankruptcy case; and

(d)    must not purport to release any pre-petition claims;

*Id.* The Exculpation Provision is not narrowly tailored to meet the needs of the bankruptcy estate.

For example, estate professionals are included in the Exculpation Provisions. (*See* Plan, Doc. 15, at 7, ¶ 1.68). It is improper to include estate professionals among the persons protected by an exculpation clause because, *inter alia*, doing so allows what is prohibited in connection with their employment.[10]

In *In re Baltimore Emergency Serv. II*, LLC, 291 B.R. 382 (Bankr. D. Md. 2003), Judge Derby discussed the parameters of a permissible indemnification provision in a professional's initial employment contract. Judge Derby explained that "it may be reasonable to indemnify [an estate professional] from something commonly described as

---

[9] This is the bankruptcy court's opinion on the remand of *Behrmann* that was subsequently appealed in *Highbourne Foundation.*

[10] The exculpation provisions approved in *In re National Heritage Foundation, Inc.* (the ruling after the first remand by the Fourth Circuit) did not exculpate estate professionals. As the court noted, in response to the United States Trustee's objection, estate professionals were removed from the exculpation clause in that case. *National Heritage Foundation*, 478 B.R. at 233-34

ordinary negligence, without tolerating actions akin to gross negligence." *Id.* at 384. Thus, Judge Derby ruled that the reasonableness of an indemnification clause should be judged "by principles akin to the business judgment rule." *Id.*

In so recognizing, Judge Derby set out four overarching principles to which a permissible indemnification clause must adhere:

> 1.    The professional must remain liable for breaches of the duty of loyalty including conflicts of interest and non-disinterestedness;
>
> 2.    The professional must remain liable for breaches of the duty of care;
>
> 3.    The professional cannot be indemnified for contractual disputes with the debtor, including disputes over the services agreed to in the employment contract of which approval is being sought; and
>
> 4.    The gross-negligence exclusion from indemnification cannot be limited to injuries or damages from acts that are "solely" or "primarily" caused by the advisor's gross-negligence.

*Id.* at 384-385.

The Exculpation Provision here purports to preclude liability on the back end for the very things Judge Derby held were improper to exclude on the front end.   For instance, the Exculpation Provision does not exclude from its reach actions against estate professionals for breaches of the duty of loyalty, conflicts of interest or non-disinterestedness, or actions for breach of contract.

It is entirely improper to include estate professionals in any exculpation clause. These professionals hold themselves out as experts and are paid handsomely for their services.   The trade-off is that they should be responsible for their wrongful acts. However, to the extent the Court is inclined to allow professionals some level of

exculpation, it certainly should not include protection from the precise types of suits the Court has held professionals cannot be indemnified against in their initial employment contract.  Otherwise, the Court is simply allowing the professionals to obtain at the end of the case what was precluded at the beginning.

The Exculpation Provision also releases some creditors from liability, so long as those creditors are members of the Creditors Committee.  The United States Trustee appoints members of the Creditors Committee to adequately represent the various types of creditors in the case, not so they can bootstrap their membership into undeserved releases of liability by parties who did nothing but happen to be creditors of the same debtor who were not selected to serve on the Creditors Committee.

Finally, to be permissible, an exculpation clause must contain a "gatekeeper function" by which the Court may, "in its discretion, permit an action to go forward against the exculpated parties."  *National Heritage*, 478 B.R. at 234.  The Plan here does not provide for such a "gatekeeper function" by the Court.

## CONCLUSION

For the reasons stated above, the Court should not confirm the Plan.

Respectfully submitted

Dated: April 24, 2017

JUDY A. ROBBINS
United States Trustee, Region Four

By: /s/ *Hugh M. Bernstein*
Hugh M. Bernstein (Fed. Bar No. 23489)
United States Department of Justice
101 W. Lombard Street, Suite 2650
Baltimore, MD 21201
(410) 962-4300
hugh.m.bernstein@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 24th day of April, 2017, a copy of the foregoing document was filed electronically in the United States Bankruptcy Court for the District of Maryland and that, according to the Court's CM/ECF system, the following parties were served electronically as a result:


- Debra L. Felder    dfelder@orrick.com, dfullem@orrick.com
- Edmund A. (UST) Goldberg    Edmund.A.Goldberg@usdoj.gov, danielle.brown@usdoj.gov
- Thomas Clinton Goodhue    tgoodhue@hunton.com, tcanada@hunton.com,jkelley@hunton.com
- Alan M. Grochal    agrochal@tydingslaw.com, bcammarata@tydingslaw.com;jdunsmore@tydingslaw.com
- Katherine A. (UST) Levin    Katherine.A.Levin@usdoj.gov, brenda.b.wilmore@usdoj.gov
- Kyle J. Moulding    bankruptcymd@mwc-law.com
- Scott Jeffrey Pivnick    scott.pivnick@alston.com
- Joel I. Sher    jis@shapirosher.com, ejd@shapirosher.com;msw@shapirosher.com;jlj@shapirosher.com
- Susan R. Sherrill-Beard    sherrill-beards@sec.gov, atlreorg@sec.gov;baddleyd@sec.gov
- Lisa Yonka Stevens    lstevens@yvslaw.com, pgomez@yvslaw.com;wscalley@yvslaw.com;yvslawcmecf@gmail.com
- Matthew G. Summers    summersm@ballardspahr.com, buhrmank@ballardspahr.com;kittingerj@ballardspahr.com;pellegrinoa@ballardspahr.com
- US Trustee - Baltimore    USTPRegion04.BA.ECF@USDOJ.GOV
- Irving Edward Walker    iwalker@coleschotz.com, jdonaghy@coleschotz.com;pratkowiak@coleschotz.com
- Daniel Joseph Zeller    djz@shapirosher.com, ejd@shapirosher.com;jlj@shapirosher.com


I HEREBY FURTHER CERTIFY that on this 21st day of March 2017, a copy of the foregoing was mailed by first-class mail, postage prepaid, to:

Tyler P. Brown
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

- 29 -

Deloitte Tax, LLP
c/o Stephen Tarrant
7900 Tysons One Place
Suite 800
McLean, VA 22102

Steven J. Fink
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street New York, New York
New York, NY 10019

Thomas J. Fleming
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019

Adam H. Friedman
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019

Jason W. Harbour
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Husch Blackwell LLP
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105

Nathan Kramer
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Paul Laurin
2029 Century Park East
Suite 300
Los Angeles, CA 90067

Paul J. Laurin
Barnes & Thornburg, LLP
2029 Century Park East
Suite 300
Los Angeles, CA 90067

Richard Lehman
Boulay PLLP
7500 Flying Cloud Drive
Suite 800
Minneapolis, MN 55344

Martin Loring
HUSCH BLACKWELL LLP
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105-3433

National Economic Research Associates, Inc
Faten Sabry, Managing Director
NERA Economic Consulting
1166 Avenue of the Americas, 29th Floor
New York, NY 10036

Olshan Frome Wolosky
1325 Avenue of the Americas
New York, NY 10019

Paul W. Smith
Holland & Knight LLP
111 Congress Ave.
Suite 540
Austin, TX 78701

Evan Tomaskovic
Carl Marks Advisory Group LLC
900 Third Avenue
New York, NY 10022

Mark T. Tsukerman
1325 Avenue of the Americas
19th Floor
New York, NY 10017

John W. Weiss
90 Park Avenue
New York, NY 10016

                                        /s/ Hugh M. Bernstein
                                        Hugh M. Bernstein